UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - -- - - - - - - - - - - - -x
:
GLEN CRAIG                                                              :
                                                                        :
                            *Plaintiff*,                : 16-cv-05439 (JPO)
                                                                        :
                                                                        :
        vs.                                                             :
                                                                        :
                                                                        :
UNIVERSAL MUSIC GROUP, INC.,                                            :
KINGSID VENTURES, LTD., and ESTATE OF                                   :
RILEY B. KING,                                                          :
                                                                        :
                            *Defendants*.                :
-- - - - - - - - - -- - - - - - - - - - - - -- - - - - - - - - - - - - - - - - - - - - -x

## DECLARATION OF GLEN CRAIG

I, Glen Craig, hereby declare, under the penalty of perjury as follows:

1. I am the Plaintiff in this litigation.

2. I submit this declaration in support of Plaintiff's Motion to Disqualify Defendants' Expert Witness Jeffrey Sedlik.

3. I was referred to Mr. Sedlik by a common professional connection at American Society for Media Photographers, Tom Kennedy.  I shared the contact information with my attorney.  My attorney said he recognized the name from a recent case.

4. I initially contacted Mr. Sedlik in order to set up a telephone conference with my attorney.  Both I and my attorney were eager to retain Mr. Sedlik as an expert witness in this case.

5. While my attorney and Mr. Sedlik were working out a convenient time for all parties to speak on the phone, I contacted Mr. Sedlik on or around September 19, 2016 without my counsel.  I had two extensive telephone conferences with Mr. Sedlik, without my counsel's knowledge.  In addition to these two conversations, we also corresponded via email and exchanged some documents. I forwarded emails between me and Mr. Sedlik to my attorneys in preparation of this motion. True and correct copies of forwarded emails between myself and Mr. Sedlik is attached hereto as Exhibit A to Declaration of Richard Liebowitz.

6. During the two times I spoke to Mr. Sedlik without my counsel, we discussed about all aspects of the case. I thought he was trustworthy because he was referred by a professional acquaintance and was affiliated with ASMP, an organization devoted to protecting the rights of photographers. I also believed he was well-regarded since my attorney recognized his name. He, on the other hand, never mentioned being a professional photographer, but advertised himself as a professor.

7. During our two extensive telephone conferences, Mr. Sedlik was eager to learn more about the case. I told him everything about how I ended up taking the photographs, who else was there, who else was around in those days, my relationship to Changes Magazine that publishes other photographs that were taken during that session. I related the whole narrative of what happened and gave him the theory of the case. He asked probing questions about my employment, commissions, licensing of the images, UMG's exploitation as well as many other questions that would, presumably, help him assess the damages in this case. I was pleased that he was so inquisitive and eagerly volunteered a lot of important information about the case.

8. In return, Mr. Sedlik made a preliminary assessment of damages that far exceeded our previous assessment. He explained his methodology, that presumably he used in a recent case, that exponentially grew the potential damages in this case. I explained how we measured damages up to that point, and he offered to speak with my attorneys about his method of calculating the same.

9. Mr. Sedlik held himself out as a member of the team. I believed we were having productive conversations, of many to follow. I thought he was giving me this detailed assessment of damages as a preview of his expert opinion.

10. Having established a good relationship during our first telephone conference, Mr. Sedlik also expressed concern about my representation during our second private conversation. I was a bit taken aback but heard him out, because we were having a frank discussion about the legal strategies employed in this case. Mr. Sedlik would later send me a chart of the many case my current attorney had filed. First, Mr. Sedlik offered his legal services and said that I do not need an attorney to get compensation for my work. He offered to write cease and desist letters on my behalf and to collect compensation – all for a small fee. When I seemed reluctant, he then suggested that I contact an attorney that he frequently works with, Jan Berlage. He forwarded Mr. Berlage's contact information. He sent my contact information to Jan and set up a meeting at an alumni club on Vanderbilt Ave in New York, NY.

11. I attended the meeting with Jan Berlage and found that Jan was already duly apprised of all facts surrounding my case. He knew things beyond the public record. He knew things that I revealed to Mr. Sedlik shortly before. I did not wish to switch attorneys and found

    it peculiar that Mr. Sedlik would divulge so much confidential information to another attorney.

12. In a few days, I participated in the telephone conference with my attorney and Mr. Sedlik regarding this case.  Throughout the conference, Mr. Sedlik would easily recall information I gave him in our previous two private conversations.  I was impressed with his attention to detail.  He seemed to care about the issues in the case and had a facility with facts as well as the law.   I was pleased that we did not have to repeat ourselves and that he was already apprised of many relevant facts as well as concerns.

13. In our joint telephone conference, Mr. Sedlik continued to be supportive of our case.  He explained his calculations of damages and reiterated his willingness to be a part of the team.  He did not express any concern about my attorney on our joint conference.  Instead, he seemed energetic and eager to work together.

14. Throughout our joint telephone conference Mr. Sedlik discussed a great many things that we broached in our two private conversations.   My attorney and Mr. Sedlik touched on issues like work-for-hire, statute of limitations, the availability of damages and the extent of the exploitation.  I was not always familiar with the legal concepts they discussed but Mr. Sedlik already knew many relevant facts and my attorney was surprised by how much.

15. In May of 2017, when the case has advanced to the next phase, my attorney contacted Mr. Sedlik so that he could start putting together a preliminary expert report based on his earlier assessment.

16. My attorney said that we need to check for conflicts, but that Mr. Sedlik revealed that he has no conflicts with UMG, and even specified that he was then being retained by another plaintiff in a case against UMG.

17. My attorney did express some concern about whether Mr. Sedlik could be retained in this case because he has an existing business relationship with the Estate of B.B. King.

18. Despite my attorney's misgivings, Mr. Sedlik did not definitively say that he can't be retained in this case.   He even asked about a new deadline for submitting an expert report.   He was still mulling over meeting the May 29, 2017 deadline.

19. My attorney even spoke to Mr. Sedlik following this exchange about the formal retainer.

20. On October 13, 2017 my attorney said that the Defendants served expert disclosures, naming Mr. Sedlik as their expert witness. I read his export report which did not disclose any of our interactions, communications, nor the critical confidential information he received as a result.

21. I was upset and felt betrayed by a person I trusted. I told my attorney that this is wrong and that I wanted to challenge this expert witness.

22. My attorney then asked me to remember everything I talked about with Mr. Sedlik, especially during our two private conversations. I tried my best to recall the topics of those conversations. I also forwarded all my emails between myself and Mr. Sedlik, regardless of whether my attorney was copied on them, to my attorneys.

23. There are things that I know that I discussed that are relevant and confidential, like how I got assigned to cover the B.B. King event, who took the photographs and gave it to UMG, how many exploitations were found during our investigation. There are also things I don't remember that I said that could have been confidential and I can't speculate as to those topics. But there are also things I have said that I might not know are confidential and relevant. As a lay person, it difficult to ascertain what is confidential and what is not. I expected that both of our conversations would be confidential because we both revealed private matters that we would not want shared with the world. For example, he specifically asked me not to share or forward the list of cases my attorney had filed and that he recommended another attorney. We had a confidential relationship and any reasonable person would say the same.

Executed this 1st day of December, 2017

_____
Glen Craig
*Plaintiff*