# Slotnick Declaration Ex. F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GLEN CRAIG,

       Plaintiff,

    v.

UMG RECORDINGS, INC., KINGSID
VENTURES, LTD., and ESTATE OF RILEY B.
KING,

      Defendants.

No. 16 Civ. 5439 (JPO)

**PRELIMINARY EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK**

SUBMITTED October 13, 2017

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

I have been engaged by defendants ("Defendants") UMG Recordings, Inc. ("UMG"), KingSid Ventures, Ltd. ("KingSid") and Estate of Riley B. King ("Estate") in the above-captioned matter brought by Plaintiff Glen Craig ("Craig") to provide expert testimony as set forth below.

I have been asked by Defendants to provide expert opinions on damages and other issues related to Craig's claims of copyright infringement and copyright violations by Defendants in this matter. My opinions are based in part on more than 25 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries. I have been an internationally recognized advertising photographer for more than 30 years, working with many clients, observing and interacting with large numbers of professional photographers, advertising agencies, design firms, corporate clients, model agencies, stock agencies, product manufacturers, and others in the United States and abroad. I have served as Project Manager in projects involving development, operation, and maintenance of websites, web applications, and other applications. I have also owned and operated a publishing company, producing and selling photography-related products for more than 20 years.

In addition to my personal knowledge, my opinions are based on an independent examination of documents and materials produced in this matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Preliminary Expert Report ("Report") has been prepared in connection with the above-referenced matter. Section VI of the Report outlines my opinions.

If called upon as a witness in this matter, I could and would make the following statements of my own personal knowledge and experience.

1

## I.     QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock photo agencies and all other image licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. I also serve as a founding member of the PLUS Board of Directors, and was personally responsible for the initial development of the core concept that ultimately resulted in the formation of the PLUS Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers in the United States, for which I have also served as Chief National Advisor on Licensing and Copyright. In that position, I have advised the APA on current issues related to copyright, photography, advertising, and modeling business practices, standards, contracts and releases. I have represented the organization in discussions with the United States Copyright Office on matters related to photography and copyright, and also interacted with trade organizations in photography and other industries, discussing, developing, and maintaining industry standards for image licensing, modeling, and other matters related to the business of photography. I have also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA.

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC") and have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"). I serve as an "Invited Expert" on the Permissions and Obligations

Working Group of the World Wide Web Consortium ("W3C"). I am also a Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, focusing on the integration of technology systems to efficiently manage and trade intellectual property rights online for any and all types of usage, across any and all types of content, in any and all media. I also currently serve as a Founding Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. I also serve on the copyright speakers bureau of the American Society of Media Photographers ("ASMP"), and authored the "Photography Licensing" chapter of "Professional Business Practices in Photography," published by that organization.

In addition to my expertise in traditional photographic methods and analysis, I have been creating and analyzing digital images since the dawn of digital photography. I serve on the Prerelease Team for Adobe Systems, and also served on the Adobe Photographers' Council, as one of 12 photographers selected by Adobe to represent the interests of all photographers worldwide, advising Adobe on matters related to professional photography, digital photographic techniques, copyright, image licensing, and software. I also served in a similar capacity for other organizations.

I sit on the Intellectual Property Committee of Art Center College of Design ("Art Center"), where I am an active faculty member, holding the title of Professor of Photography. At Art Center, I teach advanced courses on legal, business, photographic production, lighting, and technical issues related to photography, digital photography techniques, and advertising, including instruction on copyright law, copyright registration, copyright licensing, and photography licensing contract interpretation. I taught advanced courses on lighting people and all manner of products, including automobiles.

After more than 30 years as an award-winning commercial photographer and the President of Jeff Sedlik Photography, I continue to operate an advertising and

entertainment photography production company in California, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others. In particular, I have significant experience in creating and licensing photography in the music industry, and have lectured on this topic at the Art Center College of Design, Stanford Law School, and at conferences such as the National Association of Recording Merchandisers (NARM) Conference, in a seminar entitled "Managing Photographic and Video Archival Assets."

I provide forensic image analysis and consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling. In addition, I am the President of Mason Editions, a publishing company engaged in producing and distributing fine reproductions of photographs.

In recognition of my expertise and my contributions to the photography and advertising industries, I received the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, and the 2007 APA Industry Advocacy Award.  In 2008, I was awarded a Master's Degree from the Brooks Institute of Photography, recognizing lifetime achievement and mastery of the the craft and industry of photography.

I am frequent speaker at copyright events hosted by the US Copyright Office, the US Patent Office, and the US Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a US Copyright Office sponsored Copyright Practicum. I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing insights on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker on copyright law for many institutions and organizations, including Duke University Law School, New York University Law School, and the Copyright Society of the United States. In

addition, I have testified before Congress on copyright law, and worked closely with legislators, stakeholder groups, and the United States Copyright Office on legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising copyright legislation. I am an active participant in the Copyright Alliance, serving on both the Creators Advisory Board and the Academic Advisory Board.

I have testified as an expert witness in litigation involving photography, illustration, product design, copyright, metadata, advertising, branding, graphic design, right of publicity/privacy, breach of contract, criminal matters, and related topics. The cases in which I have testified at trial or by deposition within the last four years are:

Andrew Paul Leonard v. Stemtech Health Sciences, Inc.
US District Court, District of Delaware
Case # 08-67-LPS-CJB Consolidated

G. Mitchell Davis v Tampa Bay Arena, Ltd
US District Court, Middle District of Florida, Tampa Division
Case # 8:12-cv-60-T-30MAP

Nouveau Model & Talent Management v JAKKS Pacific, Inc.
Superior Court of the State of California, County of Los Angeles
Case # SC111112

American Apparel v Alyssa Ferguson
JAMS Consolidated Arbitration
JAMS Reference #1220042480

eVox Productions, LLC v Gabriels Technology Solutions, Inc.
US District Court, Central District of California, Southern Division
Case # CV 13-00846-CJC(RZx)

Tiffany Laurence v Beats Electronics, LLC
Superior Court for the State of California, County of Los Angeles
Case # BC 510035

Steven M. Gardner v Cafepress Inc.
United States District Court, Southern District of California
Case # 13CV1108 GPC JMA

Joseph Tomelleri v Zazzle, Inc.
United States District Court, District of Kansas
Case # 13-CV-2576 EFM/DJM

Stephen Kennedy v Gish Sherwood & Friends, Inc.
United States District Court, Eastern District of Missouri, Eastern Division
Case # 4:13-cv-02236-JAR

In Re: Multiple Listing Service Real Estate Photo Litigation
United States District Court, Southern District of California
Case # 3:14-cv-01158-BAS-JLB

Brian Harness v Forever 21 Retail, Inc.
United States District Court, Northern District of Texas, Dallas Division
Civil Action # 3:14-cv-01316

EVOX Productions, LLC v California Rent-A-Car, Inc.
United States District Court, Central District of California, Western Division
Case # 15-CV-08046 MWF (RAOx)

Timed Out, LLC v 13359 Corp
Superior Court of the State of California, County of Los Angeles
Case # BC583739

Jerome Turner v Metals USA, Inc.

24th Judicial District Court for the Parish of Jefferson, State of Louisiana
Case # 751-431

TC Reiner v Ryon Nishimori et al.
United States District Court, Middle District of Tennessee, Nashville Division
Case # 3:15-cv-00241

David McNeese v Access Midstream Partners, L.P.
United States District Court, Western District of Oklahoma
Case # CIV-14-503-D

VHT, Inc. v Zillow Group, Inc.
United States District Court, Western District of Washington, at Seattle
Case # 2:15-cv-1096-JLR

EVOX Productions, LLC v Kayak Software Corporation
United States District Court, Central District of California, Western Division
Case # CV15-05053-PSG (AGR)

Under-A-Foot Plant, Co. v Exterior Design, Inc.
United States District Court, District of Maryland
Civil # BPG-15-871

Sustainable Sourcing, LLC v Brandstorm, Inc. et al.
United States District Court, District of Massachusetts, Western Division
Case # 12-CV-30093

Dana Ruth Lixenberg v Bioworld Merchandising, Inc.; et al.
United States District Court, Central District of California
Case # 2:15-cv-07242 MWF-MRW

Capri Krakana, Johan Krakana
Arizona Superior Court, Maricopa County

Case #JSS18301

Osram Sylvania v Photographic Illustrator Corporation v Brooks Electrical et al.
American Arbitration Association
Case # 01-16-0000-2652

Capri Krakana D.O.B. 12/18/2009, Johan Krakana D.O.B. 09/12/2007
Unites States Superior Court of the State of Arizona, in and for the County of
Maricopa
Case # FC2016-050246

Nelson Araujo, et al v City of San Jacinto et al.
Superior Court of California, Riverside County
Case # RIC1411590

Laspata Decaro Studio Corporation v Rimowa GmbH et al.
United States District Court, Southern District of New York
Case # 16-cv-00934-LGS

My publication list is included in my curriculum vitae, a copy of which is attached to
the Report as Exhibit A.

## II.    COMPENSATION

My work on this matter is being billed at my standard rate of $650.00 per hour. My
compensation is not contingent upon, dependent upon, or related in any way to the
outcome of this matter.

## III.    MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on
to provide, I have considered the materials listed in Exhibit B.

## IV.    ASSUMPTIONS

Retaining counsel instructed that I rely on the following assumptions in forming my opinions in this matter. As the scope of my engagement does not include verification of the accuracy of the assumptions, my reliance on the assumption/s does not reflect a lack of rigor in the formation of my opinions. If any assumption is determined to be incorrect, I may revise my opinions. If later asked to verify the accuracy of the assumptions, I will do so where possible. I have been instructed to:

A. Assume as true, all factual allegations in the Complaint[1] regarding the creation of the photographs at issue ("the Photographs").[2]

B. Assume that due to the statute of limitations, actual damages apply only to usages occurring during the three-year period prior to the date of the Complaint, commencing June 2013.

C. Assume that UMG products manufactured in the USA were neither sold nor distributed to recipients outside of the USA.

D. Assume that the the USA is the primary distribution audience for UMG digital downloadable products in/on which the Photographs were reproduced.

E. Assume that products manufactured or released by entities located outside of the USA are excluded from calculations of actual damages and profits.

F. Assume that the document entitled "UMG Usage Data," Exhibit C, supplied by retaining counsel, is a complete listing of all infringing usages relevant to this matter, and that other alleged infringements identified in the Complaint are to be excluded from calculations of actual damages and profits.

G. Assume that information provided by retaining counsel in "UMG Usage Data," Exhibit C, including but not limited to quantities, dates, and UPC codes, is correct.

H. Assume that product releases in or on which none of the Photographs appeared on the front cover of the packaging are to be excluded from calculations of actual damages and profits, in relation to digital downloads.

---

[1] Complaint, Glen Craig v Universal Music Group, Inc., KingSid Ventures, LTD., and Estate of Riley B. King, July 7, 2016 ("Complaint")
[2] See "The Photographs," Section VI(C).

I. Assume that for the purpose of calculating actual damages and profits, all releases sharing a common UPC code are a single release.

J. Assume that neither the Estate nor KingSid infringed on Craig's copyrights within the statute of limitations period.

K. Assume that neither the Estate nor Kingsid committed any violation/s of the DMCA in connection with the Photographs, within the statute of limitations period.

## V.    BACKGROUND

Glen Craig is a photographer based in Astoria, New York.[3]

UMG Recordings, Inc. is a wholly owned subsidiary of Universal Music Group, Inc., a music company engaged in recorded music, music publishing, merchandising, and audiovisual content.[4] UMG is a Delaware corporation.[5]

KingSid Ventures, Ltd. is a Delaware corporation[6] originally formed by Sidney Seidenberg and BB King.

Estate of Riley B. King is the estate of the deceased musician BB King.[7]

As alleged in the Complaint, in the period 1969 to 1970, Craig captured photographs of BB King at one or more concert events.[8] Craig further alleges that commencing in 1971 and continuing to present, certain of his photographs of BB King have been reproduced in and on packaging for products manufactured, distributed, and sold by UMG, its predecessors and affiliates. Craig has identified a total of three of such photographs.[9] Craig alleges that all such usages were made by UMG, and its predecessors and affiliates, without license from Craig, and without

---

[3] Complaint, 5
[4] http://www.universalmusic.com/company/
[5] Complaint, 6
[6] Complaint, 7
[7] Complaint, 8
[8] Deposition of Glen Craig, March 17, 2017 ("Craig Depo") 153:15
[9]  Complaint, 9. Also see "The Photographs," Section  VI (C)

Craig's knowledge.[10] Craig claims to have first discovered unlicensed usages in 2014.[11] Craig contacted Defendants to discuss the usages and to seek additional information. The parties were unable to resolve the matter, and Craig filed a complaint on July 7, 2016, alleging copyright infringement and copyright violations for removal of copyright management information.[12]

## VI. DISCUSSION

### A.    General Background Regarding Image Copyright Licensing

In the image licensing industries, clients seeking to make use of images may either commission new images ("assignment images"), or acquire rights to existing images ("stock images").

1. Assignment Images

Artists create assignment images (also known as "commissioned images") when clients contract with artists or their agents to create new works. Artists typically retain copyright ownership of the images that they create. Artists often grant limited licenses to their clients in exchange for a license fee based in great measure on the scope of the rights granted. Artists often later engage in licensing such images to parties other than the commissioning client, throughout the copyright life of the images. In the alternative, artists may agree to assign copyright ownership to their clients, or may agree to create works under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

2. Stock Images

---

[10] Complaint, 56.
[11] Craig Depo, 267:11
[12] Complaint

Artists often create stock images independently and speculatively, then offer these existing images for licensed usage by clients. This offering is typically made on stock image websites, either by the artist or by a "stock agency" acting as an authorized licensor for the artist's images.

Clients seeking stock images typically visit stock image websites, search for images meeting their requirements, and then purchase licenses and download the images for usage. Such purchases may be made via an automated process, or by communicating with sales staff at the stock agencies or an artist's office.

Clients may acquire rights to stock images under various "licensing models." While some vendors specialize in certain licensing models, many vendors offer images under several licensing models. Common licensing models include:

(a) Royalty Free ("RF"): This model allows a client to pay a single, one-time fee based on the size of the digital image file desired by the client. The client receives a license allowing broad usage of the image—typically in unlimited media, for unlimited time, at any size, in any quantities, worldwide, for nearly any purpose, including but not limited to the promotion of products and services. For example, such a license may allow a client to use an image on any number of websites in any and all countries, worldwide, forever. There may be any number of detailed restrictions on RF licenses but in general, the licenses allow broad usage. RF images are often professionally produced, and are typically less unique than many images offered under the Rights Managed model (see below).

(b) Microstock: A variant of RF licensing, microstock is a less expensive alternative. Like RF, microstock licenses provide broad rights for a low price, based on the size of the image file desired by the client. Like RF, microstock licenses include restrictions but typically permit usage in unlimited media, unlimited quantities,

12

unlimited sizes, unlimited countries, for an unlimited time. Whereas RF images are typically provided by professional artists and semi-pros, microstock images are provided by amateurs as well.

(c) Subscription models: Many licensors now offer subscription-based licensing schemes. Subscription licensing is a variant of RF licensing, under which clients pay a monthly or annual license subscription fee and receive a broad license permitting the downloading of a quantity of images during each subscription period—either per year, per month or per day. Such licensors nearly always employ a system of graduated pricing tiers under which clients pay an amount commensurate with a maximum quantity of images available for downloading during each subscription period. There are many variants on subscription licensing schemes, driven by competitive pressures.

(d) Rights Managed ("RM"): A long-standing licensing model, rights managed licensing remains a common form of stock image licensing. In RM licensing, usage fees are based not on file size, but upon the scope of usage desired by the client. In general, the greater the scope of usage desired, the greater the licensing fee required of the client. Scope is defined broadly by the general category of the use, whether commercial or editorial, and is defined more specifically by the type of media, the size and quantity of reproductions, the placement/s of the image, geographic regions in which the reproductions will be distributed, the duration of use, exclusivity desired, and other factors. The scope of use permitted under RM licenses spans the full spectrum, from very narrow, to very broad. RM images are primarily created by professional artists. Fees associated with RM licenses are often (but not always) higher than fees for RF licenses.

13

Seeking to maximize profitability and sales, stock agencies have been experimenting with new, hybrid models, such as licenses requiring payment based on the quantity of viewers of images published online, or payment for advertising placement in or on an image published online. The market continues to evolve.

Based upon my review of the testimony, documents, and materials provided to me in this matter, and with a reasonable degree of certainty, had Defendants and Craig engaged in one or more license agreements allowing Defendants to make use of the Photographs, the resulting license/s would have been "Rights Managed" licenses.

**B.    Licensing of Photographs in the Music Industry**

1. Boilerplate Agreements

Based on my personal knowledge and experience, music labels often maintain and use "boilerplate" license agreements for use in licensing photography for use in or on packaging for their products. It has been my personal observation, from the 1980's to present, that these agreements typically define a broad license, permitting use of photographs in various media, without limitation as to format, quantity, versions, region or license period. While my experience as a professional photographer commenced in the late 1970's, I understand, based on my education and on working experience with photographers who contracted with music labels in the early 1970's, that boilerplate license agreements in the music industry during that period typically included the right to make use of photographs in multiple releases and in various formats such as LPs, singles, 8-track tapes, and later, compact cassette tapes, CDs, streaming, and digital downloads.

14

During the period 1970 through present, some photographers have accepted the terms of the music labels' boilerplate agreements, typically permitting broad usage, such as:

(a) Usage in an unlimited number of releases.

(b) Usage in any format, now existing or yet to be developed.

(c) Usage in an unlimited quantity of products to be produced or sold.

(d) Usage in unlimited placements on the front cover, back cover, booklet, liner notes, etc.

(e) Usage in an unlimited size of reproduction.

(f) Usage in unlimited versions, multiple releases, and re-issues.

(g) Usage in media distributed worldwide.

(h) Usage for an unlimited license period.

(i) Usage extending/transferable to successors, assigns and sub-licensees.

(j) Usage in advertising, publicity and for other purposes.

During the period 1970 through present, some photographers have negotiated revisions to the terms of the music labels' boilerplate license agreements, introducing constraints on the scope of permitted usage of photographs under the license, such as limiting usage to:

(a) Usage only in a specific named release.

(b) Usage only in a specified format.

(c) Usage in or on a specified quantity of product units.

(d) Usage only on specified placement/s of photographs on the front cover and/or back cover and/or booklet and/or liner notes, etc.

(e) Usage only at a specified size of reproduction.

(f) Usage only on a single product release or version, excluding re-issues and other releases.

(g) Usage only in a specified geographic region of distribution.

(h) Usage only during a specified license period.

15

(i) Usage only by a single music label, excluding sub-licensees, successors assigns, and other music labels.

(j) Usage on packaging only, excluding advertising, publicity and other media.

2. Scope and Pricing

Scope of use is typically a key factor in fee negotiations between photographers and music labels. Examples of factors influencing fees include:

(a) Media: the categories and formats of media in/on which the photograph will appear. A license permitting use in broad media and multiple formats may bring a higher fee than a license limiting use to a specific category or format. A license permitting use on packaging, advertising and publicity may bring a higher fee than a license permitting use on packaging only.

(b) Placement: The positioning of the photograph in or on the media. A license permitting use on the front cover of a package may bring a higher fee than a license permitting use only on the back cover, or only on the interior, booklet, or liner notes.

(c) Versions: The use of the photograph on re-issues, alternative versions, and/or other releases. A license permitting use on re-issues or multiple releases may bring a higher fee than a license permitting use only on a single release, excluding re-issues.

(d) Quantity: The quantity of reproductions that may be produced and sold. A license permitting use in or on a greater quantity of reproductions may bring a higher fee than a license permitting use in or on a lesser quantity of reproductions.

(e) Size: The size of reproduction of the photograph in or on the media. A license permitting reproduction of the photograph at a

16

relatively large size in or on the media may bring a higher fee than a license permitting reproduction at a relatively small size.

(f) Geographic Distribution: The geographic area within which the reproductions will be distributed in or on the media. A license permitting worldwide distribution may bring a higher fee than a license permitting usage only in certain countries, states, provinces, cities or regions.

(g) Period: The period during which the photograph may be reproduced, distributed and displayed in or on the media. A license permitting a greater period of use may bring a higher fee than a license permitting a lesser period of use.

(h) Exclusivity: An exclusive license may bring a higher fee than a non-exclusive license.

3. Negotiating Position

The negotiating positions of a photographer and music label may be affected by various factors, such as:

(a) Alternatives. The extent to which similar photographs are available from other sources. The ready availability of multiple viable alternative photographs may weaken a photographer's negotiating position, while an absence of viable alternative photographs may strengthen a photographer's position.

(b) History. The licensing history of the photograph. If a photograph has been previously licensed for use on album cover art or has been extensively licensed for other usages, a photographer's negotiating position may be weakened. If a photograph has never been licensed for cover art or has seldom been licensed, a photographer's position may be strengthened.

(c) Competitive Fees: The fees accepted by other sources for similar licenses of similar images. If licenses of similarly suitable images (of similar quality and impact) are available from other sources

17

at fees lower than offered by a photographer, the photographer's negotiating position may be weakened. If the photographer's fees are competitive, the photographer's position may be strengthened.

(d) Financial Status: The photographer's financial status. If a photographer is in need of income, the photographer's negotiating position may be weakened, whereas a photographer with an adequate financial status may have a stronger position.

(e) Professional Status: The photographer's professional status. A established, known photographer whose work is in high demand may have a strengthened negotiating position, whereas an emerging or unknown photographer may have a weakened position.

(f) Ongoing Business Relationship: The relationship between the photographer and the music label.  If the photographer and music label maintain an ongoing relationship in which the photographer regularly sells licenses to the music label and expects to continue to sell licenses to the label in the future, the photographer may have a weakened negotiating position and/or may be inclined to make concessions in the interest of maintaining that relationship.

(g) Requirements: The correlation between the photograph and the music label's requirements. If the aesthetic and technical characteristics of the photograph meet the requirements of the record label, the photographer may have a strengthened negotiating position. Where a photograph does not meet the requirements of the music label, the photographer may have a weakened position.

(h) Artist Preference: A music artist's preference for cover art. If the music artist has approval rights over photography and/or has indicated a preference to make use of a certain photograph on cover art, the photographer's negotiating position may be strengthened, as music labels are typically obliged to, at

18

minimum, consider the opinion and/or approval of the music artist.

(i) Deadlines: The music label's manufacturing deadlines.Where impending deadlines impede a music label's ability to seek out alternatives, a photographer's negotiating position may be strengthened. Where deadlines permit a music label sufficient time to seek out alternatives, a photographer's position may be weakened.

(j) Budget: The music label's budget for the project. Where a music label's budget is sufficient to permit the label to pay a fee desired by a photographer, the photographer's negotiating position may be strengthened. Where a photographer's desired fee exceeds the music label's budget, the photographer's position may be weakened.

(k) Skill: The negotiating skills of each party. A photographer skilled in negotiations may have a stronger negotiating position than a photographer lacking negotiating skills.

The above factors are representative examples, and are not proffered as a comprehensive accounting of factors affecting negotiations between photographers and music labels. Other factors and circumstances may affect negotiations. The degree to which each factor affects a negotiation (if any) varies considerably and can affect the degree to which other factors affect the negotiation.

4. Period of Use

While the parties may negotiate a limited period of use, the parties may alternatively negotiate a perpetual period of use, or a period coinciding with the duration of time that a product remains in the product catalog of the music label and its successors and assigns. Even where perpetual use is negotiated, the period of use may be limited by

a termination of transfer.[13] Ultimately, the copyright life of the photograph[14] may impact the period of use, permitting the music label to continue use indefinitely after the photograph eventually enters the public domain.

5. Renewals

Based on my personal knowledge and experience, license renewals in the music industry may be negotiated at the time of renewal, or may be controlled by terms pre-negotiated at the commencement of a license. Upon the expiration or exhaustion of a license, a music label may exercise pre-negotiated options to renew or expand upon previously licensed rights, typically by paying an agreed additional fee to the photographer. In the absence of pre-negotiated options, a music label may seek to negotiate pricing and terms for a new or renewed license from the photographer.

6. Assignment

Based on my personal knowledge and experience, licenses granted to a music label are often transferable to successors and assigns, whose rights and obligations may be constrained by permissions, constraints and duties of the license.

7. Breach

Based on my personal knowledge and experience, license agreements in the music industry often require notification of a breach, and provide a right to cure any breach within a specified time period.

---

[13] 17 U.S.C. §203
[14] 17 U.S.C. §302

## C.    The Photographs

The Photographs are depicted below.[15]

1                                                2                          3



## D.    UMG's Usage of the Photographs

Craig has alleged that UMG, its predecessors, and affiliates made use of the Photographs in or on various of their products distributed as CDs, LPs and digital downloads. I am advised by retaining counsel that certain of the usages alleged by Craig were made by foreign entities not named as Defendants in this matter, and that such foreign entities, though affiliated with UMG, are not wholly owned by UMG or vice versa. I am further advised by retaining counsel that certain other usages alleged by Craig were made outside of the statute of limitations period defined in the Act. At the instruction of retaining Counsel,[16] this Report contemplates only usages made by UMG, and excludes usages falling outside of the statute of limitations period. Where a usage commenced outside of the statute of limitations period, but a portion of that usage falls within the statute of limitations period, this Report contemplates only that portion falling within the statute of limitations period. Examples of UMG's usages are depicted below, each marked with an identifier correlating to a complete listing of the usages

---

[15] Complaint, Exhibit A. Also see "Visual Index of Images," Exhibit J of the Report
[16] See "Assumptions," Section IV

contemplated by this Report, in "Table of Usages," Exhibit D. Also see "Visual Index of Usages," Exhibit K.



### E.    The History

At deposition, Craig repeatedly described his theory[17] that circa 1970, Ruby Mazur, an art director at Changes Magazine illicitly delivered prints of Craigs's photographs of BB King (including the Photographs) to Mazur's new employer, ABC Dunhill.[18] Craig asserts that this delivery resulted in the inclusion of certain of Craig's BB King photographs in a BB King Tour Book ("Tour Book"), and thereafter, in various products released by UMG, its predecessors and affiliates, which use has continued to this day.[19] This theory, even if true, has no relevance to determinations of liability and damages in the instant matter. With a reasonable degree of professional certainty, based on the documents and materials produced in this matter and on my personal knowledge and experience, the fact that Craig's name

---

[17] Craig Depo, 212:6
[18] Craig Depo, 212:20
[19] Craig Depo, 215:16

appeared in the BB King article in Changes magazine and was subsequently omitted from a very similar layout in the Tour Book (produced nearly fifty years ago) has no relevance to any determination in this matter. Neither party has produced determinative evidence establishing the means by which Defendants received or first accessed the Photographs. Defendants' use of the Photographs proves that Defendants at some point received copies of the Photographs. Craig's theories and conjecture as to the ultimate source of copies of the Photographs fifty years ago have no relevance to this litigation, which I understand is limited to infringements occurring after June, 2013.[20]

## F.    Copyright Management Information

Craig alleges that Defendants intentionally removed, altered or falsified Craig's copyright management information ("CMI") from the Photographs for the purpose of inducing, enabling, concealing and facilitating copyright infringement.[21]

Craig has failed to produce:

(1) Any evidence of the presence of Craig's CMI in or on any copy of the Photographs.

(2) Any evidence that any of the Defendants received any copy of any of the Photographs bearing Craig's CMI.

(3) Any evidence that any of the Defendants intentionally removed, altered or falsified any CMI for the Photographs.

(4) Any evidence that any of the Defendants took any action intended to induce, enable, facilitate or conceal infringement.

Craig testified at deposition that certain of his BB King photographs were published in Changes Magazine in the early 1970s, and that Craig's name

---

[20] See "Assumptions," Section IV
[21] Complaint, 67-68

appeared in that publication.[22] Craig admitted that none of the Photographs at issue in this matter were published in that publication.[23] Thus, the CMI appearing in that publication was not published in, on, adjacent to, or in association with any of the Photographs at issue in this matter. Craig alleges that the photographs in Changes Magazine were later published in the Tour Book, in a design similar to the design of the layout in Changes Magazine.[24] There is no evidence that any of the Defendants produced the Tour Book. There is no evidence that any of the Defendants removed, altered or falsified any CMI in relation to the Tour Book. There is no evidence of any intent, by any of the Defendants, to induce, enable, facilitate, or conceal infringement in the Tour Book. If CMI was removed, there is no evidence that any of the Defendants participated in or had knowledge of that removal in relation to the Tour Book. Perhaps most importantly, there is no evidence that the Tour Book included reproductions of any of the Photographs at issue in this matter. Lastly, all of this activity took place in the early 1970's, at least twenty-five years prior to the October 28, 1998 effective date of the DMCA, and more than forty years prior to the statute of limitations period applicable to this matter.

The documents and testimony in this matter indicate that prior to litigation, UMG made a significant effort to provide Craig with information and materials related to Defendants' usage of the Photographs. As Craig has produced no evidence that the Photographs contained Craig's CMI, and no evidence that Defendants removed Craig's CMI from the Photographs, I conclude that Craig's claim that Defendants intentionally removed Craig's CMI is unsupported and groundless.

### G.     Damage to Craig's Business

Defendants repeatedly requested that Craig produce documents evidencing Craig's income and any revenue earned by Craig from the licensing of his

---

[22] Craig Depo, 55:8
[23] Craig Depo, 57:8
[24] Craig Depo, 212:11

photographs. Craig chose not to produce evidence of any income earned by Craig, whether from photography or other sources. It is my understanding that Craig bears the burden to prove that his business was damaged by the alleged infringements. Craig has had every opportunity to produce such evidence, including his annual tax returns, his estimates, invoices, licenses, royalty reports, and other documents. Craig elected to produce no evidence of any income, whether from photography or other sources.

At deposition, when providing an accounting of his photography career, Craig testified that he performed photography "on the side,"[25] and could remember only three specific instances in which he was paid for usage of his photographs during the period between the 1960's and present. Craig testified that in one instance, Craig was paid between $500.00 USD and $1,000.00 USD in total for the use of five photographs on the back cover of an album.[26] Craig testified that in another instance, Craig was paid between $500.00 USD and $750.00 USD for the use of a photograph on the back cover of an album.[27] Craig has provided neither documentation nor testimony as to any income earned by Craig within the last four decades, whether from photography or otherwise.

Craig testified at deposition that he was approached by a potential client, BBC, regarding a license of one of the Photographs:

> "...BBC, upon his death, contacted the gallery and wanted to license a couple of those pictures that you're referring to and so forth, and they were given some pricing and they passed on it so there was no market value whatsoever." [28]

Craig's assertion that UMG's use of Craig's photograph on packaging for UMG products caused BBC to reject Craig's offer because there was no "market value" is unsupported by any documents or materials produced in this

---

[25] Craig Depo, 70:10;118:11;
[26] Craig Depo, 112:3
[27] Craig Depo, 80:22
[28] Craig Depo, 205:19

matter. Craig's assertion ignores fundamental marketplace conditions. In reality, the ready availability of thousands of photographs of BB King provides BBC and other customers a wide range of licensing options and alternatives.

My opinion is further supported by Craig's testimony indicating that BBC also requested to license other Craig photographs never used by Defendants, then declined to license those other photographs.[29]

Should the Court find any of the Defendants liable for copyright infringement, Craig may claim to have lost profits from licensing fees never received by Craig from Defendants for unauthorized usages within the statute of limitations period. However, there is no evidence of any other damage to Craig's business resulting from Defendants' usage of the Photographs.

## H.    Actual Damages

Actual damages are determined in part by the fee that a willing buyer would have been reasonably required to pay at the time of the infringement.[30] In the photography marketplace, each licensor sets his/her own fees, based upon criteria defining the scope of a license. These criteria typically include the type of media in which the photograph will be reproduced, the size of reproduction, the region of distribution, the duration of the license, exclusivity, and other factors.

Craig has produced no evidence of past licenses of the Photographs. Craig testified at deposition that he has never licensed the Photographs: [31]

> *Q: Have you actually licensed 3A, 3B or 3C?*

> *A. No.*

---

[29] Craig Depo, 207:11
[30] *Davis v. Gap, Inc.,* 246 F.3d 152, 166, 172 (2d Cir. 2001)
[31] Craig Depo, 206:6

*Q. Not from '69 to now?*

*A. No.*

Craig has produced no evidence of past licenses of any of Craig's photographs, of any subject matter, at any point in his lifetime. As a result, I am unable to calculate actual damages based on Craig's licensing history. I therefore turn to market rates to calculate actual damages in this matter.

To arrive at a reasonable estimate of licensing fees applicable to the infringing usages, I obtained comparative stock photography license fee quotes from two stock photography agencies. I calculated total fees based on the information available to me, including some or all of these factors: the media in which the Photograph was reproduced, the reproduction quantity, size, placement, and period of use. Where data for one or more criteria were unknown, I made the best approximation possible under the circumstances.

In addition to the license fee computations performed by obtaining reference fee quotes reasonably matching the alleged unauthorized usages to the greatest extent possible, I have relied on my personal knowledge and experience in image licensing and in the development and management of industry standards for image licensing.

In license negotiations between a photographer and client, the parties may agree upon license terms specifying both the quantity of units to be manufactured and the period of time during which the products may be manufactured or distributed, as well as other constraints. In the instant matter, the initial manufacture and distribution of the majority of the allegedly infringing products did not occur within the statute of limitations period. As my calculations cannot contemplate reproductions manufactured outside of the statute of limitations period,[32] my actual damages calculations are based on the quantity of units sold within the statute of limitations period. I requested that Defendants provide an accounting of the quantity of

---

[32] See "Assumptions," Section IV

units sold during the three-year period established by the statute of limitations. UMG provided an accounting, "UMG Usage Data," attached as Exhibit C.[33] In the event that the usage data provided by Defendants is determined to be incorrect, I will review and consider that information and make revisions to my calculations where appropriate.

Based on the information available to me as of this writing, and based on my personal knowledge, experience, and a review of the documents, materials, and testimony in this matter, reasonable actual damages, if applicable, would be as follows:

License Fees (Actual Damages) by Media Category

| | |
|---|---|
| **Packaging** | $9,452.21 |
| | |
| **Total License Fees** | $9,452.21 |

This amount, $9,452.21, represents only the approximated 2013 fair market value of licenses of BB King photographs for the alleged unauthorized usages by UMG.[34]

I have attached the following tables as exhibits to the Report, documenting my calculations.

Table of Usages (Exhibit D)

List of instances of the usage of the Photographs. Derived from "UMG Usage Data," Exhibit C.

Table of Licenses and Fees (Exhibit E)

List of licenses applied to the Usages appearing in "Table of Usages," Exhibit

---

[33] Also see "Assumptions," Section IV

[34] In the event that Usage U6, in the "Table of Usages," Exhibit D, is found to be excluded from this matter due to distribution of that release by Geffen Australia, the total License Fees will be reduced by $518.64, the amount of the License Fee attributed to that use in "Table of Licenses and Fees," Exhibit E, license number L5.

D. License fees are derived from "Table of Market Rate Calculations," Exhibit F. License fee calculations are based on multi-year licenses, as Craig testified that he would have agreed to issue multi-year licenses.[35]  Where a UMG product release date occurred prior to June 2013 (the temporal limit arising from the statute of limitations period), I substituted June 2013 for the earliest date permitted under the statute of limitations.[36] If a release date occurred after June 2013,[37] I relied on the actual release date. At the direction of retaining counsel, I did not contemplate usage occurring after the date of the Complaint.[38] For these reasons, the actual damages calculations are based on multi-year licenses, with a maximum license period of three years.

Table of Market Rate Calculations (Exhibit F)

List of license fees based on market rates for image licenses applicable to the license periods for the licenses listed in "Table of Licenses and Fees", Exhibit E. I surveyed two vendors, then averaged their license fees to determine the 2017 average license fee for each License Type. I then applied an adjustment to the 2017 average license fees to arrive at the 2013 adjusted license fees. See "License Fee Adjustment 2017 v 2013," Exhibit H, for details regarding the adjustment.

Agency Stock Quotes Combined (Exhibit G)

Copies of market pricing survey documentation.

License Fee Adjustment 2017 vs 2013 (Exhibit H)

Describes an adjustment of 2017 Market Rates to 2013 Market Rates. To arrive at a reasonable approximation of the differential between 2017 market rates and 2013 market rates, I compared a sample 2017 license fee for retail packaging[39] to a sample 2013 license fee for retail packaging,[40] selecting the

---

[35] Craig Depo, 114:16
[36] "Assumptions," Section IV
[37] "UMG Usage Data," Exhibit C
[38] "Assumptions," Section IV
[39] "2017 License Fee Sample for License Fee Adjustment 2017 vs 2013," Exhibit L
[40] http://selling-stock.com "Where to License RM Images," published March 27, 2014. Reference image 200244661-001, U.S. pricing for "Retail."

same image from the same vendor. I determined that the rate for retail packaging use in 2013 was 13.56% lower than the rate for retail packaging use in 2017, and have adjusted 2017 license fees by -13.56% to arrive at a reasonable approximation of market rates in 2013. This adjustment appears in "Table of Market Rate Calculations," Exhibit F. The adjusted fees appear in "Table of Licenses and Fees," Exhibit E and "Table of License Fees by Image," Exhibit I.

Table of License Fees by Image, Exhibit I

Describes the total license fees attributable to each photograph, spanning all usages identified in "Table of Usages," Exhibit D and all licenses identified in "Table of Licenses and Fees," Exhibit E. 2017 fees were adjusted to 2013 fair market value per  "License Fee Adjustment 2017 vs 2013," Exhibit H, and "Table of Licenses and Fees," Exhibit E.

## I.    Damages Multipliers

Craig's expert Michael A. Einhorn ("Einhorn") opines:[41]

> *"I am advised that as a matter of law, courts have employed certain multipliers in the calculation of a copyright holder's losses due to unauthorized copying of photographic works."*

A brief review of BB King photographs available for licensing indicates that there are many "live concert" photographs of BB King available on the marketplace, including photographs of a quality equal to or greater than the Photographs. The Photographs are neither iconic nor especially rare. Application of a scarcity multiplier for actual damages would be inappropriate.

Defendants' use of the Photographs does not comprise exclusive use. Craig has been free to offer and license his photographs for nearly half a century

---

[41] Einhorn Report, 6.4

but has chosen not to do so. Application of an exclusivity multiplier in calculating actual damages would be inappropriate.

It is my understanding that methodology for the calculation of actual damages must not employ any punitive multiplier. Application of a punitive multiplier would be inappropriate.

**J.      Profits**

Craig's expert Einhorn opined in his report:[42]

> "*It is the plaintiff's burden at the outset to present the amount of revenues earned from infringing activity.*"

Einhorn's report omits any mention of Craig's burden, as plaintiff, to establish that a causal nexus or reasonable relationship exists between the use of the Photographs and the revenues received by any of the Defendants from product sales.[43] While Einhorn implies the existence of such a causal nexus by opining that Craig is entitled to disgorged profits, Einhorn's report includes no opinion as to causal nexus, and no evidence supporting the existence of a causal nexus.

Where one of the Photographs was reproduced only on the liner notes or internal booklet, not visible to consumers in advance of purchasing the product, it is unreasonable to suggest that the presence of a reproduction of the photograph inside the product, invisible to the buyer, comprised a causal nexus between the photograph, the consumer's buying behavior, and profits earned. Similarly, where one of the Photographs appeared only on the back cover, and thus invisible to most consumers prior to making a purchasing decision, it is not reasonable to opine that the profits arose from the back cover photograph to the same extent as profits may have arisen from a photograph reproduced on the front cover. It is Craig's burden to prove the

---

[42] Einhorn Report, 5.2
[43] 17 U.S.C. §504(b)

existence of a causal nexus between Defendants' profits and Defendants' use of any of the Photographs in or on the front cover, back cover, interior, booklets or liner notes of UMG's product packaging. For an accounting of the placement of the Photographs in or on each release, see the "Placement" column in the "Table of Usages," Exhibit D.

It is my understanding that in the Second Circuit, several factors are to be considered in apportioning those  "*elements of profit attributable to factors other than the copyrighted work*." [44] These factors include:

> "*(1) [D]efendants' own notoriety and ability to command high prices for their work, (2) the expert and creative operations involved in the production and direction of the [infringing work], (3) the outstanding performances, talent and drawing power of [D]efendants, and (4) the creativity of [D]efendants" in creating the work.[45]*

Here, factors other than Craig's photograph include, but are not limited, to consumer contemplation of:

1. BB King's talent, performance and the music recorded on the CD, LP or digital download.
2. The graphics on the packaging.
3. The other photographs on the packaging.
4. The text on the packaging.
5. BB's King's fame.
6. The BB King brand.
7. The UMG brand.
8. Awards, such as Grammy's, won by BB King.
9. Advertisements promoting the sale of the CD, LP or digital download.

---

[44] *Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992)
[45] *Caffey v. Cook*, 409 F.Supp.2d 484, 506-07 (S.D.N.Y. 2006)

Indeed, repeat customers may purchase BB King releases without consideration of the cover art, and consumers may buy BB King releases without ever seeing the cover art.

Moreover, in "Best of BB King and Bobby Bland," two photographs are featured on the cover, only one of which is Craig's photograph. It would not be reasonable to assert that 100% of the sales of this product are attributable to only one of the two photographs, nor can it be reasonably assumed that the 0% of the sales are attributable to other design elements, text, name recognition, or most importantly, the music of Mr. King and Mr. Bland.

Cover Art for "Best of BB King and Bobby Bland" from Exhibit H to the Complaint



Notably, in "The Ultimate Collection," Craig's photograph appears only on the back cover. In many instances, consumers make purchasing decisions without ever viewing the back cover of a CD package. The website "CD Universe" displays only the front cover of the CD.[46] Similarly, retail sales sites

---

[46] See http://www.cduniverse.com/search/xx/music/pid/6834994/a/ultimate+collection.htm

offering digital downloads typically display only the front covers of CDs, and some retail sales sites display no photograph of the CD cover. Craig has not satisfied his burden to prove a causal nexus for profits attributable to a photograph appearing on the back cover of a CD.

(L) Back Cover Art for "BB King Ultimate Collection." [47]
(R) Screen capture of "BB King Ultimate Collection" offered on the website CD Universe" [48]



After opining on disgorgement of profits, Einhorn stated:[49]

> "I am advised that as a measure of actual damages, Mr. Craig may also recover for the loss of licensing income in the actual market…"

Einhorn asserts that Craig is entitled to *both* disgorge UMG's profits and to *also* recover loss of licensing income. Einhorn's assertion conflicts with the plain language of the statute, which provides that plaintiffs are not entitled to recover profits taken into account in computing actual damages:

---

[47] See U11 in "Visual Index of Usages," Exhibit D
[48] See http://www.cduniverse.com/search/xx/music/pid/6834994/a/ultimate+collection.htm
[49] Expert Report of Michael A. Einborn, PHD. ("Einhorn Report"), 6.1

> *"The copyright owner is entitled to recover the actual damages*
> *suffered by him or her as a result of the infringement, and any profits*
> *of the infringer that are attributable to the infringement <u>and are not</u>*
> <u>*taken into account in computing the actual damages.*[50]</u>

### K.    Copyright Registration

I have reviewed a copy of copyright registration certificate VAu 1-159-683, as produced by Craig. The certificate indicates an effective date of registration of March 18, 2014. While Craig asserts that copies of the Photographs were submitted to the Copyright Office with this registration, Craig has not produced certified copies of the deposits, nor has Craig produced any evidence establishing that the Photographs were included in the registration. As the registration was allegedly made before first publication of the Photographs, the registration provides prima facie evidence of the validity of the facts stated on the certificate.[51] These facts do not identify any of the Photographs.

The March 18, 2014 effective date of registration is later than the date of commencement of the alleged infringements. 17 U.S.C. §412 prohibits an award of statutory damage or attorneys fees in relation to such infringements.[52]

Retaining counsel has requested that I inspect the deposits and application associated with registration VAu 1-159-683. As of this writing, I have not completed my inspection. Upon completing my inspection, I may opine on the registration, application and deposits in a supplemental report.

---

[50] 17 U.S.C §504(b)
[51] 17 U.S.C. §410(c)
[52] 17 U.S.C §412: "...no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration..."

**L.    Statutory Damages**

Even if statutory damages were available to Craig, the range of statutory damages available to Craig, as described by Craig's expert Einhorn, is incorrect.

Einhorn opined:[53]

> *As per the Copyright Act, remedies for willful infringement may range from $30,000 to $150,000 per each work infringed.*

I respectfully disagree. The range of statutory damages for willful infringement is $750.00 USD to $150,000.00 USD.[54]

Einhorn further opined:[55]

> *The median value for the statutory range is $90,000 per work.*

I respectfully disagree. The median of $750.00 USD and $150,000.00 USD is $75,375.00 USD, not $90,000.00 USD.

Moreover, under 17 U.S.C. 504(c)(2), Craig bears the burden of proving that the alleged infringements were committed willfully:

> *In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.*

In my review of the documents and testimony in this matter, I have seen no indication that Defendants acted with the intent to infringe on Craig's copyrights. Unless Craig satisfies his burden to prove that Defendants acted willfully, the applicable range for statutory damages (if any) is $750.00 USD

---

[53] Einhorn Report, 7.2
[54] 17 U.S.C. §504(c)(2)
[55] Einhorn Report, 7.3

to $30,000.00 USD,[56] or in the alternative, not less than $200.00 USD per work innocently infringed.[57] In the the event that Craig satisfies his burden to prove the Defendants acted willfully, the Court may award statutory damages of as much as $150,000.00 USD per photograph infringed, or as little as $750.00 USD per photograph infringed.

## VII. RIGHT TO SUPPLEMENT

I understand that Craig may offer expert testimony to support Craig's' claims in this matter, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by Defendants, I may offer supplemental reports and/or rebuttal testimony to the opinions expressed by Plaintiff and Plaintiff's experts, in accordance with the Court's scheduling order.

Respectfully Submitted,

_____ October 13, 2017

Professor Jeffrey Sedlik

---

[56] 17 U.S.C. §504(c)(1)
[57] 17 U.S.C. §504(c)(2)

37

Index to Exhibits

A          Professor Jeffrey Sedlik Curriculum Vitae
B          Materials Considered
C          UMG Usage Data
D          Table of Usages
E          Table of Licenses and Fees
F          Table of Market Rate Calculations
G          Agency Stock Quotes Combined
H          License Fee Adjustment 2017 vs 2013
I          Table of License Fees by Image
J          Visual Index of Images
K          Visual Index of Usages
L          2017 License Fee Sample for License Fee Adjustment 2017 vs 2013

**EXHIBIT A**

**PROFESSOR JEFFREY SEDLIK**
**Curriculum Vitae**

## Contact Information

Mailing Address    145 North Sierra Madre Boulevard, Suite 4, Pasadena, California 91107 USA
Telephone          626.808.0000 (LA)   212.447.1255 (NYC)   213.716.6627 (Cell)
Email              expert@sedlik.com

## About Professor Sedlik

President & CEO of the PLUS Coalition, the international standards body for the licensing of visual works. Professional photographer, educator, publisher, forensic analyst, graphic designer, product designer, expert witness, fundraiser, negotiator and consultant. Past National President of the Advertising Photographers of America (APA), a leading trade association in the commercial photography industry. Past APA Chief Advisor on Licensing and Copyright. 2005 Photography Industry Leadership Award, International Photography Council. 2006 Photography Person of the Year, Photo Media Magazine. 2007 Industry Leadership Award, Advertising Photographers of America.

Advises clients on industry trends, business practices, copyright and contract issues, digital asset management, asset identification systems, metadata standards, rights languages, valuation of photographs/photography and other visual artworks and related services, licensing, rights of publicity/privacy, social media, investment and acquisition opportunities, strategic partnerships, photographic history, digital and traditional photographic and design techniques and workflows, forensic photographic analysis, graphic design, product design, publishing, and product manufacture. Provides expert witness and consulting services on these and other matters related to photography, advertising, design and the modeling industry.  Provides expert testimony on damages and other liability arising from breach of contract, infringement of copyright, trade dress, removal/alteration of copyright management information, DMCA violations, rights of publicity/privacy, loss/damage/theft of artworks, image manipulation, creative expression, original authorship, employment status, sale tax and other issues. Provides photogrammetric services and forensic analysis of images and video.  Serves as a Professor at the Art Center College of Design.  An accomplished and experienced educator, conducts advanced seminars and workshops for professionals, and teaches college-level courses on copyright, licensing, advertising, design and related business practices.

## Professional Experience

**PLUS Coalition, Inc.**, 2005 – Present.  Serves as President and CEO for the global standards body for the image licensing industries. A non-profit organization, Picture Licensing Universal System ("PLUS") is dedicated to the development and maintenance of international licensing standards and systems in the photography, illustration, publishing, advertising, graphic design, museum, library and education communities in 120 countries. Directed recruitment of trade organizations and other interested parties worldwide and supervised development and implementation of licensing standards, and development of a global rights registry.

**PLUS Coalition, LTD.**, 2005 – Present.  Serves as President, CEO and Director of the London-based subsidiary of the PLUS Coalition, Inc..

**Sedlik Productions/Sedlik Design,** 1986 – Present. Serves as President of a leading commercial photography, design, and film production company.  Also serves as Producer, Director, Photographer, and Director of Photography, creating photography, film and video productions for advertising agencies, graphic design studios, the entertainment industry, and other clients. Operates SedlikStock, a subsidiary dedicated to licensing existing Sedlik images for advertising, editorial and merchandizing usage via affiliates including stock photography agencies and publishers. Maintains relationships with major photography industry manufacturers, testing and demonstrating analog and digital equipment and software. Provides graphic design, advertising design and product design and manufacturing services.

## Partial Client List- Sedlik Productions/Sedlik Design

**Clients:** 3m; 20th Century Fox; A&E Television Network; ABR Information Services; Alpo; AmSouth Bank; Andazia, Inc; Arista Records; Association of Tennis Professionals; AT&T; Avery Dennison; Bank of America; Barrington Music Products; BBC;  Blue Cross; BMG/RCA Records; Bristol Myers Squibb; Buena Vista Pictures; Bureau of Census; CareAmerica; Chesebrough-Ponds; CBS/Sony Music; Cedars Sinai; Century 21; Cherokee; Columbia Pictures; Computer Associates; Concord Records; Conroy's Florist; Direct TV; Disney; Doubleday; Dreyfus; Epson; Essilor; Farmer's Insurance; Federal Express; Fitzgerald-Hartley Co.; Ford; Gannon/Hartley; Geffen Records; Georgia Pacific; Great Performances; Great Western Bank; GRP Records; GTE; Guinness Museum; Hanna-Barbera; Harcourt Publishers; Hopper Papers; Ikea; Infiniti Automobiles; Island Records; Janssen Pharmaceuticals; JVC Musical Industries; Kraft Food Products; Korg, Inc.; LaFace Records; Laura Ashley; Levi Strauss; Mark Taper Forum; Missouri Historical Society; MCA Records; MCA International; Metro Goldwyn Mayer; Microsoft; Motion Picture & TV Fund; Movieland; MSN; MTM Entertainment; MTV Networks; Navisite; NBC Television; Neenah Paper; Nestle'; New World Pictures; Nike; Pacific Bell; Palm Press; Paramount Pictures; Phillip Morris; Polygram Records; Pomegranate Books; Potlatch; Prentice-Hall; San Diego Zoo; Schering Plough; SBC; Signature Eyewear; Smithsonian Institution; Sony Inc.; Southern Natural Gas; Spanish Tourism Office; Sugar Hill Records; Taco Bell; Telarc International; Toyota; Turner Broadcasting; U. C. Press; United Airlines; United Way; Universal Studios; VH-1; Warner Brothers Records; Web TV; Windham Hill Records; Word Records; World Savings; Yamaha; Zellerbach; Ziff-Davis; Zildjian

**Advertising Agencies & Design Firms:** Alan Sekuler & Associates; Asher Gould; BBDO;  Bozell, Brierley & Partners; Brooks-Gruman Advertising; Campbell, Mithun, Esty; Cline, Davis, & Mann; Cross & Associates Design; Dailey & Associates; Davis, Elen; Daymark; DDB Needham, Worldwide; Deutsch; Douglas Oliver Design; DVC Marketing; DZN; The Design Group; East/West Network; Fitzgerald & Associates; FKQ Advertising; FP Horak Advertising; Foote, Cone, & Belding; GBF Ayer; Goodby Silverstein; Grey Advertising; Hill & Knowlton; Huerta Design; Ikkanda Design; Interbrand; J. Walter Thompson; Kang & Lee; Kaufman/Stewart; Ketchum Advertising; Klemtner Advertising; Kovel Kresser; Kuester Group; Lehman Millet, Inc; Lintas Campbell Ewald; Mangos; Mediatrix; Melia Design Group; Ogilvy & Mather; OZ Advertising; Phillips Ramsey; Poppe-Tyson; Potter Katz & Partners; John Ryan Company; Saatchi & Saatchi; Seineger Advertising; Slaughter Hanson; SmithKlein Beecham; Strike Group; Team One Advertising; Team Creatif; Torre Lazur; Tracy-Locke; Tribe Design; Vrontikis Design; White Rhino Advertising; Young & Rubicam

**Editorial:** American Film; Arts & Entertainment; CD Review; Cosmopolitan; Details; Downbeat; Elle; Entertainment Weekly; Glamour; GuestInformant; Imperial Press; In Focus; Interiors & Sources; Jazziz; Jazz Times; Life; Los Angeles Magazine; Los Angeles Times Magazine; Mirabella; Music Connection; Newsweek; Photo District News; People; Premiere; Pulse; Q Magazine; Rolling Stone; Select; Spin; Time-Life

## Other Professional Experience

**Linked Content Coalition, (LCC)** 2013 – Present.  Serves as a Founding Director of the Linked Content Coalition (LCC), a UK-based, not-for-profit global consortium of standards bodies and registries. LCC members are organizations engaged in creating and managing data standards associated with content of one or more types, particularly for identifiers, metadata and messaging. The purpose of the LCC is to facilitate and expand the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata.

**American Society of Collective Rights Licensing (ASCRL),** 2014 – Present. Serves as Founding Director of ASCRL, a non-profit collecting society engaged in collecting and distributing  foreign and domestic royalties to authors and copyright owners in visual works in the United States.

**Copyright Alliance (CA),** 2016 – Present. Serves as Board member on the Copyright Alliance Creators Advisory Board and Academic Advisory Board, collaborating with leading organizations and experts in the creative industries on copyright-related issues including education, legislation, advocacy and other efforts.

**Advertising Photographers of America (APA)**. Served as National President , 2000 – 2002. Served as Chief Advisor on Licensing & Copyright, 2002 – 2012. Directed and supervised all operations of the largest trade organization representing advertising photographers, leading more than seventy volunteer board members located in all areas of the country. Advised federal and state legislators, and senior officials at the Small Business Administration and US Copyright Office. Also served on the Board of Directors of the APA Los Angeles Chapter, and on that chapter's Legal and Legislative Committee, Advocacy Committee and Sales Tax Committee.

**Beijing Intellectual Property Expertise Center of Judicature (JZSC)**, 2007 – Present. Advisor to Chinese governmental agency and the People's Court of China on intellectual property issues in China.

**IPTC Photo Metadata Working Group,** 2006 – Present. Active participant in the International Press Telecommunications Council (IPTC) standards body. Member of the IPTC Photo Metadata Working Group, charged with establishing and maintaining standards for embedded metadata in digital photographs. Co-authored the IPTC Photo Metadata White Paper 2007 and the IPTC-PLUS Photo Metadata Toolkit.

**Universal Photographic Digital Imaging Guidelines (UPDIG),** 2004 – Present.  Active participant in working group charged with developing worldwide standards in the commercial application of digital imaging technologies. Participant in Model Release Working Group, charged with developing international standards for model releases and model release workflow.

**Consultant and Expert Witness,** 2000 – Present. Provide consulting services, forensic analysis and expert testimony on legal, business and technical matters related to digital and traditional photography, illustration, marketing and other topics.

**United States Copyright Office**, 2008 – Present. Advises senior staff members on topics including copyright registration, regulatory, re-engineering and professional workflow issues. Alpha test consultant for online electronic copyright registration system.

**Adobe Photographer's Council,** 2004 – 2010. Advised Adobe Systems on matters related to Adobe products and services, including digital photography technologies, stock photography, and industry standards.

**Adobe Pre-release Testing,** 2004 – Present. Provides pre-release testing services to Adobe, both alpha and BETA testing of Adobe products and services.

**Founder, Digital Technology Advisory Council**, 2002. Founded advisory council comprised of high level representatives from each of the leading photography industry manufacturers.

**Advisory Board Member, WorkbookStock,** 2000 – 2006. Served on the advisory board of WorkbookStock, a leading stock photography agency. Consulted on the development of a vendor contract, copyright registration procedures, and web interface.

**Advisory Board Member, Exactly Vertical**, 1998 – 2000. Served on the advisory board of Exactly Vertical, a company offering interactive business management solutions for photographers. Consulted on issues including web interface, software design, copyright registration, merchandizing, stock licensing, photographers' workflows, and branding.

**Other, 1996 – Present:** Numerous additional consulting  engagements under NDA, including the identification and analysis of investment opportunities, strategic partnerships, acquisition targets, product development and launch strategies, advisory council recruitment, fundraising, negotiations, mediation and deal brokering.

## Awards & Recognition

**APA Photography Industry Leadership Award,** 2007. Presented by Advertising Photographers of America.

**Photography Person of the Year,** 2006. Presented by Photo Media Magazine.

**ICP Photography Industry Leadership Award,** 2005. Presented by the International Photography Council, a non-governmental organization of the United Nations.

**Mamiya Award of Excellence in Photo Education**, 1999. Recognized as a leading arts educator. Selected from all college-level photography instructors, nationwide.

**The Clio Awards. Silver Clio, Director of Photography, Rich Media Advertising**, 1999;

### Selected Additional Awards and Recognition

Print's Regional Design Annual. Award of Excellence, 1999; Ozzie Awards. Silver Ozzie for Best Photography, 1999; Art Directors Club. Excellence in Photography, 1999; Art Directors Club. Excellence in Photography, 1999; PDN/Nikon Award of Excellence in Self Promotion, 1998; Advertising Photographers of America. Best in Show, 1998; Communication Arts Award of Excellence in Editorial Photography, 1998; The One Show Award for Excellence in Advertising, 1997; Communication Arts Award of Excellence, Unpublished Work, 1997; Communication Arts Award of Excellence in Self Promotion, 1996; Communication Arts Award of Excellence in Advertising Photography, 1994; Communication Arts Award of Excellence, Book Series, 1993; Art Direction Magazine Creativity Award, 1992; Communication Arts Award of Excellence in Editorial Photography, 1992; Communication Arts Award of Excellence in Advertising Photography, 1991; Communication Arts Award of Excellence in Editorial Photography, 1990; Art Direction Magazine. Creativity Award, 1990

## Selected Articles Authored

**ASMP Professional Business Practices in Photography, 2008.** Contributing author.

**United States House Judiciary Committee.** "The Orphan Works Dilemma: Challenges & Recommendations," 2006. Treatise submitted to the House Judiciary Committee by invitation of the General Counsel, in relation to the U.S. Copyright Office "Report on Orphan Works."

**Photo District News.** Contributor to Photo District News, the photography industry's primary trade publication. Authored the "Ask The Expert" column, writing on subjects of business management, licensing, copyright, and creativity.

**In Focus.** Contributor to In Focus Magazine, the magazine of the Advertising Photographers of America, writing on subjects including business management, industry trends, protecting the value of photography, licensing, copyright, creativity.

**Wraparound.** Founder and regular contributor to Wraparound Magazine, writing on legal and business topics.

**APA/LA NewsMagazine.** Contributor to the news magazine published by the Advertising Photographers of America, Los Angeles Chapter.

**Photo Media.** "Get Down to Business" Fall, 2000

**IPTC Photo Metadata White Paper 2007.** Co-author.

---

**Professional Societies**

---

**PLUS Coalition, Inc. (PLUS)**

**Advertising Photographers of America (APA)**

**American Institute of Graphic Arts (AIGA)**

**American Society of Media Photographers (ASMP)**

**American Society of Picture Professionals (ASPP)**

**Pro Imaging (PI)**

**Photography Instructors Education Association (PIEA)**

---

**Selected Speaking Engagements**

---

**Miscellaneous Events and Engagements,** 1977 – Present. Invited speaker/panelist at the industry's major trade shows, speaking on topics including copyright, licensing, advertising, branding, design, publishing, product development, self promotion, stock image licensing and technical issues. Lectured on photography at LAUSD Community Adult School. Speaks before groups of photographers and creatives worldwide. Wrote and produced the APA "Real World" seminar series on topics ranging from estimating, to licensing, to producing.

Participated in the development of Digital Imaging for Photographers, a leading seminar series dedicated to cutting- edge digital techniques and equipment.  Speaker at the "PDN on the Road" seminar series, on copyright, licensing and stock photography.  Speaker at the ASMP Strictly Business Workshops, ASMP Copyright Symposiums, Copyright & Technology Conferences, Digital Asset Management Conferences, World Copyright Summits, Copyright Office Roundtables and many other events.

**United States House Judiciary Subcommittee on the Courts, Intellectual Property and the Internet**, 2014. Testimony at hearing entitled "Preservation and Reuse of Copyrighted Works."

**United States Copyright Office**, 2014. Orphan Works & Mass Digitization Round Table.

**University of California Los Angeles**, 2014. US Copyright Office Recordation Reengineering Roundtable.

**World Creators' Summit**, 2013. Orphan Works.  Balancing Access and Creator's Rights.

**IPTC Metadata Conference**, 2013. Metadata Technology. What the Future Might Bring.

**California Visual Resources Association Conference**, 2014. Image Rights: Leveraging Rights Metadata to Maximize Access and Minimize Liability.

**National Association of Recording Merchandisers (NARM) Conference, 2013**. Managing Photographic and Video Archival Assets.

**Advertising Photographers of America (APA)**, 2013. Social Media, the PLUS system, and Strategic Marketing in the Internet Age

**ICON LA Illustration Conference**, 2010.  Illustrators and Copyright

 **Picture Archive Council of America, International Conference**, 2004.  Image Licensing in the 21st Century

**Createasphere/ EXPLORE Entertainment Technology Exposition**, 2010. Effective Digital Asset Management Workflows

**American Society of Media Photographers**, 2010. Copyright and the New Economy: Issues and Trends Facing Visual Artists

**Photo Plus Expo**, 2009. Strategic Estimating

**Museum Computer Network**, 2009. Copyright in the Cultural Heritage Sector

**Smithsonian Institute**, 2009. Beyond the Copyright Field: Current Trends in Rights and Licensing Metadata

**Photo Marketing Association**, 2008. Breakthroughs in Photo Archiving using Metadata

**Picture Archive Council of America (PACA), International Conference**, 2008. Copyright in the stock image industry

**Henry Stewart DAM Symposium**, 2008. Rights, Images and PLUS: Challenges & Solutions

**IDEAlliance XMP Open Content Metadata Summit**, 2008. Leveraging XMP to Advance Industry Standards

**Picture Archive Council of America (PACA)**, 2007. Searching for a Common Ground: Setting Standards in a Time of Change

**Library of Congress**, 2007. Image Preservation with PLUS

**Japan Photographer's Union**, 2007. Photography & Copyright: International Issues

**Digital Library Federation, Fall Forum**, 2007. Facilitating the Fair Licensing of Digital Images, and Determining Copyright

**Museum Computer Network, Annual Conference**, 2007. Museums and Intellectual Property: Challenges and Solutions

**IDEAlliance XMP Open Content Metadata Summit**, 2007. Advanced Photography Metadata Workflow Strategies

**American Society of Picture Professionals, Education Conference**, 2006.  Strategic Licensing: The Art & Science of Maximizing Your Profits

**International Press Telecommunications Council (IPTC) Conference**, 2006. PLUS and IPTC, a Collaboration

**Coordination of European Picture Agencies Press Congress (CEPIC) Conference**, 2006. Implementing International Standards in Image Licensing

**Oxford University**, 2006.  Digital Object Identifiers and Copyright

---

**Foundation, Community Service and Charitable Work**

**Warren King Foundation**, President, 2000–2002. Created foundation providing endowed photography scholarships to promising photography students. Produced a fundraising event attended by photographers, educators, government officials and media. Lobbied Los Angeles Unified School District to re-launch abandoned arts education programs in local schools. Arranged for an arts teacher to receive a lifetime achievement award at the Kennedy Center.

**Other Community Service and Charitable Work.** Conduct visiting lectures on the art and history of photography for elementary school students in the Los Angeles Unified and Pasadena Unified School Districts. Judge photography exhibitions at the high school, college, and amateur, and professional levels.  Photograph pro-bono or reduced-fee public service campaigns for charitable organizations such as the LA Times "Reading by Nine" program, Jewish Family Services, Motion Picture and Television Fund, United Way, and others. Volunteered time to leadership in the Boy Scouts and public schools. Donated original photographic prints to each of the Focus on Aids annual fundraising auctions 1987-2003, Woodcraft Rangers, Pediatric Aids Foundation and other vital charitable organizations.

**Boy Scouts of America,** Eagle Scout, 1972-1977.

## Academic

**Continuing Education,** 1986-Present. Attends workshops and seminars on business, legal and technical issues affecting photographers, illustrators, designers and other visual creators, with an emphasis on intellectual property, business management, stock photography, and digital technology courses. Consults with manufacturers and distributors in testing new equipment to stay abreast of the latest developments in digital imaging, design and manufacturing technologies.

**Brooks Institute,** 2008, MFA, HC.

**Art Center College of Design,** 1986,  BFA.

**University of California at Santa Barbara,** 1980-1983, Liberal Studies major with emphasis in Art, Art History, Economics, Business Management.

**EXHIBIT B**

**MATERIALS CONSIDERED**

| Type | Description | Reference |
|---|---|---|
| Type | Description | Reference |
| Complaints & Answers | Complaint: Glen Craig v. Universal Music Group, et al, U.S.D.C. S.D.N.Y., Case No. 16-cv-05439-JPO, Docket No. 1 (with exhibits A through RR thereto) | |
| Complaints & Answers | Estate of Riley B. King's Answer, Docket No. 15 | |
| Complaints & Answers | Kingsid Ventures, Ltd's Answer, Docket No. 16 | |
| Complaints & Answers | UMG Recordings, Inc.'s Answer, Docket No. 13 | |
| Depositions (and associated exhibits) | March 17, 2017 Deposition of Glen Craig (with Exhibits 1-8) | |
| Depositions (and associated exhibits) | April 4, 2017 Deposition of Caroline Frilot (with Exhibits 1-3) | |
| Depositions (and associated exhibits) | April 21, 2017 Deposition of Ryan Null (with Exhibits 1-4) | |
| Depositions (and associated exhibits) | April 25, 2017 Deposition of Ryan Null (with Exhibit 5) | |
| Depositions (and associated exhibits) | April 6, 2017 Deposition of Louise Laverne Toney (with Exhibits 1-5) | |
| Initial Disclosures | Plaintiff Glen Craig's Rule 26(a)(1) Initial Disclosures, dated October 18, 2016 | |
| Initial Disclosures | Estate of Riley B. King's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)(A), dated October 18, 2016 | |
| Initial Disclosures | Kingsid Ventures, Ltd's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)(A), dated October 18, 2016 | |
| Initial Disclosures | UMG Recordings, Inc.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)(A), dated October 18, 2016 | |
| Interrogatories (and responses thereto) | Defendants' First Set of Interrogatories to Plaintiff, dated October 25, 2016 | |
| Interrogatories (and responses thereto) | Plaintiff's First Set of Interrogatories to Estate of Riley B. King, dated October 25, 2016 | |
| Interrogatories (and responses thereto) | Plaintiff's First Set of Interrogatories to Kingsid Ventures, Ltd, dated October 25, 2016 | |
| Interrogatories (and responses thereto) | Plaintiff's First Set of Interrogatories to Universal Music Group, Inc., dated October 25, 2016 | |
| Interrogatories (and responses thereto) | Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories to Plaintiff, dated November 25, 2016 | |
| Interrogatories (and responses thereto) | Defendant Estate of Riley B King's Responses and Objections to Plaintiff Glen Craig's First Set of Interrogatories, dated November 25, 2016 | |
| Interrogatories (and responses thereto) | Defendant Kingsid Ventures, Ltd Responses and Objections to Plaintiff Glen Craig's First Set of Interrogatories, dated November 25, 2016 | |
| Interrogatories (and responses thereto) | Defendant UMG Recordings, Inc.'s Responses and Objections to Plaintiff Glen Craig's First Set of Interrogatories, dated November 25, 2016 | |
| Requests for Production (and responses thereto) | Defendants' First Set of Document Requests to Plaintiff, dated October 25, 2016 | |
| Requests for Production (and responses thereto) | Plaintiff's First Set of Document Requests to Estate of Riley B. King, dated October 25, 2016 | |
| Requests for Production (and responses thereto) | Plaintiff's First Set of Document Requests to Kingsid Ventures, Ltd., dated October 25, 2016 | |

**MATERIALS CONSIDERED**

| Type | Description | Reference |
|------|-------------|-----------|
| Requests for Production (and responses thereto) | Plaintiff's First Set of Document Requests to Universal Music Group, Inc., dated October 25, 2016 | |
| Requests for Production (and responses thereto) | Plaintiff's Responses and Objections to Defendants' First Set of Document Requests, dated November 25, 2016 | |
| Requests for Production (and responses thereto) | Defendant Estate of Riley B. King's Responses and Objections to Plaintiff Glen Craig's First Set of Document Requests, dated November 28, 2016 | |
| Requests for Production (and responses thereto) | Defendant Kingsid Ventures, Ltd Responses and Objections to Plaintiff Glen Craig's First Set of Document Requests, dated November 28, 2016 | |
| Requests for Production (and responses thereto) | Defendant UMG Recordings, Inc.'s Responses and Objections to Plaintiff Glen Craig's First Set of Document Requests, dated November 28, 2016 | |
| Requests for Production (and responses thereto) | November 29, 2016 letter to Richard Liebowitz regarding Plaintiff's discovery objections and responses | |
| Order | Stipulated Protective Order, Glen Craig v. Universal Music Group, et al, U.S.D.C. S.D.N.Y., Case No. 16-cv-05439-JPO, Docket No. 23 | |
| Document Production | Documents produced by Estate of Riley B. King, KING0000001-173 | KING0000001-173 |
| Document Production | Documents produced by UMG Recordings, Inc., UMG0000001-3381 | UMG0000001-3381 |
| Document Production | Documents produced by Estate of Riley B. King/UMG Recordings, Inc., UMGBBK0000001-4365 | UMGBBK0000001-4365 |
| Requests for Production (and responses thereto) | December 21, 2016 Liebowitz letter to Barry Slotnick and Linna Chen regarding deficiency letter | |
| Expert Report | Expert Report of Michael A. Einhorn, Ph.D. On Behalf of Glen Craig | |
| Document Production | Glen Craig Discovery Production No. 2 | GC00027 - GC00068 |
| Document Production | Glen Craig Disovery Production | GC00001 - GC000026 |
| Document Production | Glen Craig Discovery Production | GC00027.1 - GC00046.1 |
| Website | www.cduniverse.com | |
| Website | www.universalmusic.com/company/ | |
| Website | www.gettyimage.com | |
| Website | www.morrisonhotelgallery.com | |
| Website | archive.org | |
| Website | www.superstock.com | |
| Website | www.dreamtime.com | |
| Website | www.selling-stock.com | |

**EXHIBIT C**

# UMG Usage Data

| CTRL SEQ | GENERIC TITLE | UPC ID | FRR Album TITLE | FRR Album Artist DESC | TOTAL DIG UNITS | TOTAL PHY UNITS | TYPE CD, LP, CASS,DIG | Release Date | Company Name | Geo Distrib. | Front Cover Image 1,2,3 | Back Cover Image 1,2,3 | Booklet Image 1,2,3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | KING OF THE BLUES | 0000881 1067724 | KING OF BLUES Box Set | KING,B.B. | REDACTED | REDACTED | CD | 10/20/92 | GEFFEN | USA | N/A | N/A | 1 |
| 5 | LIVE IN JAPAN | 0000881 1181024 | B.B. KING LIVE IN JA | KING,B.B. | | | CD | 5/18/99 | GEFFEN | USA | 2 | 3 | N/A |
| 6 | LIVE IN JAPAN | 0000881 1181024 | LIVE IN JAPAN | B.B. KING | | | DIG | 5/18/99 | GEFFEN | USA | 2 | N/A | N/A |
| 7 | LIVE IN JAPAN | 6025370 65073 | LIVE IN JAPAN | B.B. KING | | | DIG | 6/5/12 | GEFFEN | USA | 2 | N/A | N/A |
| 10 | BB KING AND BOBBY BLAND | 0007674 2070625 | BEST OF B.B. KING & BOBBY BLAND | B.B. KING | | | DIG | 3/19/13 | GEFFEN | USA | 1 | N/A | N/A |
| 11 | LADIES AND GENTLEMEN | 0060075 3384992 | MR. B.B. KING | KING,B. B. | | | CD | 10/9/12 | HIP-O | USA | 1 | N/A | N/A |
| 12 | LADIES AND GENTLEMEN | 0060075 3390863 | MR. B.B. KING 4 CDS | KING,B.B. | | | CD | 10/9/12 | HIP-O | USA | 1 | N/A | N/A |
| 13 | LADIES AND GENTLEMEN | 0060075 3411506 | LADIES AND GENTLEMEN... MR. B.B. KING | B.B. KING | | | DIG | 1/1/12 | Universal International Music B.V. | USA | 1 | N/A | N/A |
| 14 | LADIES AND GENTLEMEN | 0060075 3629734 | LADIES AND GENT(2LP) | KING,B.B. | | | Vinyl | 11/6/15 | GEFFEN | USA | 1 | N/A | N/A |
| 15 | ULTIMATE COLLECTION | 0060249 8266137 | ULTIMATE COLLECTION | KING,B.B. | | | CD | 3/15/05 | GEFFEN | USA | N/A | 1 | N/A |
| 17 | WHY I SING THE BLUES | 0007674 2025625 | WHY I SING THE BLUES | KING,B.B. | | | CD | 4/6/92 | Universal Special Products | USA | 1 | N/A | N/A |
| 18 | WHY I SING THE BLUES | 0060251 7372313 | WHY I SING THE BLUES | KING,B.B. | | | CD | 6/12/07 | GEFFEN | USA | 1 | N/A | N/A |
| 19 | WHY I SING THE BLUES | 0060251 7372313 | WHY I SING THE BLUES | B.B. KING | | | DIG | 6/12/07 | GEFFEN | USA | 1 | N/A | N/A |

**EXHIBIT D**

# Table of Usages

| Usage # | CTRL SEQ | Image # | Format | Size | Placement | Circulation | Duration | Company Name | Geo Distrib. | Start Date – Unlicensed Usage Earliest | End Date – Unlicensed Usage – Latest | Usage Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U1 | 1 | 1 | CD | Full page | Interior | Up to 1,000 | 3 | GEFFEN | USA | 10/20/92 | 7/7/16 | KING OF BLUES Box Set UPC – 00008811067724 |
| U2 | 5 | 2 | CD | Full page | Front | Up to 1,000 | 3 | GEFFEN | USA | 5/18/99 | 7/7/16 | B.B. KING LIVE IN JA UPC – 00008811181024 |
| U3 | 5 | 3 | CD | Full page | Back | Up to 1,000 | 3 | GEFFEN | USA | 5/18/99 | 7/7/16 | B.B. KING LIVE IN JA UPC – 00008811181024 |
| U4 | 6 | 2 | Digital | Full page | Front | Up to 1,000 | 3 | GEFFEN | USA | 5/18/99 | 7/7/16 | LIVE IN JAPAN UPC – 00008811181024 |
| U5 | 7 | 2 | Digital | Full page | Front | Up to 1,000 | 3 | GEFFEN | USA | 6/5/12 | 7/7/16 | LIVE IN JAPAN UPC – 602537065073 |
| U6 | 10 | 1 | Digital | Up to 1/8 page | Front | Up to 1,000 | 3 | GEFFEN | USA | 3/19/13 | 7/7/16 | BEST OF B.B. KING & BOBBY BLAND UPC – 00076742070625 |
| U7 | 11 | 1 | CD | Full page | Front | Up to 1,000 | 3 | HIP-O | USA | 10/9/12 | 7/7/16 | MR. B.B. KING UPC – 00600753384992 |
| U8 | 12 | 1 | CD | Up to 1/2 page | Front | Up to 1,000 | 3 | HIP-O | USA | 10/9/12 | 7/7/16 | MR. B.B. KING 4 CDS UPC – 00600753390863 |
| U9 | 13 | 1 | Digital | Up to 1/2 page | Front | Up to 1,000 | 3 | Universal Inte | USA | 1/1/12 | 7/7/16 | LADIES AND GENTLEMEN... MR. B.B. KING UPC – 00600753411506 |
| U10 | 14 | 1 | Vinyl | Up to 1/2 page | Front | Up to 1,000 | 1 | GEFFEN | USA | 11/6/15 | 7/7/16 | LADIES AND GENT(2LP) UPC – 00600753629734 |
| U11 | 15 | 1 | CD | Full page | Back | Up to 25,000 | 3 | GEFFEN | USA | 3/15/05 | 7/7/16 | ULTIMATE COLLECTION UPC – 00602498266137 |
| U12 | 17 | 1 | CD | Full page | Front | Up to 5,000 | 3 | Universal Special Products | USA | 4/6/92 | 7/7/16 | WHY I SING THE BLUES UPC – 00076742025625 |
| U13 | 18 | 1 | CD | Full page | Front | Up to 25,000 | 3 | GEFFEN | USA | 6/12/07 | 7/7/16 | WHY I SING THE BLUES UPC – 00602517372313 |
| U14 | 19 | 1 | Digital | Full page | Front | Up to 1,000 | 3 | GEFFEN | USA | 6/12/07 | 7/7/16 | WHY I SING THE BLUES UPC – 00602517372313 |

**EXHIBIT E**

## Table of Licenses and Fees

| License # | Image # | Usage # | License Type # | License Type Code | License Type Description | Start Date – Unlicensed Usage Earliest | End Date – Unlicensed Usage - Latest | Usage Description | 2013 Adjusted License Fees |
|---|---|---|---|---|---|---|---|---|---|
| L1 | 1 | U1 | T1 | Pckg_Full_In_1K _3yrs | Product Packaging, Full page, Ins de, Up to 1,000, 3 Years | 10/20/92 | 7/7/16 | KING OF BLUES Box Set UPC - 00008811067724 | $484.06 |
| L2 | 2 | U2, U4 | T2 | Pckg_Full_Frt_1 K_3yrs | Product Packaging, Full page, Front, Up to 1,000, 3 Years | 5/18/99 | 7/7/16 | B.B. KING LIVE IN JA UPC - 00008811181024 | $723.94 |
| L3 | 3 | U3 | T3 | Pckg_Full_Bck_1 5K_3yrs | Product Packaging, Full page, Back, Up to 1,000, 3 Years | 5/18/99 | 7/7/16 | B.B. KING LIVE IN JA UPC - 00008811181024 | $723.94 |
| L4 | 2 | U5 | T2 | Pckg_Full_Frt_1 K_3yrs | Product Packaging, Full page, Front, Up to 1,000, 3 Years | 6/5/12 | 7/7/16 | LIVE IN JAPAN UPC - 602537065073 | $723.94 |
| L5 | 1 | U6 | T4 | Pckg_1/8_Frt_1 K_3yrs | Product Packaging, Up to 1/8 page, Front, Up to 1,000, 3 Years | 3/19/13 | 7/7/16 | BEST OF B.B. KING & BOBBY BLAND UPC - 00076742070625 | $518.64 |
| L6 | 1 | U7 | T2 | Pckg_Full_Frt_1 K_3yrs | Product Packaging, Full page, Front, Up to 1,000, 3 Years | 10/9/12 | 7/7/16 | MR. B.B. KING UPC - 00600753384992 | $723.94 |
| L7 | 1 | U8 | T5 | Pckg_1/2_Frt_1 K_3yrs | Product Packaging, Up to 1/2 page, Front, Up to 1,000, 3 Years | 10/9/12 | 7/7/16 | MR. B.B. KING 4 CDS UPC - 00600753390863 | $723.94 |
| L8 | 1 | U9 | T5 | Pckg_1/2_Frt_1 K_3yrs | Product Packaging, Up to 1/2 page, Front, Up to 1,000, 3 Years | 1/1/12 | 7/7/16 | LADIES AND GENTLEMEN... MR. B.B. KING UPC - 00600753411506 | $723.94 |
| L9 | 1 | U10 | T6 | Pckg_1/2_Frt_1 K_1yr | Product Packaging, Up to 1/2 page, Front, Up to 1,000, 1 Years | 11/6/15 | 7/7/16 | LADIES AND GENT(2LP) UPC - 00600753629734 | $639.66 |
| L10 | 1 | U11 | T7 | Pckg_Full_Bck_2 5K_3yrs | Product Packaging, Full page, Back, Up to 25,000, 3 Years | 3/15/05 | 7/7/16 | ULTIMATE COLLECTION UPC - 00602498266137 | $1,251.22 |
| L11 | 1 | U12 | T8 | Pckg_Full_Frt_5 K_3yrs | Product Packaging, Full page, Front, Up to 5,000, 3 Years | 4/6/92 | 7/7/16 | WHY I SING THE BLUES UPC - 00076742025625 | $963.81 |
| L12 | 1 | U13, U14 | T9 | Pckg_Full_Frt_25 K_3yrs | Product Packaging, Full page, Front, Up to 25,000, 3 Years | 6/12/07 | 7/7/16 | WHY I SING THE BLUES UPC - 00602517372313 | $1,251.22 |
| 12 | Total Licenses | | | | | | | Total Fees | $9,452.21 |

**EXHIBIT F**

## Table of Market Rate Calculations

| License Type # | License Type Code | License Type Description | Getty Images Img# 84912818 | Superstock Img# 990-650 | 2017 License Fee (Averaged) | 2013 License Fee (Adjusted) |
|---|---|---|---|---|---|---|
| T1 | Pckg_Full_In_1K_3yrs | Product Packaging, Full page, Inside Up to 1,000, 3 Years | $590.00 | $530.00 | $560.00 | $484.06 |
| T2 | Pckg_Full_Frt_1K_3yrs | Product Packaging, Full page, Front, Up to 1,000, 3 Years | $885.00 | $790.00 | $837.50 | $723.94 |
| T3 | Pckg_Full_Bck_1K_3yrs | Product Packaging, Full page, Back, Up to 1,000, 3 Years | $885.00 | $790.00 | $837.50 | $723.94 |
| T4 | Pckg_1/8_Frt_1K_3yrs | Product Packaging, Up to 1/8 page, Front, Up to 1,000, 3 Years | $635.00 | $565.00 | $600.00 | $518.64 |
| T5 | Pckg_1/2_Frt_1K_3yrs | Product Packaging, Up to 1/2 page, Front, Up to 1,000, 3 Years | $885.00 | $790.00 | $837.50 | $723.94 |
| T6 | Pckg_1/2_Frt_1K_1yr | Product Packaging, Up to 1/2 page, Front, Up to 1,000, 1 Year | $765.00 | $715.00 | $740.00 | $639.66 |
| T7 | Pckg_Full_Bck_25K_3yrs | Product Packaging, Full page, Back, Up to 25,000, 3 Years | $1,530.00 | $1,365.00 | $1,447.50 | $1,251.22 |
| T8 | Pckg_Full_Frt_5K_3yrs | Product Packaging, Full page, Front, Up to 5,000, 3 Years | $1,180.00 | $1,050.00 | $1,115.00 | $963.81 |
| T9 | Pckg_Full_Frt_25K_3yrs | Product Packaging, Full page, Front, Up to 25,000, 3 Years | $1,530.00 | $1,365.00 | $1,447.50 | $1,251.22 |

**EXHIBIT G**

# Agency Stock Quotes Combined



Getty_Pckg_1|2_Frt_1K_1yr



Getty_Pckg_1|2_Frt_1K_3yrs

Agency Stock Quotes Combined



Getty_Pckg_1|8_Frt_1K_3yrs



Getty_Pckg_Full_Bck_1K_3yrs

# Agency Stock Quotes Combined



Getty_Pckg_Full_Bck_25K_3yrs



Getty_Pckg_Full_Frt_1K_3yrs

Agency Stock Quotes Combined



Getty_Pckg_Full_Frt_5K_3yrs



Getty_Pckg_Full_Frt_25K_3yrs

# Agency Stock Quotes Combined



Getty_Pckg_Full_In_1K_3yrs



Superstock_Pckg_1|2_Frt_1K_1yr

Agency Stock Quotes Combined



Superstock_Pckg_1|2_Frt_1K_3yrs



Superstock_Pckg_1|8_Frt_1K_3yrs

Agency Stock Quotes Combined



Superstock_Pckg_Full_Bck_1K_3yrs



Superstock_Pckg_Full_Bck_25K_3yrs

Agency Stock Quotes Combined



Superstock_Pckg_Full_Frt_1K_3yrs



Superstock_Pckg_Full_Frt_5K_3yrs

Agency Stock Quotes Combined



Superstock_Pckg_Full_Frt_25K_3yrs



Superstock_Pckg_Full_In_1K_3yrs

**EXHIBIT H**

# License Fee Adjustment 2017 vs 2013

| Agency | Reference Image | Media Description | License Fee (2017) | License Fee (2013) | Difference | Decrease |
|--------|-----------------|-------------------|--------------------|--------------------|-----------|----------|
| Getty Images | 200244661-001 | Retail, Calendar Interior, up to full page, 5,000, 1 year, U .S. | $590.00 | $510.00 | $80.00 | 13.56% |

**EXHIBIT I**

## Table of License Fees, by Image

| Image # | License # | Usage # | Usage Description | Total 2013 Adjusted License Fees for Image |
|---|---|---|---|---|
| 1 | L1, L6, L7, L8, L9, L10, L11, L12 | U1, U6, U7, U8, U9, U10, U11, U12, U13, U14 | KING OF BLUES Box Set UPC - 00008811067724<br><br>"BEST OF B.B. KING & BOBBY BLAND UPC - 00076742070625"<br><br>"MR. B.B. KING UPC - 00600753384992"<br><br>"MR. B.B. KING 4 CDS UPC - 00600753390863"<br><br>"LADIES AND GENTLEMEN… MR. B.B. KING UPC - 00600753411506"<br><br>"LADIES AND GENT(2LP) UPC - 00600753629734"<br><br>"ULTIMATE COLLECTION UPC - 00602498266137"<br><br>"WHY I SING THE BLUES UPC - 00076742025625"<br><br>"WHY I SING THE BLUES UPC - 00602517372313" | $7,280.41 |
| 2 | L2, L4 | U2, U4, U5 | B.B. KING LIVE IN JA UPC - 00008811181024<br><br>"LIVE IN JAPAN UPC - 602537065073" | $1,447.87 |
| 3 | L3 | U3 | B.B. KING LIVE IN JA UPC - 00008811181024 | $723.94 |

**EXHIBIT J**

Visual Index of Images



Image #1



Image #2



Image #3

**EXHIBIT K**

## Visual Index of Usages



U1



U2



U3



U4

Visual Index of Usages



U5



U6



U7



U8

Visual Index of Usages



U9



U10



U11



U12

Visual Index of Usages



U13



U14

**EXHIBIT L**

# 2017 License Fee Sample for
# License Fee Adjustment 2017 vs 2013



Retail, Calendar Interior, up to full page, 5,000, 1 year, U.S.