UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GLEN CRAIG,

          Plaintiff,

          -against-

UMG RECORDINGS, INC., KINGSID
VENTURES, LTD., and ESTATE OF RILEY
B. KING,

          Defendants.
-----------------------------------------------------------X

No. 16 Civ. 5439 (JPO)

# DECLARATION OF JEFFREY SEDLIK IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISQUALIFICATION

I, **JEFFREY SEDLIK**, declare as follows:

1. I am a professional photographer, with decades of experience in photo licensing. I am also employed as a professor at the Art Center College of Design, and have taught college courses, seminars and workshops on copyright and photography licensing for more than thirty years. I currently serve as the President and CEO of the PLUS Coalition, a non-profit, international standards body and trade association that develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. I also serve as a Director of the American Society for Collective Rights Licensing, and a Director of the Linked Content Coalition. At the Copyright Alliance, I am a member of both the Creators Advisory Board and Academic Advisory Board. I am the past National President of the Advertising Photographers of America.

2. Since 2000, I have maintained an active consultant and expert witness practice providing consulting services, forensic analysis and expert testimony on legal, business and

technical matters related to digital and traditional photography, illustration, marketing and other related topics. Since 2008, I have advised senior staff members of the United States Copyright Office on topics including copyright registration, regulatory, re-engineering and professional workflow issues.

3. I have read both Glen Craig's declaration (Dkt. No. 58) and Richard Liebowitz's declaration (Dkt. No. 57) submitted in support of Craig's motion to disqualify me (Dkt. No. 55) and am utterly shocked and dismayed by the scope and number of intentional omissions, misleading statements, and falsehoods propounded in both declarations.

4. As per my usual business practice, I contemporaneously log every interaction I have with every client and potential client, and every task I undertake for each client and potential client. Thus, my recollections of my interactions with Craig and Liebowitz, and with counsel for UMG Recordings, Inc. ("UMG"), Estate of Riley B. King ("Estate") and Kingsid Ventures, Ltd. ("Kingsid", and together with UMG and Estate, "Defendants"), are not only informed and supported by email exchanges, but also informed and supported by the contemporaneous notes that I took during those interactions.

**Communications with Craig and Liebowitz**

5. I have never been retained by Craig or Liebowitz in connection with any litigation. In fact, I had never heard of Craig until he contacted me.

6. Craig first contacted me on September 19, 2016[1], when he called my office and left a message. In that message, he stated that he was referred to me by the American Society of Media Photographers ("ASMP"), a trade association for photographers, for which I am a volunteer.

---

[1] Liebowitz's assertion that Liebowitz contacted me or attempted to contact me on September 19, 2016 (Dkt. No. 57, ¶ 4) is false.

7.      I speak on ASMP's copyright speakers bureau, and, among other things, have written the licensing chapter of their professional practices book. ASMP regularly receive calls from photographers seeking advice on copyright and business matters, and they often refer those calls to me. I regularly dedicate hours of pro bono time to discussing such matters with the photographers referred by ASMP and other organizations. Thus, because Craig mentioned in his message that he was referred to me by ASMP's executive director, my expectation in returning his call was that he was a photographer seeking advice from me as an ASMP volunteer. In his message, he did not mention that he was seeking my services as an expert.

8.      After receiving this message, I downloaded and reviewed the complaint filed in this action (Dkt. No. 1 ("Complaint")), reviewed copyright registrations in Craig's name available from the website of the U.S. Copyright Office, and reviewed publicly available articles on Craig from Musee Magazine, Analogue Gallery, and Morrison Gallery.

**The Initial, Preliminary September 19, 2016 Call With Craig Lasted 45 Minutes**

9.      I called Craig back and spoke to him for approximately 45 minutes. We spoke of nothing substantive regarding this case. During the call, Craig only very briefly and generally informed me of the allegations contained in the Complaint: he told me that he took multiple photographs of B.B. King, which were used on multiple releases without his knowledge or permission. He stated that the photographs are registered with the U.S. Copyright office, and that while the infringements occurred before the registration, they are still ongoing.

10.     All of this information that Craig disclosed to me was previously known to me based on my review of the complaint. Contrary to Craig's assertions, Craig, did not ever, at this time or any other, discuss with me "all aspects of the case," "how [Craig] ended up taking the photographs, who else was there, who else was around in those days, [his] relationship to

Changes Magazine that publishe[d] other photographs that were taken during that session," or Craig's "theory of the case." Dkt. No. 58, ¶ 7. Moreover, contrary to Craig's assertions, I never asked any "questions about [his] employment, commissions, licensing of the images, UMG's exploitation" or any "other questions" relevant to "assess[ing] the damages in this case" during this call or any other call with Craig. *Id.*

11. Significantly, while Craig may have told Liebowitz of his supposed impression that I was "eager to teach [them my] method of calculating damages in this case," (Dkt. No. 57, ¶ 5) as a business practice, I do not make the determination of applying any specific method to calculating damages until I have reviewed all relevant documents, materials, and testimony produced and filed in that matter. Because this was an initial, preliminary consultation, I would not and could not have provided – and did not provide – any such methodology or calculations.

12. Indeed, I never "made a preliminary assessment of damages" on the phone, nor did I give a "detailed assessment of damages as a preview of [my] expert opinion," nor "explained [my] methodology … that exponentially grew the potential damages in this case" to Craig. *Id.* at ¶¶ 8-9; Dkt. No. 57, ¶ 5. Craig never "explained [to me] how [he] measured damages to that point" and I never "offered to speak with [Craig's] attorneys about [my] method of calculating" damages. Dkt. No. 58, ¶ 8. In truth, we had no "lengthy [or] extensive" conversations regarding the substance of this case. Dkt. No. 57, ¶ 5.

13. Craig also informed me that he was seeking damages from UMG and the Estate, and that his attorney had advised him that he needed to find an expert to testify on damages. After learning this, I advised Craig that I had or have business relationships with two of the Defendants. I advised Craig that I had previously licensed images to UMG entities in the past, and that I also have a poster business which has a licensing agreement with the Estate. I advised

Craig that I was concerned that my ongoing relationship with the Estate might potentially give rise to a perception of a conflict of interest. Craig advised me that he understood my concern, and advised that he would like to set up a call with Liebowitz and me to discuss that issue. I agreed to participate in such a phone call, and the call ended.

14. At no point during the call or after did I ever "h[o]ld [myself] out as a member of the team." Dkt. No. 58, ¶ 9. This was a preliminary consultation, a first conversation with Craig, someone I had never met nor had any contact, and which centered mostly around Craig asking me for information on various attorneys. Moreover, I had directly and repeatedly advised Craig that I would likely not be able to accept the engagement due to a potential conflict with the Estate.

15. In fact, Craig dedicated the vast majority of the 45-minute call to describing his displeasure and frustration with Liebowitz's representation of him in this action, and relating his ongoing efforts to identify and retain substitute counsel. Even so, contrary to Liebowitz's assertions, at no time during this lengthy discussion did I ever "encourage [Craig] to fire" Liebowitz. Dkt. No. 57, ¶ 18. Rather, Craig asked for my opinion of the firm that Craig was considering as substitute counsel (with whom he said he was already in discussions), and also asked me for an attorney referral. Craig also asked for my opinion and impression of Liebowitz, and for my knowledge of Liebowitz's experience as a copyright litigation attorney. We discussed all of the foregoing and I promised to send him the contact information of an attorney that I mentioned in our call,[2] as well as any information I had regarding Liebowitz's other filed cases.

---

[2] Contrary to Liebowitz's assertion that I have one "attorney [I] prefer to work with," this particular attorney has engaged my expert services only twice, while I have had over 300 engagements as an expert or consultant.

16. Craig also asked for my professional experience and my qualification as an expert, and asked for my resume. I advised him of that experience, and Craig asked me to send him my curriculum vitae for the purpose of sharing my qualifications with Liebowitz. I agreed to send Craig my curriculum vitae by email after the call.

17. We also briefly discussed our mutual frustration with online infringement of our respective photographs. In the course of that discussion, I informed Craig that I was aware of the infringement of many photographers' music-related photographs on the website Yellowkorner.com. Craig asked for the link to that website, and I agreed to provide that link after the call via email.

18. Thus, after the call, I sent Craig three emails with the information that he requested: (a) an email with my curriculum vitae, (b) an email with the other attorney's contact information, and (c) an email with the link to the Yellowkorner website. True and correct copies of the emails are attached hereto as **Exhibits 1-1, 1-2, and 1-3**. This information, as well as the conversation with Craig in general, was provided not as an expert, but what I considered to be my role as an ASMP volunteer.

19. The next day, I sent Craig an email with the additional information that he had requested during the call regarding Liebowitz's background and the cases that Liebowitz had filed. In that email, I informed Craig that I would be "willing to speak" with Liebowitz, but reiterated that "I can't take on matters involving [the] bb king estate, [as] I have a licensing arrangement with them." A true and correct copy of my September 20, 2016 email to Craig is attached hereto as **Exhibit 2**.

**The September 21, 2016 Call With Craig Lasted Nine Minutes**

20.     On September 21, 2016, Craig called me and we spoke for nine minutes, again mostly regarding Craig's dissatisfaction regarding his retention of Liebowitz.  Contrary to Craig's assertions, we never discussed "the legal strategies employed in this case" (nor could we in a nine minute phone call), and he was the one who brought up his dissatisfaction with Liebowitz. Dkt. No. 58, ¶ 10.  Indeed, the entirety of Craig's summary of our phone call is false. First, as Exhibit 2 shows, I had sent Craig the information regarding Liebowitz's filed cases prior to this phone call.  *Id.* ("Mr. Sedlik would later send me a chart..").  Second, I never, at any time, told Craig that he "does not need an attorney," never at any time offered my "legal services," never at any time offered to "collect compensation," for Craig, never at any time offered to "write cease and desist letters," never at any time offered to work for a "small fee," (my standard consulting fee for all clients is $650 per hour), never sent Craig's contact information to the attorney, nor did I at any time " set up a meeting" for Craig with the attorney... *Id.*

21.     I did not refer Craig to any attorney during that call, because at Craig's request, I had already referred Craig to that attorney, and had indeed, at Craig's request, emailed that attorney's contact information to Craig, prior to the call.[3]  *See* Ex. 1-2.

22.     In fact, during this call, Craig informed me that he had spoken and met with the attorney that I had recommended during our last call, and that he was continuing to speak with other attorneys in order to identify and retain substitute counsel in the matter.  Craig then advised that Liebowitz had read that I was the expert in the case *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376 (3rd Cir. 2016) and was impressed with the dollar amount of damages in that matter.  Craig

---

[3] While I neither arranged nor attended the alleged meeting between Craig and this attorney, I have no reason to believe that the attorney "knew things beyond the public record" regarding this action, because I did not provide the attorney with any information regarding this action, other than the names of the parties listed in the complaint.

asked whether I was still willing to have a call with him and Liebowitz despite my concern of a potential conflict.  I informed Craig that I was still willing to have such a phone call, and that Craig should propose a time.  The call then ended without any discussion of the facts or theories of this case.

### The September 22, 2016 Call With Craig and Liebowitz Lasted 15 Minutes

23.     On September 22, 2016, Craig and I exchanged emails in order to set up a time to speak with Liebowitz.[4]  A true and correct copy of that email exchange is attached hereto as **Exhibit 3**.

24.     On that same day, Craig, Liebowitz and I participated in a 15 minute conference call.  Prior to the call, as is my practice as an expert, I took it upon myself to review and further familiarize myself with the allegations and defenses asserted in this case.  I reviewed the complaint, the answers filed by the Defendants, UMG's Local Rule 7.1 Statement, and the Order for a Pre-Trial Conference.

25.     During this call, we only briefly discussed Craig's allegations against the Defendants.  Liebowitz disclosed to me a general broad summary of the allegations made in the Complaint: Liebowitz stated that Craig had taken multiple photographs of B.B. King, and that such photographs were used on multiple releases without his knowledge or permission.  Liebowitz stated that the photographs were registered, that the infringements occurred before the registration but were ongoing, and that Craig was seeking damages, disgorged profits, and statutory damages from UMG.  All of this information was already known to me because it is all contained in the Complaint.

---

[4] Liebowitz's assertion that he and I "corresponded via email and set up a time for a telephone conference regarding the same" (Dkt. No. 57, ¶ 4) is false.

26. Moreover, I could "easily recall information [Craig] gave [me]" (Dkt. No. 58, ¶ 12), knew "Craig's work history during that time," "knew the issues surrounding the registration with the U.S. Copyright Office," and was aware of the "facts surrounding the case, … the legal strategy, potential issues, strengths and weaknesses of [the] case" (Dkt. No. 57, ¶¶ 7-8) because (a) we spoke only in very general terms, (b) all of this information was contained in the public Complaint, answers (which contain defendants' theories of available affirmative defenses), and Craig's copyright registration, as well as publicly available articles containing Craig's work history, and (c) I have a professional knowledge of copyright law and the issues surrounding photography copyright, and thus had a general understanding of how the relevant laws would apply to the Complaint's allegations. Contrary to Liebowitz's assertion, however, I did not discuss, nor was I aware of, at that time, "how Craig discovered the photographs' exploitation by the Defendants."[5] Dkt. No. 57, ¶ 8.

27. For the rest of the 15 minute call, we did not discuss anything substantive regarding this case. Liebowitz stated that they would need my expert opinion on the issue of damages. Liebowitz stated that he had read *Stemtech*, and asked if I could calculate damages in the same manner as I had in that case. As this call lasted only fifteen minutes, I generally answered his basic and broad questions regarding my role and opinions in *Stemtech* and in other matters, but contrary to Craig's assertions, (Dkt. No. 58, ¶ 13), I did not say anything regarding the calculation of damages in this matter. Again, because as a business practice, I do not make the determination of applying any specific method to calculating damages until I have reviewed all relevant documents, materials, and testimony produced and filed in that matter, and because

---

[5] I became aware of this subsequently, after I was retained by Defendants and was provided with the discovery produced in this action, and reviewed the transcript of Craig's deposition.

this was an initial, preliminary consultation, I would not and could not have provided – and did not provide – any answers with respect to the application of a specific methodology or calculation.

28. Moreover, contrary to Craig's assertions, I did not discuss legal "issues like work-for-hire, … the availability of damages and the extent of exploitation" with him and Liebowitz. Dkt. No. 58, ¶ 14. Rather, during the call, I told Liebowitz that based on my review of the copyright registration at issue and of the answers[6], that there may be a statute of limitations issue. There was no substantive discussion with Liebowitz or Craig regarding the statute of limitations or any other legal issues. Rather, Liebowitz quickly turned to the issue of fees and the costs for an expert report. He asked me for an estimate for providing an expert report in this matter, and I advised him and Craig of my advance engagement fee of $5,000, hourly fee of $650, and further advised them that a minimal report with minimal discovery review may require 25 hours or more of work, and that reports requiring calculation of actual damages or opinions on indirect profits require far greater time. Liebowitz then asked if I would accept a lower hourly rate, a lower retainer, and if I would work for a flat fee. I declined to do so. I then informed Liebowitz and Craig that due to my case load, I also charge an "Expedited Testimony Fee," applicable to matters in which I am retained within 30 days of the due date of the report. Liebowtiz asked if I would waive that fee, and I declined.

29. Then, because I did not know whether Craig had relayed my concerns of a potential conflict to Liebowitz, I informed Liebowitz on the call of my licensing agreement with the Estate, and that I had previously disclosed this and my concern of a potential conflict to Craig

---

[6] In my review, I found that each answer raised the statute of limitations as an affirmative defense. *See* Dkt. Nos. 13, ¶ 76, 15, ¶ 76; and 16, ¶ 76.

via phone and email. I also explained to Liebowitz that I had previously licensed images to UMG entities, including for a photograph of B.B. King.

30. Contrary to Liebowitz's assertion that I "seemed to indicate that [I was] willing and able to be retained for this case," and that I was "enthusiastic about [my] participation in this case," (Dkt. No. 57, ¶ 7), and contrary to Craig's assertions that I "reiterated [my] willingness to be part of the team" and "seemed … eager to work together," (Dkt. No. 58, ¶ 13), I specifically advised Liebowitz and Craig that while I did not feel that the prior UMG relationship was a conflict, that I was unable to accept the engagement due to the inclusion of the Estate as a defendant, but that I could refer them to another expert. I noted that I would only consider the engagement if Craig and Liebowitz dropped the Estate as a defendant in the case, and were willing to pay my standard fees.

31. The call ended without any substantive discussion of this action. This was my last contact with Craig regarding this matter, and I did not hear from Liebowitz again regarding this matter until May 14, 2017.

**May 14, 2017 Email Exchanges with Liebowitz**

32. On May 14, 2017, after almost 8 months of no contact with either Craig or Liebowitz regarding this case,[7] I received an email from Liebowitz requesting to "revisit the

---

[7] While we had no contact regarding this case, I did see Liebowitz, by chance, on October 22, 2016 at the Photo Plus Expo, a photography trade show, in New York City. Liebowitz had a booth at the trade show, and I happened to notice his booth as I was wandering through hundreds of other booths the trade show. On October 28, 2016, I received an unsolicited email from Liebowitz, referencing the trade show, stating that he "would like to continue the conversation we had at the show regarding helping some of your photographers with their copyright infringement matters…" A true and correct copy of this email is attached hereto as **Exhibit 4**. I believe this is a standard solicitation email that Liebowitz sent to everyone who came by his booth on October 22, 2016. Though I did approach his booth, I did not, and have never had any conversation with Liebowitz regarding my referral of any business to him, and I did not, and had certainly never agreed to refer any such business to him.

conversation" regarding this action and asking whether I had a conflict. A true and correct copy of this email is attached hereto as **Exhibit 5**.

33. Liebowitz and Craig attempt to cast this question, and my May 2017 exchange with Liebowitz, as the first time I had ever informed either Liebowitz or Craig of my potential conflict in this case. Dkt. Nos. 57, ¶¶ 10-12; 58, ¶¶ 16-18. This is, of course, patently false. I had explained to Craig on September 19, 2016, and Liebowitz on September 22, 2016 – the first time I spoke to each of them about this case – that I had a concern about a potential conflict, and that I did not feel comfortable taking on this engagement with the Estate as a defendant.

34. I responded to that email on the same day, reminding Liebowitz once again that "I'm not certain that I can take on a case against BB King, as my publishing company has [a] licensing agreement with the estate to use his likeness on a poster." [8] I also attached, for Liebowitz's reference, the photograph of mine that appears on the cover of the "King of the Blues" box set. Nonetheless, I closed that email stating that "we should talk," because, as I had stated previously to Liebowitz and Craig during the September 22, 2016 phone call, if the Estate were to be dropped as a defendant in this case, and if Liebowitz and Craig agreed to pay my standard rates, I would consider being retained as an expert in this action. Moreover, I was also open to speaking with Liebowitz to provide him with a referral to another expert, which I had previously offered to Craig in our September 19, 2016 phone call and offered to Craig and Liebowitz in our September 22, 2016 joint call  A true and correct copy of this email is attached hereto as **Exhibit 6**.

---

[8] This May 2017 statement to Liebowitz echoed my earlier statements to Craig and Liebowtiz in phone calls on September 19, 2016 and again September 22, 2016, and my written statement to Craig in my email of September 20, 2016, "I can't take on matters involving [the] bb king estate, [as] I have a licensing arrangement with them."

35. Liebowitz then responded to propose a time for a call, and I sent a follow up email confirming the time. I asked Liebowitz whether "the Court grant[ed his] request for a May 29 expert disclosure" and whether that was "the current target for this report." I asked this not because I was "still mulling over meeting" the deadline (Dkt. No. 58, ¶ 18), but because I had intended to refer this matter out to another expert, and a tight deadline would rule out any expert with a heavy caseload. Liebowitz responded that the Court had extended the expert disclosure to May 29, 2017, and asked for my phone number, which I provided. A true and correct copy of this email exchange is attached hereto as **Exhibit 7.**

36. I also emailed Liebowitz to inform him again that one of my photographs appeared on the cover of one of the products alleged by Craig to be infringing, and that my photograph was used under a license to MCA Records, a predecessor to UMG. A true and correct copy of this email is attached hereto as **Exhibit 8**.

### The May 15, 2017 Call with Liebowitz Lasted 31 Minutes and Was the Last Time I Spoke to Liebowitz or Craig Regarding This Matter

37. On May 15, 2017, I had my last interaction with Liebowitz regarding this matter. The call lasted 31 minutes, and we did not discuss anything substantive regarding this action. Rather, the phone call focused solely on my potential conflict and my fees. I reminded Liebowitz that I had advised him back in September of 2016 that I had a potential conflict, explained my standard fee schedule again, and that if retained, I would be applying the Expedited Testimony Fee because I would be retained less than 30 days prior to the expert report deadlines. Liebowitz asked me if I would lower my hourly rate and cap my fees. I declined, and also declined to waive the Expedited Testimony Fee. At that point, Liebowitz stated that he would no longer seek to retain me in this matter, and accepted my offer to provide him with a referral to another expert. I provided Liebowitz with the name and phone number of another

expert, and, upon information and belief, Liebowitz then contacted that expert to discuss engagement in the case.

38. After Liebowitz informed me he would no longer seek to retain me in this matter, and after I gave Liebowitz a referral to another expert on May 15, 2017, I had no further contact with either Liebowitz or Mr. Craig regarding this matter. Craig's assertion that Liebowitz "spoke to [me] following [the call] about the formal retainer" is entirely false. Dkt. No. 58, ¶ 19. Indeed, even Liebowitz fails to confirm that he ever spoke to me after this call, or that he ever spoke to me regarding any formal retainer.[9]

39. I was never retained by Craig or Liebowitz in this matter. I was not sent, did not send, and did not sign any retention agreement, engagement letter, consulting agreement or confidentiality agreement. I was never paid for any time that I spent on this matter, and I never produced damages estimates, damages calculations, preliminary reports or assessments for Craig or Liebowitz in this matter, nor did I accept any request to do so.

40. Neither Craig nor Liebowitz provided me with any documents or confidential information. Rather, all the materials I reviewed and all the information they disclosed were publicly available. Because we had no confidential relationship, or any reasonable expectation

---

[9] I did not "[leave] open the possibility on[sic] working on other cases with [Liebowitz's] firm, whether for Craig or other clients." Dkt. No. 57, ¶ 14. Rather, during the call, Liebowitz told me that he would like to speak with me about another matter at a later date. Indeed, the next day, Liebowitz emailed me regarding a "Motley Crue" matter and we set up a call for the next day. On May 17, 2017, I had a brief call with Liebowitz regarding the Motley Crue matter. We did not discuss this action at all. Rather, Liebowitz asked me for an estimate of my fees for an expert report in the Motley Crue matter. I provided him with an estimated number of hours, and also reminded him of the Expedited Testimony Fee. Liebowitz then asked whether I would waive that fee and also work for a lesser hourly fee or a flat fee. I declined to do so and suggested that he contact the same expert that I had earlier referred him to for this action. On September 26, 2017, more than four months after I declined the engagement, Liebowitz contacted my office requesting an engagement letter, despite the fact that I had declined engagement. A true and correct copy of these email exchange is attached hereto as **Exhibit 9**.

of a confidential relationship, when I *did* want Craig to keep an email confidential, I asked Craig to "[p]lease do not forward this message or the attachment." *See* Ex. 2.

41. In total, I spent one hour and forty minutes on the phone with Craig and/or Liebowitz regarding this matter. The conversations with Craig were, for the most part, regarding Craig's dissatisfaction with Liebowitz, Craig's ongoing search for a new attorney, and my potential conflict with the Estate. The conversations with Liebowitz and the joint conversation with Craig and Liebowitz focused primarily on my potential conflict with the Estate, and my fee schedule for an expert report.

42. While Craig, Liebowitz and I did have brief discussions in which the allegations of the Complaint were mentioned, neither Craig nor Liebowitz disclosed any confidential information to me, and the discussions remained general and brief. In fact, neither Craig nor Liebowitz disclosed any information to me that I did not already know based on my review of the filings in this matter, and of publicly available articles regarding Craig and his photography.

43. Contrary to Liebowitz's assertions, I did not discuss "the circumstances surrounding the creation of the photographs, Craig's work history at the time the photographs were taken, Craig's discovery of the exploitation of the photographs, the exclusivity, rarity and scarcity of B.B. King photographs, the countries where the exploitation took place, the number of unique infringing products, [or] several data points that inform a calculation of market value for the photographs." Dkt. No. 57, ¶ 17. Even so, all of the foregoing information is either publicly available, or disclosed by Craig to the Defendants during his deposition. Indeed, my only source of information regarding "the circumstances surrounding the creation of the photographs, Craig's work history at the time the photographs were taken, [and] Craig's

discovery of the exploitation of the photographs" was Craig's deposition transcript, which I received and reviewed after being retained by Defendants.

44. Similarly, contrary to Craig's assertions, he did not ever disclose to me "how [he] got assigned to cover the B.B. King event, who took the photographs and gave them to UMG [or] how many exploitations were found during [his] investigation." Dkt. No. 58, ¶ 23. Even so, all of the foregoing information was disclosed by Craig to the Defendants during his deposition, as a part of document production, or in his interrogatory responses.

**Retention by Defendants**

45. On July 27, 2017, I received a voicemail from Linna Chen, counsel for Defendants, regarding engaging my services as an expert in this matter on behalf of the Defendants.

46. I returned Ms. Chen's call on the same day. This was my first contact with counsel for the Defendants in relation to this matter. I advised Chen that Craig and his counsel had discussed this matter with me, sought to retain me, but ultimately did not retain me as their expert. I advised her of the same potential conflicts that I had previously mentioned to Liebowitz and Craig – that I have a licensing agreement with the Estate, and that I had previously licensed photographs to UMG entities.

47. Though all the information regarding the case that Liebowitz and Craig disclosed to me was public, I did not disclose any of that information to Ms. Chen, nor did I mention Craig's dissatisfaction with Liebowtiz or Craig's efforts to identify and retain substitute counsel.

48. On August 11, 2017, I sent Ms. Chen a copy of my engagement letter, and confirmed that I had or have business transactions with each of the Defendants, and that I had

previously communicated with Liebowitz and Craig regarding their potential retention of my expert services.

49. On August 25, 2017, Defendants and I entered into an engagement agreement for my expert services in this matter.

50. In order to form my opinion and draft my report, I requested, and Defendants sent me, all filings made in this action, as well as all materials disclosed by all parties during discovery, including all deposition transcripts, interrogatory responses, and document productions.

51. As per my usual business practice, I relied solely on the documents provided to me by the retained party (in this case, the Defendants) to form my opinion and draft my report for this matter. Thus, there was no need to "disclose any of [my] interactions [with Craig or Liebowitz], communications [with Craig or Liebowitz]" or any information that I received from Craig or Liebowitz. Dkt. No. 58, ¶ 20, and I did not do so.

52. Upon information and belief, on October 13, 2017, Defendants served my expert report on Craig. *See* Declaration of Barry I. Slotnick, ¶ 6, Ex. E (the "Report").

53. As per my usual business practice, I draft my report with clear citations to the record. Thus, as is clear from the face of the Report, the facts underlying my opinions were obtained from (a) assumptions provided by retaining counsel, (b) filings made in this action, and (c) materials produced by the parties during discovery, including deposition transcripts. To wit:

- I knew that "Craig captured photographs of BB King at one or more concert events" because Craig disclosed this information to Defendants during his deposition. Report, 10 (citing to Craig Depo);

- I knew that Craig alleged that "certain of his photographs of BB King have been reproduced in and on packaging for products manufactured, distributed, and sold by UMG, its predecessors and affiliates" because this was disclosed in the Complaint. Report, 10 (citing to Complaint);

- I knew that "all such uses were made by UMG, and its predecessors and affiliates, without license from Craig, and without Craig's knowledge", because this was disclosed in the Complaint. Report, 10-11 (citing to Complaint);

- I knew that "Craig claim[ed] to have first discovered unlicensed usages in 2014" because Craig disclosed this to Defendants during his deposition. Report, 11 (citing to Craig Depo);

- I knew that "Craig contacted Defendants to discuss the usages and to seek additional information" because this information was known to Defendants and disclosed during discovery. Report, 11; *see* Slotnick Decl., Ex. G;

- I knew that "the parties were unable to resolve the matter" because this information was known to Defendants. Report, 11;

- I knew that "Craig filed a complaint on July 7, 2016, alleging copyright infringement and copyright violations for removal of copyright management information" (Report, 11) because this was all disclosed in the Complaint;

- I knew that "Craig has alleged that UMG, its predecessors and affiliates made use of the Photographs in or on various of their products distributed as CDs, LPs and digital downloads" (Report, 21) because this was disclosed in the Complaint, Complaint, ¶¶ 12-56;

- I was advised by retaining counsel as to the extent of UMG's alleged usages in calculating damages for my report. Report, 21-22;

- I knew Craig's theory of how the Photographs came into the possession of UMG's predecessor because "[a]t deposition, Craig repeatedly described his theory.." Report, 22 (citing to Craig Depo);

- I knew about Changes Magazine's publication of certain B.B. King photographs in the early 1970s, and Craig's theory of how the B.B. King Tour Book received certain of his photographs to be published, because "Craig testified at [his] deposition" regarding all of these matters. Report, 22-23 (citing to Craig Depo);

- I knew the details of Craig's work history, including his licensing history of the Photographs because this was disclosed by him during his deposition. Report, 25-27 (citing to Craig Depo);

- I calculated the fair market value of license fees applicable to the alleged infringing uses based on my expertise and experience in image licensing and in the development and management of industry standards for image licensing. Report, 27-28; and

- I opined on the unavailability of statutory damages and attorneys' fees based on my knowledge of the applicable copyright law, and the publicly available copyright registration at issue. Report, 35.

54. Indeed, because Craig and Liebowitz did not disclose to me any confidential information, and because I relied solely on information that was disclosed by Craig to Defendants during discovery or in public filings, Craig has not and cannot identify a single opinion or statement of fact in my Report that is not derived from the documents filed in this matter, or documents produced during discovery in this matter.

55. Lastly, contrary to Craig's assertions that the field is "populated by experts," I am one of only a few qualified experts in the photography copyright space. Upon information and belief, I am one of five people in the United States who holds themselves out to be an expert qualified to opine on the issue of damages related to copyright infringement of photography. In fact, in the most significant photography copyright matters, both the plaintiff and the defendant have called to retain me, including, for example, the other UMG matter that Craig alludes to in his moving brief.[10]

56. Allowing Craig to disqualify me on the facts of this case – where no payments have been made, no confidentiality or other consulting or retainer agreement signed, where only public information was disclosed, where the information allegedly disclosed to me *was actually disclosed to Defendants by Craig,* and where there were only a handful of brief interactions with the Craig and Liebowitz – would likely deprive me of a source of essential income. Under such circumstances, unscrupulous parties may make brief contact with me – without retaining me or having any longstanding relationship with me – solely in order to preempt the ability of their adversaries from obtaining my expert assistance.

---

[10] Contrary to Craig's assertions, the plaintiff in that matter did not retain me.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: Los Angeles, California
        December 22, 2017

_____
Jeffrey Sedlik