I5PHCraH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GLEN CRAIG,

                    Plaintiff,

            v.                          16 Civ. 5439 (JPO)


UNIVERSAL MUSIC GROUP, INC.,
et al.,
                                        Hearing

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        May 25, 2018
                                        3:00 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                        District Judge

                    APPEARANCES

LIEBOWITZ LAW FIRM PLLC
        Attorney for Plaintiff
BY:  RICHARD LIEBOWITZ

LOEB & LOEB LLP
        Attorneys for Defendants
BY:  BARRY I. SLOTNICK
     CHENG L. CHEN

I5PHCraH

| 1 | (Case called) |

MR. LIEBOWITZ:  Richard Liebowitz, Liebowitz Law Firm,

counsel for plaintiff, Glen Craig.  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. SLOTNICK:  Good afternoon.  Barry Slotnick and

Lina Chen, Loeb & Loeb.

THE COURT:  Good afternoon.

MR. SLOTNICK:  Good afternoon.

THE COURT:  We're here for a hearing on

plaintiff's motion to disqualify defendants' expert witness.  I

read the parties' submissions regarding this motion and the

declarations attached to them, and I determined that it made

the most sense to have a hearing.  I knew you were in

settlement discussions.  I thought if there was one way to get

this case to settle, it might be scheduling this hearing for a

Friday before Memorial Day at 3:00 p.m.  Much to my chagrin,

that didn't work, but anyway, here we are.

I don't think we need openings or anything.  I think

we just need to go right to the testimony probably.  To the

extent that anybody has any housekeeping matters or anything

they want to address about how to go forward today, I'm happy

to hear it.  I assume we'll just have plaintiff first, then

defendant, and we can talk about whether you want to do some of

it *in camera*.

MR. LIEBOWITZ:  Your Honor, yes, I would like, since

I5PHCraH

1    there was confidential information exchanged, doing it

2    privately potentially with some of the things that we're going

3    to talk about today.

4           But in terms of the overview in terms of -- I do want

5    to bring up that the parties are relatively close in terms of

6    settlement number.  We were waiting for defendant to come back

7    with a response to our demand, and it's relatively very, very

8    close.  So we are just waiting for defendant to get back to us.

9           But now, going right to this, plaintiff, Glen Craig,

10   had a discussion with Mr. Sedlik without counsel on the phone,

11   and he thought that this was a confidential discussion.  A lot

12   of things did come out regarding evaluation in terms of

13   strength and weaknesses of the case and a lot of information

14   that Mr. Sedlik could use for the expert report and testimony

15   at trial.  And it was a reasonable expectation that Mr. Sedlik

16   was going to help plaintiff with the matter, him being an

17   expert in this particular field, and at length had a long

18   conversation without me on the phone and, obviously, numerous

19   things happened on that phone call, and he expected that to be

20   confidential.  So we do feel that numerous items in the expert

21   report were discussed with the plaintiff in this action before

22   the report was created and thought that that was used for the

23   actual report.

24          In addition to the report, obviously, there's

25   testimony at trial that we don't know what can be used that was

I5PHCraH

1    said during the conversations that Mr. Craig thought was

2    confidential.

3         MR. SLOTNICK:  Your Honor, if I may, I thought we were

4    foregoing the opening statements.  If Mr. Liebowitz would like

5    to take the stand, we'll cross-examine him, but since he

6    clearly has no knowledge of those conversations between his

7    client and Mr. Sedlik, I think we should get on with it.

8         A couple of things, though.  Your Honor has obviously

9    seen the rather extensive briefing on this, the declarations,

10   the exhibits, rather extensive exhibits attached, and we

11   thought it might be better for housekeeping purposes, rather

12   than to go through the painstaking step of introducing each

13   document into evidence, to just deem that the declarations and

14   their exhibits to be deemed into evidence and refer to those as

15   part of the record.

16        THE COURT:  That's fine with me.  Is that OK with you?

17        MR. LIEBOWITZ:  That's fine.

18        THE COURT:  So ordered.

19        Do you want to start with your witness, Mr. Liebowitz?

20   You have the burden.

21        MR. LIEBOWITZ:  OK.  Yes.  All right.  Just

22   procedurally, I mean, should he stay here?

23        THE COURT:  Yes, you can call Mr. Craig.

24        MR. LIEBOWITZ:  OK.

25        THE COURT:  And then he'll come up to the witness

1   stand and be sworn in.

2           MR. LIEBOWITZ:  OK.  All right.  Mr. Craig, I'm going

3   to call you to the stand over here.

4           THE COURT:  Sir, if you'd please come up to the

5   witness stand; remain standing at the top step.  You can come

6   up to the top step and raise your right hand, and you'll be

7   sworn in.

8   GLEN CRAIG,

9        the plaintiff, called as a witness, in his own behalf,

10        having been duly sworn, testified as follows:

11           THE COURT:  Do you have additional exhibits?

12           MR. LIEBOWITZ:  No, just --

13           THE COURT:  Question from the podium, please.

14           MR. LIEBOWITZ:  Question from here?

15           THE COURT:  Yes.  You may inquire.

16   DIRECT EXAMINATION

17   BY MR. LIEBOWITZ:

18   Q.  So, Mr. Craig, when did you first know of Mr. Sedlik?

19   A.  I was introduced to Jeff Sedlik by Tom Kennedy from the

20   Association of Magazine Photographers.  He gave me his

21   information, told me to call him, that he would be helpful for

22   me in this particular case.

23   Q.  And when, approximately, did you first speak with

24   Mr. Sedlik?

25   A.  Date-wise?

Q.   Yes, approximate.

A.   That, I don't know.

Q.   So the first conversation you had with Mr. Sedlik, was it over the phone?

A.   Yes.

Q.   Could you please discuss what happened on that phone call.

A.   OK.  Turns out we're both photographers, so we talked a little bit shop to begin with, OK.  I went and then explained -- he asked me some questions, and I proceeded to answer, OK, which photographs are we talking about?  I described what they were and then who was the people that we were going against, and I mentioned Universal Music, etc., etc. Then we talked about me and my career, and so forth.  And I explained I am not a stock photographer.  I don't license photographs, per se.  I work with a gallery, Morrison Hotel Gallery, here in New York, and they handle my fine art prints around the world between their three galleries plus two galleries within Europe and one in Japan.

        So I'm not in the habit of licensing.  When somebody comes to me for work, I review that particular situation.  If I want to work with those people, I don't want to work with those people, etc., but I'm not in the stock trade.  I've never done it thus far, up until a couple times now.

        OK.  So what we -- once we've established those three pictures, I asked:  OK.  These are these three photographs, OK.

1    Now let's take a look, and what is your opinion of these

2    photographs?  And I was told that these photographs are

3    historic, archival --

4              MR. SLOTNICK:  Objection.  Hearsay.

5              THE WITNESS:  -- and --

6              THE COURT:  Hold on.  Hold on.  I'm going to overrule

7    the objection on the ground that it's not for the truth of the

8    matter in this circumstance.

9              Go ahead.

10   A.  OK.  So then we went into each photograph, OK.  And once

11   those three photographs were established that they were part of

12   this lawsuit, OK, trying to put an initial value on these

13   pictures that were supposedly historic and archival.  So maybe

14   bad example was used of Getty Images of what they would charge

15   for a historic image to be sold, and I was given a number of

16   about 12,500 to about 15,000 based on three to five years

17   worldwide usage.

18   Q.  OK.

19             MR. SLOTNICK:  Objection, your Honor.  If

20   Mr. Liebowitz wants to have his client conduct this as a

21   monologue, I suppose that's fine, but the comments that

22   Mr. Craig are making do not seem to put words into anybody's

23   mouth.  They seem to be a recitation of what he thinks the

24   value of these photographs are.  He hasn't yet said anything

25   that he specifically said to Mr. Sedlik or what Mr. Sedlik's

response is, and this doesn't seem to be moving the ball

forward at all.

THE COURT:  Well, I will clarify with the witness that

you should answer the question, which is what was said during

the first call.

THE WITNESS:  Yes.

THE COURT:  Maybe you could clarify whether that is

what you're reciting --

THE WITNESS:  Uh-huh, yes.

THE COURT:  -- to the best of your recollection.

THE WITNESS:  Yes.  OK.

So then I proceeded after that to go into other

details, and those details were other things of violations of

my work from non-Universal, OK, such as the T-shirts,

independent CDs, DVD, other placements, magazines, and so forth

and so on, which are now being handled apart.

OK.  So at that point we were talking back and forth.

I said:  What do you think these things are?  And he explained

to me at that point, he said:  I think they're iconic, I think

they're of historic value, and they're definitely worth a

premium.

THE COURT:  Worth what?

THE WITNESS:  A premium.  OK.

Then he said:  You know, on your other matters, I am a

photographer.  I necessarily don't use lawyers, per se.  I do

1    my own collecting of money, and so forth.  So I can show you

2    how to do that or I can along the way help you do that --

3    obviously, I guess, for a fee -- and if not, then can refer you

4    to a different attorney.

5           Then in the conversation, he said to me:  You know,

6    I'm not too crazy about talking with your current attorney,

7    Richard Liebowitz.  And he has filed -- and this was back in

8    January period -- something like 100-plus cases, and so forth.

9           OK.  So I said:  Oh, fine.  And he said:  Well, you

10   know, I just was using this other particular attorney that I

11   work with on another case, the stem cell case, he said, and I

12   introduced my -- what they would call the Sedlik rule, slide

13   rule, that became, I guess, case law at that point in district

14   in Maryland, OK.  Now, normally something like this could be

15   three times, five times the price per photograph, but in some

16   cases, it could be nine times based on using the slide rule.

17          THE COURT:  OK.  This is getting way too detailed.

18   You've got ten minutes.

19          MR. LIEBOWITZ:  OK.  Sure.

20   Q.  Mr. Craig, could you talk about specifically the valuation

21   that you discussed with Mr. Sedlik --

22   A.  Yes.

23   Q.  -- in terms of what you said to Mr. Sedlik in terms of the

24   valuation of what you felt the photographs were valued at.

25   A.  Yes.  I said to him:  Based on what you're saying to me and

I5PHCraH                         Craig - Direct

1    based on looking at the Getty site, OK, those numbers of

2    12,500 to 15,000 seem like they are in the ballpark, of course,

3    not applying any kind of in the courtroom or anything, applying

4    anything like, you know, a slide rule to these numbers.

5    Q.  OK.  Was there anything else in terms of looking at the

6    Getty website?  What else did you have in discussions on this

7    confidential information regarding what you thought the value

8    of your photographs were?

9    A.  Yes.  I was asking for an opinion, OK, based on somebody

10   who is in the field, does licensing on a regular basis, which I

11   don't, for a lead to get an idea of the pricing.  I also then

12   discussed the other cases, Getty and all the other things that

13   were on the horizon to be filed, OK.

14        So I took the advice from him and was introduced by

15   email to a gentlemen down in Maryland, Jan something, OK.  And

16   he came up to New York, and we met at the Yale Club.  And I

17   seemed a little startled because he knew a background of me,

18   you know, and my cases, and so forth, and I'm meeting this guy

19   for the first time as a stranger.

20        MR. SLOTNICK:  Objection, your Honor.  I'm not sure

21   what this has to do with confidential information shared with

22   Mr. Sedlik.

23        MR. LIEBOWITZ:  He's going to continue and discuss

24   information that was obviously --

25        MR. SLOTNICK:  I understand he can continue, but these

1   nonquestions are provoking responses that have nothing to do

2   with why we're here today.

3           THE COURT:  Were you answering the question about

4   confidential information?

5           THE WITNESS:  Yes, yes.

6           THE COURT:  OK.  You can continue.

7   A.  So this particular attorney explained to me what he does,

8   and so forth, and he explained to me that he had worked with

9   Mr. Sedlik on some cases, and so forth.  And what he introduced

10  to me was, he said:  Based on what I know and what you're

11  discussing with me --

12          MR. SLOTNICK:  Your Honor, objection, your Honor.

13  Hearsay.  Not for the truth.

14          THE COURT:  Why are you talking about what another

15  attorney told you?

16          MR. LIEBOWITZ:  Well, I think this is describing what

17  Sedlik was speaking to this attorney on, and he was startled to

18  hear what this attorney knew about the case and valuation.

19          MR. SLOTNICK:  Your Honor, then it's double hearsay.

20  I mean, he's commenting about something that somebody told him

21  that was told by somebody else.

22          THE COURT:  What was it that Mr. Sedlik said to you in

23  the phone call that you're talking about?

24          THE WITNESS:  You're talking about of this particular

25  attorney?

1          THE COURT:  No, I'm talking about the phone call you

2     had with Mr. Sedlik.

3          THE WITNESS:  Well, the idea of the worth; my

4     licensing history, as it was; my thing as a photographer; what

5     I've done in my career, and so forth; and then going into all

6     the other infringements, and so forth and so on, with -- you

7     know, in detail of mentioning the Getty, you know, one by one,

8     and so forth.  They were numerous to be dealt with afterwards.

9     BY MR. LIEBOWITZ:

10    Q.  Great.  Did you have reason to suspect that this

11    information you shared with Mr. Sedlik would be kept

12    confidential?

13    A.  Yes, because as I was recommended to him by Tom Kennedy, as

14    supposedly a friend of the photographic community and a fellow

15    photographer, I thought that it would be an opportunity and a

16    chance, you know, to bring him on board for this case.  And I

17    was a little shocked afterwards, six months later, that all of

18    a sudden there's an expert witness report that was generated by

19    UMG.  So I'm questioning here, number one, who hired him and

20    who had knowledge that he was being hired?  As I was told,

21    Barry Slotnick had no idea that this guy was being hired as an

22    expert witness.

23         MR. SLOTNICK:  Objection, your Honor.  First of all, I

24    don't know who, your Honor --

25         THE COURT:  Sustained.  Next question.

1    Q.  I want to go specifically in terms of valuation and

2    discussion you had with Mr. Sedlik on the Getty Images pricing

3    which is displayed in Mr. Sedlik's report.

4            Did you have a discussion on the Getty Images pricing

5    when you had a discussion with him over the phone?

6    A.  Yes.  And I was a little shocked when I did see the report

7    afterwards that a common photograph of BB King was pulled to

8    use as a poor example of what licensing would be worth.

9            THE COURT:  The question --

10           MR. SLOTNICK:  Objection.

11           THE COURT:  Sustained.  The answer is nonresponsive.

12           Repeat the question.

13   Q.  OK.  Mr. Craig, I just want to discuss, was the Getty

14   Images pricing that Mr. Sedlik had in his expert report, was

15   that discussed with you in your conversation?

16   A.  Yes, that's where a number of 12,500 to 15 was suggested.

17           THE COURT:  OK.

18   Q.  As a starting point?

19           THE COURT:  Who first raised that number?  Who put out

20   that number first?

21           THE WITNESS:  I was not aware of pricing because I'm

22   not used to doing something like that.  This was something that

23   was mentioned in terms of --

24           THE COURT:  Who mentioned it?

25           THE WITNESS:  Mr. Sedlik, in terms of it being

I5PHCraH                              Craig - Direct

1  considered a historic premium photograph.  Then I went back

2  after the phone call, I looked it up myself just to see --

3           THE COURT:  OK.

4           THE WITNESS:  -- what the numbers were.

5           THE COURT:  Fine.  We're just focused on the

6  conversation.

7  BY MR. LIEBOWITZ:

8  Q.  Yes, yes, we're just focused on the conversation.

9           Were you surprised to see in the report that what you

10 discussed in the conversation, that this was used in the report

11 because you were discussing about this valuation from the Getty

12 Images website?

13 A.  Yes, I was.

14 Q.  Did you expect that to be confidential about discussing

15 that you would use pricing from the Getty Images website to

16 support your theory of damages?

17          MR. SLOTNICK:  Objection, your Honor.

18 A.  Yes.

19          MR. SLOTNICK:  Certainly lacking specificity.  He's

20 talking about a report.  The report's not in evidence.  He

21 hasn't asked a specific question regarding the report.  I have

22 no way of cross-examining this witness because I have no way of

23 understanding what this witness is saying.

24          THE COURT:  I'm going to allow it as it is.  I mean,

25 he just said, were you surprised to see the Getty pricing in

I5PHCraH                          Craig - Direct

1   the report?

2           MR. LIEBOWITZ:  Yes.

3   Q.  So were you surprised to see the Getty Images pricing that

4   you were discussing with Mr. Sedlik on the phone and what you

5   were discussing ended up being in the report?

6   A.  Yes, I was.  And I was very shocked to see a completely

7   different photograph, not even my photograph, being used, which

8   was a common photograph, as a bad example as pricing, really

9   low pricing, for an image that meant nothing.  It just was

10  common.  And then in the report it goes on to say that the

11  photographs were just common photographs of BB King like of

12  anybody's, etc., etc.  Now, if that was the case, why did

13  Universal use the images on 44 CDs worldwide?

14          MR. SLOTNICK:  Objection, your Honor.  Nonresponsive.

15          THE COURT:  I'll allow it.

16          Next question.

17          MR. LIEBOWITZ:  OK.

18  Q.  Did you discuss with Mr. Sedlik the strengths and

19  weaknesses of your case?

20  A.  Yes.

21  Q.  OK.  Could you explain that, what you discussed.

22  A.  Well, I had no guidelines in terms of pricing, OK, for that

23  or anything in the future, and I was looking to him as a leader

24  in the field in terms of an expert, in terms of giving me a

25  hand or giving us a hand in terms of coming up with some

I5PHCraH                              Craig - Direct

1   pricing of what things were worth.

2   Q.  Did you yourself throw out numbers in terms of valuation

3   for him to get feedback on the valuation?

4   A.  I kind of let him lead.

5   Q.  OK.

6   A.  Because, again, I'm not an expert in that.

7   Q.  All this was under the expectation that this was

8   confidential; that he was on your team?

9   A.  Yes.

10  Q.  Was there any other confidential information that was

11  discussed on the phone call with Mr. Sedlik?

12  A.  The other cases mentioned which did not appear in my

13  declaration or affidavit that I did, OK.  Nowhere did it appear

14  in the Getty filings, or anywhere else, any of that stuff

15  mentioned.

16  Q.  Anything else in terms of valuation of your photographs

17  that were discussed besides the Getty Images pricing?

18  A.  Just the fact of the formulas of slide rule and the offer

19  to show how to use the slide rule, and so forth, and that these

20  photographs could be used at that point, not the standard three

21  or five times multiplier.

22  Q.  OK.  Did you have any other discussions with Mr. Sedlik?

23              THE COURT:  It's Mr. Sedlik, right?

24              MR. SLOTNICK:  Yes.

25              THE COURT:  Mr. Sedlik.

1          MR. LIEBOWITZ:  Sedlik.

2     A.   Just the factors, and we went into the thing of the other

3     attorney, of introducing us together.  And like I said, I'll

4     repeat again, I just was a little taken back when I met him of

5     his already knowledge about me and what was going on.

6     Q.   And did you have another phone call conversation with

7     counsel on the line with Mr. Sedlik?

8     A.   Yes, there was a phone call afterwards jointly.

9     Q.   And do you recall what was said on that phone call?

10    A.   I think most of what was said in that case was the attorney

11    asking questions, you know, more and me just listening.

12    Q.   OK.  Was valuation discussed on that phone call as well?

13    A.   I believe so.

14         MR. LIEBOWITZ:  I have no further questions.  Thank

15    you, your Honor.

16         THE COURT:  Thank you.

17         Would you like to do cross-examination?

18         MR. SLOTNICK:  Yes, your Honor.

19    CROSS-EXAMINATION

20    BY MR. SLOTNICK:

21    Q.   Good afternoon, Mr. Craig.

22    A.   Uh-huh.

23    Q.   You talk about this conversation you had alone with

24    Mr. Sedlik.  Do you recall how long that call was?

25    A.   About 45 minutes to an hour.

I5PHCraH                        Craig - Cross

1   Q.  You said you talked shop.  What does that mean to somebody

2   who is not a photographer?

3   A.  OK.  He explained to me his background, what he shot, and

4   so forth; mentioned that he actually had done some posters

5   through a company of his; and he had shot an actual BB King CD

6   cover, things like that.

7   Q.  What did you tell him about your career?

8   A.  Oh, I explained to him my background in the music business

9   first, then photography as well, parallel.

10  Q.  And your background in the music business goes back to

11  19-when?

12  A.  1966.

13  Q.  And you took him through every step between 1966 in the

14  music business to the time you were in the photography

15  profession?

16  A.  No.

17  Q.  OK.

18  A.  Photography, let's get this clear, was always a side thing,

19  as well as the music.

20  Q.  OK.

21  A.  Uh-huh.

22  Q.  And you walked through how your career developed?

23  A.  Just quick, brief summary.

24  Q.  OK.

25  A.  Not step by step, year by year, no.

I5PHCraH                        Craig - Cross

1    Q.  What did you tell him about your career in the music

2    business?

3    A.  Who I worked for, you know.

4    Q.  Who was?

5    A.  Sid Bernstein.

6    Q.  Who's Sid Bernstein?

7    A.  Sid Bernstein is the gentleman who passed away two years

8    ago.  Sid Bernstein was a premier world promoter.  This is the

9    gentleman that brought the Beatles, The Rolling Stones, The

10   Who, etc., etc., to America, and was part of their

11   representation here in the states as well as promoting their

12   concerts.

13   Q.  And you mentioned this to --

14   A.  Yeah.

15   Q.  -- Mr. Sedlik?

16   A.  I mean, Sid was the gentleman who did the Beatles' concert

17   at Shea Stadium.

18   Q.  Mr. Craig, I look around the room, and I suspect you and I

19   are the only ones who were alive when the Beatles were at Shea

20   Stadium.  So I'm asking for the record.  So thank you.

21   A.  Uh-huh.

22   Q.  You talk about who the defendants were, is that correct?

23   A.  Yes.

24   Q.  And you mentioned UMG?

25   A.  Yes.

1    Q.  Did you also mention the BB King estate?

2    A.  Yes.

3    Q.  And did Mr. Sedlik tell you that he had a business

4    relationship with the --

5    A.  It was mentioned he had licensed some photographs to them.

6    Q.  Did he mention any reluctance about being an expert adverse

7    to the estate?

8    A.  At that point, he was more not wanting to talk to the

9    counsel, my counsel, because of his so-called reputation.

10   Q.  OK.  We can get to that in a moment, but my question was

11   did he say anything to you about his reluctance to bring -- to

12   be an expert adverse to the BB King estate?

13   A.  What was mentioned to me that I can recall was he was

14   reluctant to have a conversation with Mr. Liebowitz or be

15   associated with Mr. Liebowitz based, so-called, on his

16   reputation as an ambulance chaser.

17   Q.  OK.  Again, I promise you we will get to that, but you're

18   not answering my question.

19           Did he, at the time that he spoke to you, tell you

20   about his relationship, his business relationship, with the BB

21   King estate and his reluctance to be an expert adverse to the

22   BB King estate?

23   A.  It was mentioned to me that he had a working or past

24   relationship, that he had licensed photographs to these people,

25   and then pointed out which CD it was, and so forth.  And I just

I5PHCraH                          Craig - Cross

1    so happened to have photographs within that particular CD.

2    Q.  So you have no other recollection of the conversation

3    regarding the BB King estate and Mr. Sedlik's reluctance to be

4    a witness adverse to them?

5    A.  What I remember was the reluctance to want to talk to

6    Richard Liebowitz.

7    Q.  OK.  Can you go into detail.  What did he say?  How long

8    did you talk about that?

9    A.  A few minutes.  And then he proceeded to send me

10   for-your-eye's-only email that had something like hundred-plus

11   cases that Richard Liebowitz filed since January.

12   Q.  Did you ask for that?

13   A.  No.

14   Q.  Did you tell him not to send it?

15   A.  No, I just got it.

16   Q.  OK.  So there was no discussion about that during your

17   call, to your recollection?

18   A.  About that I was going to get an email?

19   Q.  Yes.

20   A.  No.

21   Q.  You talked about Getty Images.  How does that factor into

22   this, please?

23          MR. LIEBOWITZ:  Objection.  Form.  What do you mean?

24   A.  How it factored into this?

25   Q.  Yes.

1              THE COURT:  Overruled.

2              You can answer.

3  A.   I was not the person who brought that up, nor did I bring

4  that up in this report that you furnished to the Court.

5  Q.   So you're saying that references to Getty Images was

6  brought up by Mr. Sedlik?

7  A.   Yes.

8  Q.   In what context?

9  A.   In terms of the photographs themselves being considered

10 iconic, historic value.  And I later went onto the Getty site

11 myself and punched in some stuff and saw some friends, Jim

12 Marshall, other people's work, and so what they were asking for

13 a historic archival premium photograph.

14 Q.   So that information was available to you online on the

15 Getty Images website?

16 A.   Yes, I looked afterwards.

17 Q.   Other than Getty pricing, what else did you discuss about

18 valuation?

19 A.   What was discussed was a starting point of what a historic

20 premium photograph would be worth, OK.  Normally, let's say in

21 a court, was the norm of three to five.  And then what was

22 discussed was the idea based on the introduction of case law of

23 the -- in the stem cell case that he handled and was an expert

24 witness for, and using that, the math for that slide rule, OK,

25 of what a value could be worth of a photograph.

I5PHCraH                          Craig - Cross

1   Q.  What do you mean by "that slide rule"?

2   A.  It's something that Mr. Sedlik came up with in that

3   particular stem cell case that he worked with this attorney Jan

4   that was introduced to me, and it became case law.  At that

5   point the judge accepted it, and it's kind of the norm to be

6   able to use that in a trial.

7   Q.  And that's what you read about after the fact, this stem

8   case?

9   A.  Yes.

10  Q.  OK.

11  A.  Yeah.

12  Q.  And you've had a chance to read that case?

13  A.  Yes.

14  Q.  And that case was provided to you by Mr. Sedlik or was that

15  provided to you by counsel or just public record?

16  A.  No, I was curious afterwards, and I got on it and I read

17  the whole thing up and down.  I saw PBN News, things like that,

18  just to see what was going on with the case.

19  Q.  You talked about your second conversation with Mr. Sedlik,

20  which was with counsel, is that correct?

21  A.  Correct.

22  Q.  And you said that you listened mostly; that Mr. Liebowitz

23  did much of the talking, is that correct?

24  A.  Correct, uh-huh.

25  Q.  And you said that you were interested in getting

I5PHCraH                              Craig - Cross

1   information about pricing because that's not something that

2   you've done historically in your career?

3   A.   Correct.

4   Q.   So that you had no ability to contribute to that

5   conversation regarding pricing?

6            MR. LIEBOWITZ:   Objection.

7   A.   No.

8   Q.   Now, you talk about other cases.  What cases are those?

9   A.   What other cases are those as follows:  OK.  There are nine

10  independent CDs that do not belong to Universal Music; one DVD

11  issued by EuroArts; five independent T-shirts, not counting the

12  T-shirt that you did in conjunction with the estate, UMG, that

13  was sold on the BBKing.com site, OK.  We have the Getty Images.

14  We have cases against the Granger Collection, Warner Bros.,

15  Sony Music, Vice, BuzzFeed, AOL, *Huffington Post*.  There's a

16  couple hundred cases.

17  Q.   When you say "cases," are you referring to actually filed

18  lawsuits?

19  A.   Coming.

20  Q.   OK.  So they're not actually filed as of this date?

21  A.   One of them is.

22  Q.   That's the one against Getty Images?

23  A.   Yes.

24  Q.   OK.  And you recounted these facts to Mr. Sedlik?

25  A.   Yeah, I mentioned, you know, this is the extent of the

1    abuse that has gone on, and gone on not in 1970 but recently

2    kind of thing.

3    Q.   But none of those cases, as you call them, are part of this

4    case, is that correct?

5    A.   Correct.

6    Q.   This case is limited to certain photograph records that

7    have been released that you've sued on, is that correct?

8    A.   Yes.

9    Q.   So the other cases have nothing to do with this case?

10   A.   No.

11   Q.   Thank you.

12        Mr. Craig, have you ever retained Mr. Sedlik as an

13   expert in this action?

14   A.   I was under the impression that we were going to retain

15   him, and as I understood, there was a separate phone call later

16   on between Mr. Liebowitz and Mr. Sedlik in terms of retaining

17   his services, not just in my case, but three or four other

18   cases that were on the horizon or already started, nothing to

19   do with me.

20   Q.   So the answer to my question would be no, you have not

21   retained Mr. Sedlik as an expert in this case?

22   A.   They talked money back and forth, and they did not come to

23   any kind of an agreement.

24   Q.   So the answer to my question is no, you have not?

25   A.   Right, after the fact, yes.

I5PHCraH                      Craig - Cross

1   Q.   Okay.  And you've never signed an engagement letter with

2   Mr. Sedlik, have you?

3   A.   No, not at that point.

4   Q.   OK.

5   A.   That was just an initial exploratory phone call.

6   Q.   And at any point you've not ever entered into an engagement

7   letter with Mr. Sedlik --

8   A.   No.

9   Q.   -- is that correct?

10          And to the best of your knowledge, your attorney has

11  not entered into an agreement with Mr. Sedlik as it relates to

12  your case?

13  A.   No.

14  Q.   OK.  Did you enter into a consulting agreement with

15  Mr. Sedlik regarding this case?

16  A.   We got to the point after that phone call of Richard

17  Liebowitz talking to him and trying to work out some details

18  possibly in terms of hiring him.

19  Q.   So the answer to my question is no, you haven't entered

20  into --

21  A.   No.

22  Q.   Thank you.

23          And you don't have a signed confidentiality agreement

24  with Mr. Sedlik either, do you?

25  A.   No.

I5PHCraH                        Craig – Cross

1    Q.  OK.

2    A.  You know, amongst people you think, you know, there's some

3    kind of ethics.

4            MR. SLOTNICK:  I'll ask the Court to strike the last

5    nonresponsive answer.

6            MR. LIEBOWITZ:  Objection.

7    Q.  And you've never paid Mr. Sedlik in connection with this

8    case, have you?

9    A.  No.

10   Q.  Outside of this case, have you had -- I think you said

11   that your September 19 call with Mr. Sedlik was the first time

12   you ever spoke to him, is that correct?

13   A.  Correct, yes.

14   Q.  So you didn't know of him before?

15   A.  No.

16   Q.  So you had no prior business or personal relationship with

17   him?

18   A.  No.

19   Q.  And even though you're both photographers, you were not

20   familiar with him, per se?

21   A.  The only thing that I knew afterwards was, oh, he was that

22   guy who did the cover with the ring in the front of the

23   picture.

24   Q.  OK.  So then you have -- you've never entered into any kind

25   of agreement with Mr. Sedlik for any kind of professional

I5PHCraH                              Craig - Cross

1   business relationship before, during, or after that

2   September 19 --

3   A.  No.

4   Q.  -- 2016 call?  Thank you.

5           When you called Tom Kennedy -- Tom Kennedy is whom, by

6   the way?

7   A.  Tom Kennedy is the president of the Association of Media

8   Photographers.  He's their current president.

9   Q.  What is the Association of Media Photographers?

10  A.  OK.  Everybody is -- it's based in Philadelphia.  It's all

11  over the United States.  It's all photographers, working

12  photographers, advertising, fashion, so forth and so on.  They

13  offer member services, discounts towards insurance, legal

14  in-house counsel, and so forth.

15  Q.  OK.  Sort of like a trade association of photographers?

16  A.  Yes, exactly.

17  Q.  And you called Mr. Kennedy and you -- do you know

18  Mr. Kennedy personally?

19  A.  Yes.

20  Q.  And you called and you told him that you were looking for

21  an expert?

22  A.  Yes.

23  Q.  Did you tell him you were looking for a damages expert?

24  A.  I explained to him a little bit.  Just, look, we entered

25  into a lawsuit, Tom.  OK.  I need to put some value on these

I5PHCraH                          Craig - Cross

1   photographs, OK.  I don't know.  That's not my cup of tea in

2   terms of licensing.  Who can you recommend that has a good

3   track record?

4   Q.  OK.  Did he recommend anybody other than Mr. Sedlik?

5   A.  He recommended a gentleman in Long Island, I don't remember

6   his name, an older gentleman that was part of the chapter but

7   really had no history of this type of thing.  He knew about

8   stock photographs, that's about it.

9   Q.  Did you contact that gentleman?

10  A.  Yes, I did.

11  Q.  You recall his name?

12  A.  No.

13  Q.  Do you know --

14  A.  An older gentleman in Long Island that Tom recommended, and

15  he was kind of senile almost.

16  Q.  As I age, I get very sensitive to what people consider an

17  older gentleman, so I won't ask you how old he was.

18          Did you know if Mr. Liebowitz spoke to this other

19  gentleman?

20  A.  No.

21  Q.  So you never turned that information over to --

22  A.  No, I just mentioned to him that I spoke to this older guy,

23  and he just does some stock, and that was it.  And, you know,

24  he would be of no help.

25  Q.  In addition to this older, somewhat senile gentleman,

1    Mr. Kennedy gave you the name and contact information for

2    Mr. Sedlik?

3    A.   Correct.

4    Q.   And you chose to call him?

5    A.   Yes.

6    Q.   And before you contacted Mr. Kennedy, did you and

7    Mr. Liebowitz discuss needing an expert in this case?

8    A.   Yes.

9    Q.   Was it your task to find somebody for Mr. Liebowitz to try

10   to hire?

11   A.   We both started a mission looking.

12   Q.   Was it your understanding that after you obtained the name

13   of an expert, you were going to pass that along to

14   Mr. Liebowitz so he could have conversations with that expert?

15   A.   Yes.

16   Q.   And did you do so?

17   A.   Yes.

18   Q.   Do you recall how quickly after you received the

19   information you contacted Mr. Liebowitz?

20   A.   When I got off the phone.

21   Q.   But then you also contacted Mr. Sedlik directly, isn't that

22   correct?

23   A.   Yes.

24   Q.   You didn't wait for Mr. Liebowitz to call?

25   A.   Right.

I5PHCraH                              Craig - Cross

1    Q.  Because you wanted to talk to Mr. Sedlik personally?

2    A.  Yeah, I wanted -- was very curious to find some pricing,

3    and so forth.

4    Q.  And you didn't want to do that with Mr. Liebowitz on the

5    phone?

6    A.  No, I was, go ahead and call the guy up.

7    Q.  Wasn't it a fact that the reason you wanted to talk to

8    Mr. Sedlik alone is because you wanted to talk to Mr. Sedlik

9    about your concerns about Mr. Liebowitz?

10            MR. LIEBOWITZ:  Objection.

11   A.  Not necessarily, no.  I was interested in the pricing.

12   Q.  And you had no interest whatsoever in asking him about your

13   attorney?

14   A.  The only thing I had mentioned was to him that he's new,

15   OK, experience-wise, and so forth.

16   Q.  So you did mention that to Mr. Sedlik?

17   A.  Uh-huh.

18   Q.  How did that come up?

19   A.  Just in the -- in the conversation.

20   Q.  You raised it?

21   A.  Yeah.

22   Q.  About how long was that discussion about Mr. Liebowitz?

23   Five minutes?  Ten minutes?  Fifteen minutes?

24   A.  No, quickly.  A minute maybe.

25   Q.  Then there was another minute where he talked to you about

1    Mr. Berlage?

2    A.  Yes.

3    Q.  And then there was another minute when he talked to you

4    about all Mr. Liebowitz's cases?

5              MR. LIEBOWITZ:  Objection.

6    A.  Yeah, probably.  Minute, two, whatever.

7    Q.  You weren't watching your --

8    A.  No.

9    Q.  -- watch at the time?

10   A.  No.

11   Q.  So it could have been a minute and a half?

12   A.  Right, whatever.

13   Q.  Could have been three minutes?

14   A.  Uh-huh.

15             THE COURT:  Please try to answer yes or no if you can

16   rather than --

17   A.  Yes.

18             THE COURT:  -- rather than the noises.

19   Q.  So you spoke to Mr. Sedlik on September 20, is that

20   correct?

21   A.  I guess that was the date.

22   Q.  I'm sorry.  It was September 19.  Does that sound right

23   now?

24   A.  I know it was the fall.  What date, what hour, no.

25   Q.  OK.  You didn't take any notes of your conversation?

I5PHCraH                     Craig - Cross

1   A.  No.

2   Q.  And you didn't send an email to Mr. Liebowitz identifying

3   what happened on the call?

4   A.  Verbally.

5   Q.  So there's no email?

6   A.  Right.

7   Q.  OK.  Now, Mr. Sedlik sent you some material almost

8   immediately, did he not?

9   A.  Yes.

10  Q.  Like to show you what's been marked as Sedlik Declaration

11  Exhibit 2.

12          THE COURT:  Was this previously filed?

13          MR. SLOTNICK:  Yes, your Honor.  This was part of

14  Mr. Sedlik's declaration.  It's docket No. 63-4.

15          Your Honor, may I approach?

16          THE COURT:  Yes.

17  Q.  Mr. Craig, I'd like you to look at what was the Sedlik

18  Declaration Exhibit 2.  This was filed with the Court on

19  December 22, 2017, and it's from Jeff Sedlik to

20  glencraig@rcn.com.

21          Is that your email address?

22  A.  Yes, it is.

23  Q.  It's dated Tuesday, September 20, at 2016 at 4:15 p.m.  Do

24  you see?

25  A.  Uh-huh.

I5PHCraH                        Craig - Cross

1   Q.  Do you recall seeing this?

2   A.  This is the email that was an attachment of all the court

3   records.

4   Q.  That's correct.  So you do recall seeing it?

5   A.  Yes.

6   Q.  And you recall that, you go down beyond the court records,

7   you'll see in the second block of print, says:  "Also, I can't

8   take on matters involving the BB King estate.  I have a

9   licensing arrangement with them."

10           So you saw that on September 16, 2016, did you not?

11           THE COURT:  September 20.

12           MR. SLOTNICK:  Sorry.  September 20, 2016.  Thank you,

13   your Honor.

14   A.  Uh-huh, so it was part of the email.

15   Q.  So you saw that, is that correct?

16   A.  I focused on the list of the cases, to be honest with you.

17   Q.  Why did you focus on the list of the cases?  Wasn't that

18   irrelevant to you?

19   A.  No, I just was curious.

20   Q.  OK.  Well, why?

21   A.  When someone comes with that kind of accusation that

22   there's -- you know, discrediting somebody, oh, there's so many

23   cases filed, etc., etc., you're not curious to go into them and

24   look at them?

25   Q.  I don't know if that's an accusation or a praise for

I5PHCraH                          Craig - Cross

1    somebody that successful.

2             But you did see in the email, whether you focused on

3    it or not, Mr. Sedlik said to you I can't take on matters

4    involving BB King estate?  You saw that, correct?

5    A.  You're showing me that it was in the email.

6    Q.  Well, you received the email and it's in the email.  Did

7    you see it?

8    A.  Can I be honest with you?  No.

9    Q.  OK.

10   A.  I saw the part of --

11   Q.  That you wanted to see?

12   A.  -- of the cases, yes.

13   Q.  Did you pass this along to Mr. Liebowitz?

14   A.  Yes.

15   Q.  OK.  So presumably he saw that too or didn't, because he

16   wasn't interested either.  You don't know; you have no idea?

17            MR. LIEBOWITZ:  Objection.

18   A.  I don't speak for him.

19   Q.  OK.  That's good.  All right.

20            You have no idea what anybody representing you or you

21   thought about a statement that seems pretty clear-cut.  Reading

22   it now, do you understand what it means?

23   A.  After the fact, yes.

24   Q.  Well, reading it now, yes, so you understand what it means,

25   I can't take matters involving the BB King estate.  OK.  You

I5PHCraH                          Craig – Cross

1  acknowledge that right now, correct?

2  A.  I'm seeing it now, yes.

3  Q.  All right.  Did you ask Mr. Sedlik for a CV?

4  A.  A what?

5  Q.  A CV, a résumé.

6  A.  No.

7  Q.  You didn't ask him for a résumé?

8  A.  No.

9  Q.  You were thinking of hiring him as an expert, and you

10  didn't want to know what his background was?

11  A.  Briefly we talked about, you know, what he did, you know,

12  in the past, you know, with organizations, and so forth.  But,

13  no, I would leave that to the person who would be hiring him,

14  the attorney.

15  Q.  But you received a copy of Mr. Sedlik's CV, résumé,

16  correct?

17  A.  No.

18  Q.  You never received that?

19  A.  No.

20       MR. SLOTNICK:  Excuse me, your Honor.  Sorry, your

21  Honor.  I'm sorry, your Honor.

22       THE COURT:  That's all right.

23       MR. SLOTNICK:  Your Honor, I'm introducing Sedlik

24  Declaration Exhibit 1-1.

25  Q.  Mr. Craig, I want you to look at this document.  If you

I5PHCraH                        Craig - Cross

1    look at the second page, it's page 2 of 10, it's document 63-1.

2    It was filed with this Court on December 22, 2017, and it's an

3    email from Jeff Sedlik to glencraig@rcn.com.  It says,

4    "Subject:  Emailing Professor Jeffrey Sedlik CV," and it's

5    dated Monday, September 19, 2016, at 2:29 p.m.

6             Do you see that?

7    A.  Yes.

8    Q.  Do you see the résumé behind it, the CV?

9    A.  Yes.

10   Q.  Do you recall seeing that at the time that it was received

11   by you?

12   A.  No.

13   Q.  Do you recall whether you sent it on to Mr. Liebowitz?

14   A.  Don't think so, no.

15   Q.  OK.  Do you recall ever sending it on to Mr. Liebowitz?

16   A.  What's that?

17   Q.  Do you recall ever sending it to Mr. Liebowitz?

18   A.  No.

19             THE COURT:  Are you about done, Mr. Slotnick?

20             MR. SLOTNICK:  Your Honor, honestly --

21             THE COURT:  I'd like to get to your witness.

22             MR. SLOTNICK:  Your Honor, I can go past this.

23             THE COURT:  Do you have a significant point you wanted

24   to make?

25             MR. SLOTNICK:  The point I want to make is that from

day one, Mr. Sedlik made it very clear that he could not

represented the plaintiff because of this conflict.

THE COURT:  I think that's proven by that exhibit,

Sedlik Declaration Exhibit 2.

MR. SLOTNICK:  Your Honor, OK.

THE COURT:  Whether he paid attention to it or not, I

think that probably does establish that it wouldn't be

reasonable to assume otherwise.

MR. SLOTNICK:  Thank you, your Honor.  Beyond that,

your Honor, I think that there was never an agreement in place.

There was never a payment in place.  There was never an

agreement as to the terms.  And what this witness has testified

to is that, essentially, he was a passive party to any

conversation that he had with Mr. Sedlik.  So to the extent

that he gave any kind of confidential information, he gave

information regarding his career, he gave information regarding

the infringement, all of which is in the complaint.

He gave information regarding totally irrelevant

matters to this case, although I'm sure they're very important

to Mr. Craig.  And at the very least there should have been no

reasonable expectation of confidentiality or a relationship or

an agreement.  Frankly, your Honor, we can put Mr. Sedlik on

the stand, but I'm not sure what the point is.  It's the

plaintiff's burden to establish a confidential relationship,

and forgive me, but I just don't see it.

I5PHCraH                         Craig - Redirect

1            THE COURT:  Mr. Liebowitz.

2            MR. LIEBOWITZ:  I mean, I would like the opportunity

3   to, obviously, cross-examine Mr. Sedlik, but if he's not going

4   to come on the stand, then I could ask a few questions.

5            THE COURT:  Do you want to do more redirect?

6            MR. LIEBOWITZ:  Yeah, just maybe a couple minutes.

7            THE COURT:  OK.

8            MR. LIEBOWITZ:  OK.

9            THE COURT:  We'll do brief redirect.

10           MR. LIEBOWITZ:  OK.

11  REDIRECT EXAMINATION

12  BY MR. LIEBOWITZ:

13  Q.  Mr. Craig, Mr. Slotnick mentioned passive and that you

14  didn't mention anything in terms of valuation.  That's not

15  correct, correct?

16  A.  That's not correct.

17           MR. SLOTNICK:  Objection.

18           THE COURT:  Sustained.  No leading questions.

19           MR. LIEBOWITZ:  Yes, OK.  OK.

20  Q.  So what did you say in response to Mr. Sedlik when you were

21  discussing valuation?  You didn't just sit there and hear what

22  he had to say.  You had some response.  What did you say to

23  him?

24           MR. SLOTNICK:  Objection.  Mischaracterizes his own

25  witness' testimony that he sat there and listened.

1          THE COURT:  Sustained.

2          Just ask the question part.

3          MR. LIEBOWITZ:  Yes.

4   Q.  So what did you say in response to when Mr. Sedlik was

5   describing his thoughts on valuation?

6          MR. SLOTNICK:  Objection.

7          THE COURT:  Overruled.

8          You can answer.

9   A.  I was first a little curious because of not having the

10  history of licensing at all, coming from somebody of his

11  stature, and then the fact of the introducing the slide rule,

12  things like that, which I had never heard of before.

13  Q.  OK.  Did you say anything else?

14  A.  I think I may have asked how did you base these things, you

15  know, and so forth, you know, how.

16  Q.  Were actually specifically numbers floated by you and him

17  in terms of valuation of the damages?

18  A.  I asked what he thought in his esteemed value of what

19  something could be worth.

20  Q.  OK.  Based off of what?

21  A.  Based on his knowledge, number one; number two, his case

22  that was used in the stem cell, you know, using the multiplier

23  in that case as applied to here; and then I believe it was

24  offered to both myself and to you of how to do the multiplier,

25  how to use it in the future on this case and other cases.

I5PHCraH                              Craig – Redirect

1   Q.  But what did you specifically say?

2               MR. SLOTNICK:  Objection.  Asked and answered.

3               THE COURT:  I'll allow it.  If you remember what you

4   specifically said, you can answer.

5   A.  I don't.

6               MR. LIEBOWITZ:  OK.  I have no further questions.

7               THE COURT:  OK.

8               MR. LIEBOWITZ:  Thank you.

9               MR. SLOTNICK:  Your Honor.

10              THE COURT:  You may step down.  Thank you.

11              (Witness excused)

12              THE COURT:  Yes, Mr. Slotnick.

13              MR. SLOTNICK:  We move for a determination on denying

14  plaintiff's motion.  They haven't established a confidential

15  relationship, an expectation, or reasonable expectation, or

16  that any confidential information was imparted from Mr. Craig

17  to Mr. Sedlik.

18              THE COURT:  Mr. Liebowitz, would you like to respond?

19              MR. LIEBOWITZ:  Yeah, I would like to respond.

20              Your Honor, Mr. Craig being on the telephone with

21  Mr. Sedlik did express confidential information in terms of

22  valuation, and there was an expectation of this -- that

23  Mr. Sedlik was on Mr. Craig's team and that there were going to

24  be follow-up phone calls.

25              THE COURT:  What confidential information was given?

I5PHCraH                    Craig - Redirect

The references to, obviously, all the stuff about career and

background, that's not confidential.  Anything that he could

look up afterwards, including stuff he found online that day,

is not confidential by definition.  And stuff that refers to

some measure of damages from another case that's already

publicly been aired or happened, that's not confidential.

        So what was actually communicated that was

confidential?

        MR. LIEBOWITZ:  So in terms of the analysis, going on

the Getty website and determining and looking at those prices,

and that was what was used in the report.  So when they were

discussing about the Getty prices.

        THE COURT:  The fact that it was later used in a

report doesn't mean it was confidential.

        MR. LIEBOWITZ:  Well, the idea of going onto the Getty

Images website and establishing from there the valuation is

something that Mr. Craig discussed and obviously knew about it,

and then that was used in the report.  And that was, in terms

of the analysis and looking at that -- pretty much the range of

those prices were discussed, and that was used explicitly in

his report.  So that was discussed on that phone call and it

was used and that was Mr. Craig's testimony that he was shocked

to see, when they were discussing about the pricing about the

Getty Images website, that was used.

        THE COURT:  Right.  But if I have a conversation with

I5PHCraH                          Craig - Redirect

1    someone and I said, well, this is the method of cost-benefit

2    analysis that I use --

3            MR. LIEBOWITZ:  Yeah.

4            THE COURT:  -- and you can find it in *World Book*

5    *Encyclopedia* and this is how I've already done it and then

6    these cases have done it, and then six months later it shows up

7    in that expert's report, it doesn't mean it was confidential

8    when it was first discussed.  It's just a measure.

9            MR. LIEBOWITZ:  Expectation of what he was going to

10   use as well in terms of valuation of damages.

11           THE COURT:  OK.

12           MR. LIEBOWITZ:  But to go back and have a conversation

13   with Mr. Sedlik and then for Mr. Sedlik then to be retained by

14   the defendants, there were so many different experts that they

15   could have retained and not one that had conversations with

16   Mr. Craig, you know, that should be brought out in the first

17   instinct.

18           THE COURT:  That's just a question of --

19           MR. LIEBOWITZ:  Yeah.

20           THE COURT:  -- something that was annoying to you, but

21   I don't think that that's the standard.  Whether someone has a

22   reasonable expectation of confidentiality is the limiting

23   factor here.  It's not the fact that you're annoyed with

24   someone's litigation tactics.  You don't get anything unless it

25   rises to the level of there was a breach of confidentiality

1    requiring disqualification, which is a high standard.

2            MR. LIEBOWITZ:  Yeah, I agree with that.  I understand

3    that it is a high standard.  But on those phone calls, he did

4    believe that there was this expectation that what was discussed

5    was confidential and that they would obviously continue the

6    discussions.  We don't know what's obviously going to be used

7    at trial, you know, that is not in the report.  So we leave

8    that open to a possibility as well that there could be some

9    information that's not in this report that could be used.

10           THE COURT:  Mr. Slotnick.

11           MR. SLOTNICK:  Your Honor, I can make a representation

12   that at trial nothing beyond what's in Mr. Sedlik's report will

13   be used.  I think, again, Mr. Craig has had now three

14   opportunities, two declarations and now live, sworn testimony,

15   and while he mouths the words, there's no meaning behind them.

16           At the end of the day, he had a conversation with

17   somebody.  He let that person do most of the talking or he

18   talked about his career, which I'm sure is interesting but, as

19   you say, not confidential.  That the only discussion that the

20   witness can recall is a Getty pricing sheet, which is available

21   from Getty and others.  There's nothing that Mr. Craig said

22   that isn't in the complaint, isn't in the discovery that we've

23   taken, isn't in his deposition, isn't in his other lawsuit that

24   he brought against Getty.  So they can keep saying the words to

25   check the boxes, but that box is flat.  There's nothing in

1   there.

2          Your Honor, this has been an extraordinary hardship

3   for our clients.  Yes, Universal is a big company.  The BB King

4   estate is -- it's the estate of a jazz musician.  He was

5   successful, but it's not Bruno Mars.  And at the end of the

6   day, they have to bear the cost of this.  They have to bear

7   cost of bringing Mr. Sedlik here for nothing.  I mean, it

8   really is outrageous.  We can put him on the stand and he can

9   talk, but what's there left for him to say other than either I

10  didn't say any of those things and he didn't tell me anything?

11  And it's their burden.

12         THE COURT:  Well, I agree it is their burden, and I do

13  think that they've failed to meet the burden.  It is a high

14  burden, and I don't think it's necessary for Mr. Sedlik to

15  testify.  Honestly, based on the submissions and the

16  declarations, I thought I was going to get more down in the

17  weeds on confidential information.  I have not really heard

18  what I think is confidential information.

19         But even before you get to that, as you all know, the

20  either two- or three-part test that this circuit and this

21  district has typically applied for disqualification, which we

22  all agree is a high bar, is, first, the existence of the

23  reasonable expectation of a confidential relationship between

24  the movant and the expert; second, whether the movant, in fact,

25  disclosed confidential information to the expert; and then,

I5PHCraH                    Craig - Redirect

third, some courts also consider whether the public has an

interest in allowing or not allowing the expert to testify.

I'm not going to cite the cases, but those are in the parties'

briefs.

        I think, really, the first issue, even on the first

point, there's a failure to establish the burden of proof by

plaintiff because I don't think there was any reasonable

expectation of a confidential relationship between Mr. Craig

and/or his counsel, on the one hand, and Mr. Sedlik, on the

other.  The first reason, of course, is that there was no

signed agreement.  There were preliminary talks maybe of money,

but nothing ever agreed to.

        But even before you get to that, the one thing I

hadn't focused on, frankly, from the papers was on

September 20, he clearly said in the email, I can't take on

matters involving the BB King estate.  So that clearly provided

a situation where maybe he was hoping for some other kind of

work but clearly was not going to be retained for this matter.

        I do think it was a situation where, whether or not

Mr. Craig expected it to be confidential, and he may well have

and people do, I don't think it was reasonable to expect that

there was a confidential relationship formed at that point.  So

based on that, I'm going to deny the motion to disqualify based

on all the evidence that I've admitted and the evidence in the

form of testimony I've heard today.

I5PHCraH                          Craig - Redirect

1          All right.  Anything else?

2          MR. SLOTNICK:  Nothing.  Thank you.

3          MR. LIEBOWITZ:  Nothing.  Thank you.

4          THE COURT:  Have a good holiday weekend.  Sorry for

5    hurting your holiday weekend.

6          Thank you very much.  We're adjourned.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination  of:                      Page

 3   GLEN CRAIG

 4   Direct By Mr. Liebowitz  . . . . . . . . . . . 5

 5   Cross By Mr. Slotnick  . . . . . . . . . . . .17

 6   Redirect By Mr. Liebowitz  . . . . . . . . . .39

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```