CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:16-CV-05439-JPO

-----------------------------------)

GLEN CRAIG,

        Plaintiff,

    vs.

UNIVERSAL MUSIC GROUP, INC.,

KINGSID VENTURES, LTD., and ESTATE

OF RILEY B. KING,

        Defendants.

-----------------------------------)

CONFIDENTIAL

TELEPHONIC DEPOSITION OF RYAN NULL

New York, New York

April 21, 2017

Reported by:

Linda Salzman, RPR

Job No. 18495

Page 2

```
 1
 2
 3              April 21, 2017
 4              12:00 p.m.
 5
 6       Telephonic Deposition of RYAN
 7  NULL, the witness herein, held at
 8  the offices of Universal Music
 9  Group, 1755 Broadway, New York, New
10  York, pursuant to Notice, before
11  Linda Salzman, a Notary Public of
12  the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2              STIPULATIONS
 3         IT IS HEREBY STIPULATED AND
 4  AGREED by and among counsel for the
 5  respective parties hereto, that the
 6  sealing and certification of the
 7  within deposition shall be and the
 8  same are hereby waived;
 9         IT IS FURTHER STIPULATED AND
10  AGREED all objections, except as to
11  the form of the question, shall be
12  reserved to the time of the trial;
13         IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may
15  be signed before any Notary Public
16  with the same force and effect as if
17  signed and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S:
 3
 4  On Behalf of Plaintiff:
 5     LIEBOWITZ LAW FIRM, PLLC
 6     11 Sunrise Plaza, Suite 305
 7     Valley Stream, New York 11580
 8     (516) 233-1660
 9  BY:  KATE TSYVKIN, ESQ.
10        kt@liebowitzlawfirm.com
11        RICHARD LIEBOWITZ, ESQ.
12        rl@liebowitzlawfirm.com
13
14  On Behalf of Defendants:
15     LOEB & LOEB LLP
16     345 Park Avenue
17     New York, New York 10154
18     (212) 407-4953
19  BY:  LINNA CHEN, ESQ.
20        lchen@loeb.com
21
22  Also Present:
23     CARLA MILLER, ESQ.
24     Universal Music Group
25
```

Page 5

```
 1
 2  R Y A N  N U L L,
 3     called as a witness, having been duly
 4     sworn by a Notary Public, was examined
 5     and testified as follows:
 6  EXAMINATION BY
 7  MS. TSYVKIN:
 8     Q.   Good morning, Mr. Null.  Thank
 9  you for being here and making time for us.
10     A.   You're welcome.
11     Q.   My name is Kate Tsyvkin.  I
12  represent the plaintiff in this lawsuit,
13  Glen Craig.
14         I wanted to go over some ground
15  rules with you, just to let you know what
16  we'll be doing today.  I'm going to be
17  asking you some questions about the
18  matters involving this case and some
19  general questions as well.  If you are
20  having trouble understanding my question,
21  just let me know and maybe I will rephrase
22  it.
23         Just answer, please, to the best
24  ability that you have as far as
25  recollections, you know, just answer to
```

Page 38

R. Null - Confidential
where there's one photo.  Or it could be something more expensive with a lengthier booklet that would require more pages to fill, so could potentially use more photos.
   Q.   So it's not that you are preparing a lot of different photographs for someone to choose from.  You're just saying depending on the size of the project, you would research as few photos or as many photos as that project necessitates?
   A.   A smaller project would require less photos generally, but we would research as many as we need to until we find the correct photo that's appropriate or the correct creative choice that the art director or the designer or anyone else would approve to be used from a creative standpoint.
       If we're researching and researching and we're just finding photos we don't care for, we will keep going until we find something that is

Page 39

R. Null - Confidential
satisfactory for our needs.
   Q.   Can you talk a little about those needs, some of the factors that go into your consideration of choosing a photograph?
   A.   First we want to make sure that it's the correct time period.  It should be flattering photos of the artist.  The cover is, of course, if there's a cover as opposed to interior photos, we really are careful about what we choose for a cover.
       It really needs to be -- we're more concerned with the cover, let's say, than what shows up inside.  They all need to be good photos but you need to have a good cover.
   Q.   Can you tell us how those considerations change if you're doing a reissue of an album?
       MS. CHEN:  Object.
   A.   A reissue, well, I guess there's two distinctions from what we do.  There's a straight reissue, which would be an album maybe that was from -- an album from

Page 40

R. Null - Confidential
the past that was, I don't know, came out in the past and now we're reissuing it.  Straight reissue, meaning we're not changing the artwork or the music.  We may just be putting out on CD instead of another format or digitally instead of a prior format.
       Whereas opposed to a new compilation, which would require new art and is a unique track listing, basically a completely new collection.
   Q.   So reissuing where it's just different in the format you mentioned, so something that's for the first time is being released as a CD or sometimes you need it digitally remastered, something like that, you call that a straight reissuing; is that correct?
   A.   That's correct.
   Q.   And then if something is like a new compilation with new music track -- what is it called, track lists, is that the correct form?
   A.   Yes, new track list.  New

Page 41

R. Null - Confidential
sequence.  New graphic design.
   Q.   Then that would be not a straight reissue, that would be something else?  Is there a name for that?
   A.   Compilation.
   Q.   Can you think of any other kind of reissuing that isn't straight reissuing but something else is altered?
       MS. CHEN:  Object.
       You can answer.
   A.   Okay.  It could be a vintage album that was unreleased until this current date, like an album that was recorded back in the day, initially intended to be released at the time but for whatever reason wasn't released then, so we may release that now as, you know, a previously unreleased album.
       And there may or may not have the been artwork designed for that originally.  So we either have artwork that was intended for it originally, or if it didn't get to that point, we would be creating new art, but nevertheless it

Page 58

R. Null - Confidential
-- wherever the best photos are that we can acquire.
Q. How would you say the process with the compilation is different from the process of the straight reissue?
A. The straight reissue just requires research of the art, not individual photos. Where the compilation, from my part at least, is driven by photo research as opposed to album art research. Art that already existed. My photo research for the compilations will ultimately lead to a designer creating art.
Q. Sir, can you talk about some of the factors that you consider when selecting the photographers in the photo research for a compilation?
A. Needs to reflect the timeframe of the music that's been selected for the compilation. Photos that are flattering of the artist. That's key. We want the artist to look their best.
Q. Any other factors?

Page 59

R. Null - Confidential
A. Budgetary possibly, depending on how much money is available, that might dictate whether we just stick with photos that we own or whether we want to seek photos from a license.
Q. And in compilations, you are no longer required to use the artwork that was previously used on any one of the albums that go into a compilation, for example, any previous artwork for the particular artist?
You're not -- are you obligated to use any of that artwork from before?
MS. CHEN: Objection.
A. Well, a compilation, a new compilation artist is by nature not going to use any original album artwork, because a compilation is songs that are pulled from all -- culled from all kinds of previous albums or singles as chosen by the producer of the package.
So by definition, it's going to be some kind of new design of the art, of art by a designer that will be hired to do

Page 60

R. Null - Confidential
that.
Q. Is it typical to use cover art from one of the albums? Just to elaborate, suppose a compilation has different music tracks from different albums, is it typical to use cover art from one of the albums that go into making a compilation?
MS. CHEN: Objection.
A. It is not uncommon on a compilation to show somewhere inside some sort of collage or montage of the artist's discography. Their back catalogue basically. All their albums. All their previous albums. Front covers.
Q. But you're saying that would be typical for, you said inside, so in the booklet or the liner notes, something like that, right?
A. Yeah, just showing in the liner notes or internally, somewhere inside the package to show the artist's history of the other albums that were released by Universal-owned companies.

Page 61

R. Null - Confidential
Q. So if a cover -- if cover art for an album was used again later on on a compilation, would that be unusual?
MS. CHEN: Used again how?
BY MS. TSYVKIN:
Q. Used on the cover of a compilation?
A. A compilation would have new art. It wouldn't make sense to put an artist's album from 20 years ago on the cover of a new compilation. It would be misleading. We wouldn't do that. I mean, a consumer would see that and think it's the album from the artist put out in, I don't know, 1980.
But this is supposed to be obvious that this is a new compilation put together today with a new photo. It's got a new title. This compilation is called so-and-so's greatest hits. It wouldn't make sense for us to put an album cover from the past that is not reflected by this new track listing as the new cover.
Does that make sense?

16 (Pages 58 to 61)

Page 62

R. Null - Confidential

Q. Yeah, that makes sense to me. I guess my question is: If all a compilation is is just a new arrangement of possibly old tracks, my question is, would it be usual or does it happen that sometimes that new compilation will bear the cover art of one of the old albums?

MS. CHEN: Objection.

BY MS. TSYVKIN:

Q. I guess that's what I'm asking.

MS. CHEN: I think we're talking about different definitions of compilation.

BY MS. TSYVKIN:

Q. I think what you said before is compilation is, as opposed to a straight reissue, any kind of an issuing of a new differently ordered track list or anything different about track lists; is that correct?

A. Yeah, a compilation has a completely different track list. It could have twice as many songs as an album from the past. It could be pulled from a whole

Page 63

R. Null - Confidential

array of previous albums. The songs, sort of cherry-picked.

Typically, it could be a greatest hits package. So one album back then might have had a couple of hits on it or one, so they're pulling tracks from here and there to make a -- that's sort of the definition of a compilation, the songs are pulled from various albums to make this album.

Q. So that's how I understood it as well. It just can be a different ordering of track lists from the past in a new compilation for this particular artist, just different things from different albums from before, correct?

A. Yeah. And completely newly created artwork. Just like that track listing is a newly created track listing and sequence.

Q. So you're saying it wouldn't much sense to have one of the old album covers, even if that album contributed a lot of the tracks to a new compilation to

Page 64

R. Null - Confidential

have the same artwork be placed on the new compilation. That wouldn't make much sense to you?

A. No, it wouldn't.

Q. Let's go through the process of the compilations. So we were talking about how would you go through basically the same steps as we discussed before. You would do your photo research, you would consider the factors, the timeframe of the music, that the photograph is flattering, budgetary constraints.

What would happen next?

A. After the photo research is complete?

Q. Yes.

A. The art director would indicate which designer he had chosen to design the art for the compilations and send -- at the appropriate time, send those elements to the designer so they can start working on the design.

Q. Can you just fill in the one step in between? Do you report back to

Page 65

R. Null - Confidential

the art director with what you found in your photo research?

A. Typically, he'll ask in a meeting do we have photos yet. And he may or may not want to see them before they go to the designer.

But if I say yes, we have the photos, at that time or at some other time later he'll indicate who, which designer to send those to.

Q. How does he decide whether to see the photos you found or not to see them?

MS. CHEN: How would he know that? How would Ryan know that? How would Ryan know what someone else decides?

BY MS. TSYVKIN:

Q. I just want to know the procedure, what are the factors that your supervisor considers when he either wants to see the photographs or doesn't want to see the photographs?

MS. CHEN: Do you have knowledge

17 (Pages 62 to 65)

Page 126

1          R. Null - Confidential
2    because if this is the back cover -- it
3    looks like this is cropped.  It may have
4    been the back cover of that same --
5    actually, at the bottom of that page, you
6    can see the notes that I made.  I said
7    B.B. King -- on the bottom of GC0007,
8    there's a note there, I made notes, I see,
9    about each one of these releases.
10          Actually, starting with the body
11   of the e-mail on the previous page on 006,
12   are the results of my research.  I put
13   little notes under each title to Mr. Craig
14   to tell him what I found out in my
15   research.
16          And that one you're referring to
17   on the top of 0007, if you look at the
18   bottom of that page I put a note there,
19   B.B. King and Friends.  This title is not
20   a Universal release, so my memory is
21   serving me correctly on that.
22       Q.   If we go back to the first page
23   of that e-mail, GC0006?
24       A.   Yeah.
25       Q.   So you said that you found four

Page 127

1          R. Null - Confidential
2    albums that were in your product ordering
3    system, correct?
4        A.   Correct.
5        Q.   Of these four, you said you're
6    -- were you familiar with any one of them?
7            MS. CHEN:  He just answered
8        that.  He went through each of those
9        four and he said this one I worked on.
10       This one I worked on or didn't work
11       on.  We just did that.
12   BY MS. TSYVKIN:
13       Q.   Could we go to Plaintiff's
14   Exhibit 2, GC00012?
15       A.   Okay.
16       Q.   The top photograph, the B.B.
17   King, Ladies and Gentlemen, Mr. B.B. King
18   Amazon.com exclusive, does that look
19   familiar to you?
20       A.   Somewhat.  It looks like it's a
21   derivation of another artwork on here.  It
22   looks like it's derived from another
23   package that I am familiar with that I had
24   seen that the U.K. did, which is on the
25   following page, but it looks like the

Page 128

1          R. Null - Confidential
2    cover has been altered.
3            It does say Amazon.com
4    exclusive.  It may have been altered
5    because of that.  I'm just speculating now
6    but -- the one on the following page,
7    which is similar to it, that also says
8    Ladies and Gentlemen, Mr. B.B. King.  That
9    one I am definitely familiar with.
10           But the one that says Amazon.com
11   exclusive, I can't really say I'm familiar
12   with that.  It looks like the type on the
13   top is different, the B.B. King.  Yeah, I
14   can't say unequivocally.
15       Q.   So can we look at the one you
16   are familiar with on GC00013, which is
17   Ladies and Gentlemen, Mr. B.B. King?
18       A.   Yeah.
19       Q.   Can you tell us a little bit
20   more about your familiarity with this
21   artwork?
22       A.   I believe that it was a package
23   that was manufactured by Universal in the
24   U.K.  And it was imported into the United
25   States as far as I know, but it was

Page 129

1          R. Null - Confidential
2    produced and put together in the U.K. from
3    what I recall.
4        Q.   Did you participate in that
5    process?
6        A.   We supplied the U.K. with a
7    selection of photos, including the cover
8    photo.  I don't recall how many photos,
9    though, but I believe that was included.
10       Q.   When you say you supplied the
11   U.K. with a selection of photographs, who
12   supplied; was it you, was it Vartan?
13       A.   It would have been myself at
14   Vartan's request.  He had given me, from
15   what I recall, he said send photos to so
16   and so.  I don't recall who.  I know we
17   sent them a group of photos that we said
18   -- that wouldn't require licensing.  We
19   wouldn't give them anything we thought was
20   going to be dangerous from -- we wanted to
21   give them things they could just use that
22   we felt we had rights to.
23       Q.   You mentioned you felt you had
24   rights to.  Who requested a submission of
25   photographs from the U.K.?

Page 130

R. Null - Confidential

A. I don't know that, or I don't recall it. Requests likely would have come to Vartan, and he would have delegated it to me to pull photos and send them to whoever that was.

Q. Do you recall what exactly Vartan asked you to do? Did he ask you to pull the photographs or make sure that you could send them to the U.K.?

A. Pull, show him, send. I'm sure it was all of the above.

Q. So was part of that assignment from Vartan to make sure that whatever photographs you send them, you have rights to?

A. Yes. Correct.

Q. Do you know if Vartan e-mailed you these instructions?

A. I don't know for sure. He very well likely did.

Q. Are there any other e-mails with instructions pertaining to this assignment that you got from anyone else aside from Vartan?

Page 131

R. Null - Confidential

A. I don't think so, but I can't recall for sure. I mean, he would be the one that I would be reporting to. I would only be doing something like this if he directed it.

Q. And Vartan asked you specifically to send a particular photograph or send a few photographs to the U.K. for this particular album?

A. More than one. Not just one photo. I don't remember how many photos but it was a selection. Probably more than a few.

Q. Do you recall what you did to go about sending these photographs to the U.K.?

A. Photos were digital already. So it would have been sent digitally. Not physical photos. I'm sure whatever we sent was already digitized.

Q. Did you do any research before sending the photographs?

A. Pulling the photos, but it was just -- it wasn't really research. It was

Page 132

R. Null - Confidential

in terms of my typical research, like for our projects, I was basically just pulling photos that had already been used before that were scanned and already in our files.

Q. So that process that you described earlier, you didn't go through that?

A. No, it wasn't as intense as that. No, it wasn't as involved as that.

Q. Can you just elaborate a little bit about what you did do? You said you pulled these photographs. Can you describe what that actually entails?

A. Well, going into our digital files could be on a server that we have, where we store images in our files, or if they were backed up on some CDs that were burned to store images. That's where we store these digital files on some sort of digital storage medium.

Q. Are they searchable? Can you search for a particular artist?

A. We have them set up on our

Page 133

R. Null - Confidential

server in folders by artist name. So you wouldn't be doing a keyword search per se. They're alphabetical, so you would know. You could very easily find the B.B. King folder or any artist you were looking for.

I mentioned also CDs where we had backed up stuff on the CDs. We keep an Excel sheet so we know what's on those, and those you can search by keyword. That's a much smaller selection. Most of the stuff is on a very large server.

Q. Does B.B. King have anything on the CDs, the backup CDs that you mentioned?

A. Yes.

MS. CHEN: Can you read that back?

(Record was read back by the court reporter as follows:
"QUESTION: Does B.B. King have anything on the CDs, the backup CDs that you mentioned?
"ANSWER: Yes.")

BY MS. TSYVKIN: