CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:16-CV-05439-JPO

-----------------------------------)

GLEN CRAIG,

        Plaintiff,

     vs.

UNIVERSAL MUSIC GROUP, INC.,

KINGSID VENTURES, LTD., and ESTATE

OF RILEY B. KING,

        Defendants.

-----------------------------------)


  CONTAINS HIGHLY CONFIDENTIAL PORTIONS


 TELEPHONIC DEPOSITION OF CAROLINE FRILOT

       New York, New York

        April 4, 2017




Reported by:

Linda Salzman, RPR

Job No. 18493

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 2

1
2
3        April 4, 2017
4        12:49 p.m.
5
6        Telephonic Deposition of
7   CAROLINE FRILOT, the witness herein,
8   held at the offices of Universal
9   Music Group, 1755 Broadway, New
10  York, New York, pursuant to Notice,
11  before Linda Salzman, a Notary
12  Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2            STIPULATIONS
3        IT IS HEREBY STIPULATED AND
4   AGREED by and among counsel for the
5   respective parties hereto, that the
6   sealing and certification of the
7   within deposition shall be and the
8   same are hereby waived;
9        IT IS FURTHER STIPULATED AND
10  AGREED all objections, except as to
11  the form of the question, shall be
12  reserved to the time of the trial;
13       IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may
15  be signed before any Notary Public
16  with the same force and effect as if
17  signed and sworn to before the Court.
18
19
20
21
22
23
24
25

Page 3

1
2   A P P E A R A N C E S :
3
4   On Behalf of Plaintiff:
5        LIEBOWITZ LAW FIRM, PLLC
6        11 Sunrise Plaza, Suite 305
7        Valley Stream, New York 11580
8        (516) 233-1660
9        BY:  KATE TSYVKIN, ESQ.
10           kt@liebowitzlawfirm.com
11           RICHARD LIEBOWITZ, ESQ.
12           rl@liebowitzlawfirm.com
13
14  On Behalf of Defendants:
15       LOEB & LOEB LLP
16       345 Park Avenue
17       New York, New York 10154
18       (212) 407-4953
19       BY:  BARRY L. SLOTNICK, ESQ.
20           bslotnick@loeb.com
21
22  Also Present:
23       CARLA MILLER, ESQ.
24       Universal Music Group
25

Page 5

1
2   C A R O L I N E   F R I L O T ,
3        called as a witness, having been duly
4        sworn by a Notary Public, was examined
5        and testified as follows:
6   EXAMINATION BY
7   MS. TSYVKIN:
8        Q.  Good morning, Ms. Frilot.  Thank
9   you so much for making time for us today.
10  My name is Kate Tsyvkin.  I'm an attorney
11  for the plaintiff in this case, Glen
12  Craig.
13            How are you doing this morning?
14       A.   Good.  How are you?
15       Q.   Good.
16            I'm going to get started with a
17  few ground rules.  Just to remind you, I'm
18  going to be asking you a bunch of
19  questions about this case and sort of the
20  your company in general, and you can
21  answer these questions to the best of your
22  ability.
23            If you don't understand my
24  question, you can ask me to rephrase it.
25  If you don't remember something or don't

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 6

```
 1              C. Frilot
 2    know the answer, just let me know.  Just
 3    answer to the best ability that you can.
 4         If there's a pending question,
 5    you have to answer that question.  But if
 6    you need a break, you can let me know that
 7    you need a break after you finished
 8    answering a question and we can take
 9    breaks.
10         Do you understand these
11    instructions?
12       A.   Yes.
13       Q.   And because there's
14    videoconferencing, there will be some lag
15    time.  I'm going to give you some time for
16    you to finish your thought and then you
17    will give me some time to finish my
18    question so the court reporter can
19    accurately depict our conversation.
20         Is that clear?
21       A.   Yes.
22       Q.   Great.  Okay.  How did you
23    prepare for the deposition today?
24       A.   I did meet with my attorneys.
25    And my staff.
```

Page 7

```
 1              C. Frilot
 2       Q.   You met with your attorneys at
 3    Universal?
 4       A.   Yes.
 5       Q.   Who did you meet with?
 6       A.   With Carla, with Bear and with
 7    Carla's staff.
 8       Q.   Okay.  And how many times did
 9    you meet with them?
10       A.   Once.
11       Q.   And how long was the meeting?
12       A.   Approximately an hour.
13       Q.   Have you ever been deposed
14    before?
15       A.   Yes.
16       Q.   How many times?
17       A.   Once, but not for Universal.
18       Q.   Oh, for another case?
19       A.   Yes.
20       Q.   And what is your current
21    position at Universal?
22       A.   Vice president royalty
23    operations for artist and copyright.
24       Q.   What does that entail?
25       A.   Numerous functions under the
```

Page 8

```
 1              C. Frilot
 2    royalty division for Universal.
 3       Q.   Can you list some of these
 4    functions?
 5       A.   Processing digital sales into
 6    the royalty system.  Special markets.
 7    Litigation support.  Neighboring rights
 8    and sound exchange.  And -- I don't know,
 9    and royalty accounting.
10       Q.   Do you have other
11    responsibilities?
12       A.   What do you mean by that?
13       Q.   I mean that you've just listed
14    several things that you do.  Are there
15    other things that you do at Universal as
16    well?
17       A.   Could be special projects.
18       Q.   And what kind of special
19    projects?
20       A.   Could be anything that's
21    whatever the company needs.  At that time.
22    Anything royalty-related typically.
23       Q.   And what is your official title
24    there?
25       A.   I thought I already answered
```

Page 9

```
 1              C. Frilot
 2    that.  Vice-president royalty operations.
 3       Q.   Okay.
 4       A.   Artist and copyright.
 5       Q.   Thank you.
 6         Pertaining to the copyright part
 7    of your title, what kind of function do
 8    you have at Universal?
 9       A.   For a copyright, because some of
10    the functions that we do for litigation
11    support or for royalty accounting, it
12    crosses both artist and copyright.
13       Q.   Would you say that you're
14    familiar with copyright law?
15       A.   Not necessarily familiar with
16    copyright law.
17       Q.   But as it pertains to artists,
18    for example, to the extent that you
19    encounter copyright in your work?
20         MR. SLOTNICK:  Objection as to
21    form.
22         You can answer.
23       A.   As it pertains to my work for
24    royalty accounting, yes.  And for
25    litigation support, yes.
```

3 (Pages 6 to 9)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 10

1          C. Frilot
2     Q.   And in your role as litigation
3  support, what kind of responsibilities do
4  you have?
5     A.   We gather documents for cases
6  such as revenues, royalty expenses.
7     Q.   Do you have specific knowledge
8  about the case that is pending before us
9  today about Mr. Craig's case against
10 Universal Music?
11    A.   Just general overview based on
12 our discussions with the attorneys.
13    Q.   Have you reviewed any documents
14 in preparation?
15    A.   I did look at some of the
16 documents that we submitted to our
17 attorneys.
18    Q.   Can you generally describe the
19 documents that you submitted to your
20 attorneys in preparation for this
21 deposition?
22    A.   There were my staff prepared
23 domestic revenues as well as foreign
24 revenues and some royalty statements.
25    Q.   Do you have any information

Page 11

1          C. Frilot
2  about how Universal goes about securing
3  copyrights to photographs they use, say,
4  on album covers?
5     A.   No.
6     Q.   Just to make sure that I
7  understand, so you don't know how is it
8  that Universal decides which photographs
9  are going to be on the cover of a CD, the
10 process behind that?
11    A.   That's correct.
12    Q.   Do you have any information
13 about how Universal decides what
14 photographs are placed in liner notes?
15    A.   No.
16    Q.   Do you have any information
17 regarding how Universal secures rights in
18 general, just rights to anything
19 pertaining to securing of rights by
20 Universal?  Do you have any information
21 about that?
22          MR. SLOTNICK:  Objection as to
23    form.
24          You can answer.
25    A.   We get contracts related to the

Page 12

1          C. Frilot
2  rights that we secure.  But it's typically
3  just contractual based.
4     Q.   Can you explain that a little
5  more?
6     A.   Well, for royalty we get the
7  contracts related to masters, audio
8  masters as well as video masters, and the
9  rights are generally contained in the
10 contractual language.
11    Q.   So am I to understand you're
12 talking about when the artist, for
13 example, makes an album, there will be
14 rights addressed in the contract between
15 Universal and that artist, and that's what
16 you're talking about, right, the
17 contractual language addressing those
18 rights?
19    A.   Yes, that's correct.
20    Q.   Do you come across similar
21 contracts or similar agreements for
22 non-audio or non-recordings, but for the
23 actual media that's being used in
24 conjunction with those recordings?
25    A.   Typically, no.  There have been

Page 13

1          C. Frilot
2  some contracts that I have reviewed in
3  connection with making of videos for a
4  performance.  Music videos as well as live
5  videos.
6     Q.   Do you know what department at
7  Universal would know how photographs are
8  selected to be on the cover of albums?
9     A.   I don't know specifically the
10 department.
11    Q.   Is there a more general
12 department that addresses securing of
13 rights?
14    A.   Can you elaborate in your
15 question?
16    Q.   Here, specifically Universal is
17 a content creator and the producer and
18 also someone who distributes content.  So
19 my presumption is that there's a
20 department or some sort of an office that
21 specifically addresses intellectual
22 property rights or other kind of rights
23 that go along with producing content,
24 making content, distributing content?
25          MR. SLOTNICK:  Objection as to

4 (Pages 10 to 13)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 14

C. Frilot

1
2      form.  Assumes facts not in evidence,
3      but if you can answer, go ahead.
4      BY MS. TSYVKIN:
5          Q.   You can answer.
6          A.   There are multiple departments.
7      I don't know exactly which department that
8      would be part of that purview.  I don't
9      know for sure which department would be
10     responsible for what you're seeking.
11         Q.   Is it fair to say that you can
12     testify today mostly about the revenue,
13     the royalties, the revenue that the B.B.
14     King CDs and LPs in question have made,
15     right, the revenue?
16         A.   Correct.
17         Q.   Before your current position,
18     were you in another position with
19     Universal?
20         A.   Yes.
21         Q.   And what was that position?
22         A.   I've had a number of positions
23     with Universal.  I was controller for
24     Universal Publishing, assistant
25     comptroller for Universal Publishing, and

Page 15

C. Frilot

1
2      then a manager for Universal Publishing.
3      I've also been a manager for artist
4      royalties, as well as royalty analyst.
5          Q.   Can we sort of go backwards, and
6      the previous position that you held, the
7      controller position, can you explain a
8      little bit about your responsibilities in
9      that position?
10         A.   I was responsible for preparing
11     and consolidating the financial statements
12     for Universal Music Publishing.
13         Q.   Would you say that that role
14     prepared you for your current role?
15             MR. SLOTNICK:  Objection as to
16     form.
17             Answer.
18         A.   It definitely helped my current
19     role.
20         Q.   How so?
21         A.   Having a general overview of the
22     financial reporting for our organization.
23         Q.   So are you familiar with
24     Universal Music's document retention
25     policy?

Page 16

C. Frilot

1
2          A.   I don't know the exact current
3      limits, but I am familiar with the
4      retention, that we have a retention
5      policy.
6          Q.   Can you sort of tell us what
7      that policy is?
8          A.   Depending upon what type of
9      documents are being stored, there are
10     limits as to when the documents can be
11     destroyed.
12         Q.   So let's start with physical
13     documents, just paper documents, do you
14     know specifically about the limit of how
15     long they're kept?
16         A.   I don't know the current limits.
17         Q.   Is there a document that you
18     would consult?
19         A.   I would ask someone in my
20     department to obtain it, yes.
21         Q.   Do you happen to know what
22     happens to the paper after that limit has
23     passed?  Is it destroyed, for example, or
24     is it just, you know, it goes somewhere
25     and it's kept in archives?

Page 17

C. Frilot

1
2          A.   It depends on the type of paper
3      that's being stored.
4          Q.   Can you elaborate on that?
5          A.   Like, for instance, contracts
6      are typically kept indefinitely in
7      perpetuity whereas paper documents that
8      are just miscellaneous correspondence or
9      miscellaneous financial records can be
10     destroyed after a number of years.
11         Q.   And you know they are destroyed
12     as opposed to just being shipped
13     somewhere?
14         A.   Yes.  Because of the cost of
15     physically storing materials, they get
16     destroyed.
17         Q.   What about electronic records?
18         A.   It depends, again.  Typically
19     electronic records, again, because of cost
20     of storage, even with electronic
21     documents, there are limits to how much
22     the documents can be stored on a personal
23     computer.
24         Q.   Okay.  And when those limits are
25     exceeded, is it that the documents no

5 (Pages 14 to 17)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 18

```
 1            C. Frilot
 2  longer become searchable or are they then
 3  erased, the electronic equivalent of
 4  destroyed basically?
 5      A.   Depending on the document,
 6  people can delete their files in order to
 7  make room for new documents.
 8      Q.   So would you be able to tell us
 9  about Universal's exploitation of the
10  photographs that are involved in this
11  case?  Do you have specific knowledge as
12  to that?
13          MR. SLOTNICK:  Objection as to
14      form.
15      A.   Not specific knowledge.
16      Q.   Would you be able to tell us
17  whether Universal used these particular
18  three photographs that are at the center
19  of this case?  Would you be able to tell
20  us where they used it, for example, an
21  exhaustive list of how Universal used and
22  exploited these photographs?
23          MR. SLOTNICK:  Objection as to
24      form.  Compound question.
25          But if you can answer, go ahead.
```

Page 19

```
 1            C. Frilot
 2      A.   No, not specifically.
 3      Q.   Would you be able to answer how
 4  Universal obtained these photographs?
 5      A.   No.
 6      Q.   Would you be able to answer
 7  anything that is outside of how much money
 8  the exploitation has brought to Universal?
 9  Anything outside of that?
10      A.   Related to?
11      Q.   To these particular photographs?
12      A.   No, not necessarily.
13      Q.   Do you know which department or
14  which office underneath the Universal
15  Corporation would be able to answer
16  questions as to how Universal obtained a
17  photograph, a photograph, in general,
18  photographs to be used on CDs, for
19  example?
20      A.   Someone in the creative
21  department.
22      Q.   Let's talk about the process of
23  how CDs and LPs and other content sort of
24  makes money for Universal.  Can you
25  explain sort of how one calculates how
```

Page 20

```
 1            C. Frilot
 2  much money a CD, for example, makes?
 3          MR. SLOTNICK:  Objection as to
 4      form.
 5          Go ahead.  You can answer.
 6      A.   Typically, it would have to
 7  determine what the revenues are and all
 8  expenses related to that CD before you can
 9  determine how much money or profit that CD
10  has made.
11      Q.   Let's go step-by-step.  Let's go
12  through the first step of assessing how
13  much money it has made.
14          Can you tell us how Universal
15  calculates how much money a CD has made?
16      A.   You'd have to first obtain the
17  revenues.  You'd have to determine what
18  the royalty expenses are related to that
19  CD.  You'd have to determine whether the
20  manufacturing costs were related to that
21  CD.  You'd have to also determine what
22  recording costs were attributable to that
23  CD.
24          You'd have to know what the
25  distribution fees were related to the CD.
```

Page 21

```
 1            C. Frilot
 2  You'd also have to know how much overhead
 3  was allocated to the manufacturing and
 4  distribution of that CD.  You would also
 5  have to determine if there was union costs
 6  as well.
 7      Q.   Can you elaborate on any one of
 8  these?  You gave me a list of things just
 9  now.  Let's go through one.  The first,
10  what was it that you said, you called it
11  remedies?
12      A.   Revenues.
13      Q.   Revenues.  That makes more
14  sense.
15          So how would you calculate that?
16      A.   You would have to determine when
17  the product was first released and we
18  would have to look at all sources of
19  revenue including if there were -- for
20  that CD, we would have to determine --
21  we're talking a physical product.  We'd
22  have to determine what the revenues
23  associated to that physical product was
24  for a specific time period.
25      Q.   Does that take into account sort
```

6 (Pages 18 to 21)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 22

```
 1              C. Frilot
 2  of the selling of the CD by Universal
 3  only, or your distributors and vendors as
 4  well?
 5      A.  It would depend on what we were
 6  trying to accomplish, but yes.
 7      Q.  So it would include both?
 8      A.  Yes.
 9      Q.  Are those two categories --
10      A.  What we sold, what Universal
11  would have sold.
12      Q.  So you count what Universal has
13  sold, even if it's to say like a Barnes &
14  Noble, for example?
15      A.  Yes.
16      Q.  So at a point at which you sell
17  the CD to a Barnes & Noble, you write down
18  that's a sale?
19      A.  Correct.
20      Q.  When Barnes & Noble sells that
21  CD what happens with that, anything
22  happens or it just depends on the contract
23  that exists between you and the
24  distributor?
25          MR. SLOTNICK:  Objection as to
```

Page 23

```
 1              C. Frilot
 2      form, but you can answer.
 3      A.  Correct.  They can return the
 4  CDs as well if they do not sell it.  But
 5  we don't have necessarily how they
 6  distribute it directly.  We don't
 7  necessarily have that information.
 8      Q.  So you're saying once you kind
 9  of sell it to a distributor, they can
10  return it, but you don't continue to make
11  money off of it once they sell it?
12      A.  Correct.
13      Q.  So the chain ends at the first
14  sale, that's what you're saying?
15      A.  Correct.  In the example that
16  you provided, correct.
17      Q.  Would there be an example where
18  that's not the case?
19      A.  Not for physical necessarily.
20  But for digital, there would be.
21      Q.  Right, because it's a digital
22  thing, so you would get royalties for that
23  of some sorts?
24          MR. SLOTNICK:  Objection as to
25      the characterization.
```

Page 24

```
 1              C. Frilot
 2      A.  Yes.
 3      Q.  Can you elaborate then for us
 4  what would be the structure of that
 5  transaction?
 6      A.  It depends, but for Spotify, if
 7  they're streaming it to the customer,
 8  final customer, we would continue to get
 9  revenues associated with each of those
10  streams.
11      Q.  Something like Amazon, if they
12  have like a digital copy of a CD, would
13  you get some sort of revenue downstream?
14      A.  It depends on the exploitation.
15      Q.  What kind of documents are
16  generated when you are looking into
17  revenue, what kind of documents are
18  available that show revenue?
19      A.  We typically use our data
20  warehouse to obtain the revenues.
21      Q.  Are there specific documents
22  that are generated by your warehouse?  How
23  do you track the revenue basically?
24      A.  In this day and age, most of it
25  is electronic.
```

Page 25

```
 1              C. Frilot
 2      Q.  Is there a program that you use?
 3      A.  Yes.
 4      Q.  Do you print reports from this
 5  program?
 6      A.  We run queries and we can print
 7  reports.
 8      Q.  So, for example, when Universal
 9  decides to make an album, do you know how
10  they make a decision to make subsequent
11  albums?
12          MR. SLOTNICK:  Objection as to
13      form.
14      A.  No.
15      Q.  Do other departments ever ask
16  for revenue documents from you?
17      A.  Yes.
18      Q.  So which departments ask for
19  revenue?
20      A.  Legal can ask for revenues.
21  Labels can ask for revenues.  Management,
22  executive management can ask for revenues.
23  A number of departments can ask.
24      Q.  And what do you typically give
25  them?
```

7 (Pages 22 to 25)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 26

1          C. Frilot
2          MR. SLOTNICK:  Objection as to
3   form.
4      A.   It depends on what they're
5   asking, you know, what their objective is.
6      Q.   So can you give me an example of
7   the kind of query that they would come to
8   you with, would they give you specific
9   parameters, for example, like I need how
10  much this particular CD made in this
11  period of time in these locations?  Can
12  you give an example?
13     A.   For a litigation or for what?  I
14  guess litigation, they would say court
15  case for this period from period A to
16  period B, please pull us the revenues
17  related to this album for that period.
18     Q.   What if they were considering
19  whether this is a profitable artist or not
20  and whether to print more of CDs, just
21  reconsidering what they're going to do
22  with an artist, for example?
23     A.   Yes.  They can ask us for
24  anything related to that album or that
25  artist.

Page 28

1          C. Frilot
2      Q.   And you would go to your
3   database and you would enter the relevant
4   query and you would just -- is it just a
5   simple interface where you just put in the
6   name, the time period, the location and
7   then something comes out?
8      A.   It's not that simple, but yes,
9   we can query based on album titles,
10  artist, and then we would also do the same
11  for our foreign sales.
12     Q.   Is there a way to search for
13  album covers, is that one of the fields
14  you can search?
15     A.   Not in our financial system.
16     Q.   If someone wanted to know how
17  many times was a particular photograph
18  used on an album cover, how would one use
19  the system that you're familiar with to
20  find that out?
21     A.   Not the way I'm aware of to do
22  it by financial cover or by album cover.
23     Q.   Are there other systems you're
24  aware of that one might be able to search
25  for that?

Page 27

1          C. Frilot
2      Q.   Can you be more specific about
3   what they did for, what documents they ask
4   for?
5          MR. SLOTNICK:  Objection.  Calls
6   for speculation.
7          THE WITNESS:  Do I answer?
8   BY MS. TSYVKIN:
9      Q.   You can answer.
10         MR. SLOTNICK:  You can answer if
11  you understand the question without
12  speculating.
13     A.   Can you rephrase your question?
14     Q.   When somebody from Universal
15  Music comes to you and asks in
16  consideration whether to print another CD
17  or another album and asks for can I get
18  some documentation about revenue, what
19  kind of documents do they ask for?  What
20  kind of parameters do they ask for?
21         MR. SLOTNICK:  Objection.  Calls
22  for speculation.  Hypothetical.
23         But if you can answer, go ahead.
24     A.   They might ask us for all sales
25  related to an artist for album 1 and 2.

Page 29

1          C. Frilot
2      A.   Not for financial information,
3   no.
4      Q.   So the second item that you
5   mentioned was manufacturing costs?
6      A.   Yes.
7      Q.   Can you elaborate a little bit
8   on how those are calculated?
9      A.   That would be outside of my
10  responsibilities.
11     Q.   How about royalties, you
12  mentioned that as one of the factors that
13  go into figuring out how much profits are
14  made.  Can you discuss a little bit about
15  how royalties are calculated?
16     A.   Royalties are calculated based
17  on the contractual terms in the agreement
18  for the artist.  So if they're sales
19  based, typically they need the units and
20  the royalties due to the artist, the
21  royalty rate less any deductions that are
22  allowed under the contract.
23     Q.   Is there any specific paperwork
24  that's generated when calculating
25  royalties?  You mentioned the contract.

8 (Pages 26 to 29)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 30

1          C. Frilot
2    That's a given.
3          Any other?
4      A.   There's royalty statements.
5      Q.   Can you describe what a royalty
6    statement is and how often it is issued?
7      A.   It depends on each contract, the
8    frequency of the reporting obligation.
9      Q.   And the obligation belongs to
10   Universal?
11     A.   It may or may not, depending
12   upon the contract.
13     Q.   In case of this particular
14   artist, B.B. King, are you at all familiar
15   with what his royalty statement obligation
16   was?
17     A.   I did not review B.B. King's
18   artist agreement.
19     Q.   So you wouldn't be able to tell
20   us about the royalties owed to B.B. King
21   or B.B. King's estate?
22     A.   Not specific.
23     Q.   You mentioned recording costs.
24   How's that calculated?
25     A.   For in terms of a royalty

Page 31

1          C. Frilot
2    participant or in terms of royalty costs
3    associated with an album?
4      Q.   Royalty costs associated with
5    making an album.
6      A.   What was your question again?
7    Sorry.
8      Q.   Just how are those costs
9    calculated, the recording costs?
10     A.   All costs associated with paying
11   third parties or any type of advances due
12   under a contractual language.
13     Q.   Any paperwork generated as a
14   result of those calculations?
15     A.   They are captured on the royalty
16   statements, if they're recoupable.
17     Q.   So if Universal can, according
18   to the contract with the artist, recoup
19   the costs of the -- the recording costs,
20   then it would appear on the royalty
21   statements as a deduction or something?
22     A.   Correct.
23     Q.   You mentioned overhead costs.
24   How are those calculated?
25     A.   It depends on, I guess, the

Page 32

1          C. Frilot
2    objective of, I guess, the calculation.
3    So if we're talking about whether or not,
4    in the example we used earlier, whether or
5    not an album was profitable, management
6    might decide that a percentage of overhead
7    must be attributable to the calculation of
8    whether or not something was attributable
9    or profitable.
10     Q.   Can you elaborate on that you
11   said depending on the objective of what
12   we're calculating?
13     A.   Correct.  You said in an earlier
14   question how did one calculate  whether or
15   not an album is profitable?
16     Q.   Yes.  So basically -- let's take
17   that question, for example.  How did they
18   decide that something is making money
19   versus losing money?  Are you saying that
20   the overhead costs might either appear or
21   not appear depending on the objective of
22   making something seem profitable or not
23   profitable?
24          MR. SLOTNICK: Objection as to
25     the characteristic, but you can

Page 33

1          C. Frilot
2    answer.
3      A.   It depends.  So we all know
4    there is overhead costs associated with
5    running a business.  So if someone has --
6    a major superstar has sold so much money
7    that it doesn't even matter whether or not
8    we attributable to any overhead costs.
9          They might know we are going to
10   pick up this artist for the next or offer
11   another option because we know that the
12   artist is that hugely profitable.
13     Q.   Right.
14          So it's kind of like investment
15   and kind of thinking that this guy is so
16   great he's going to make us a lot of
17   money, it doesn't really matter -- we're
18   not going to calculate overhead the same
19   way we would calculate it somewhere else?
20          MR. SLOTNICK:  Objection to the
21     characterization.
22          You can answer.
23     A.   Correct.
24     Q.   Is that just true of the
25   overhead, because you mentioned that

9 (Pages 30 to 33)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 34

```
 1              C. Frilot
 2   before depending on the objective of
 3   whoever is asking for the analysis, you
 4   know, you mentioned that a couple of times
 5   depending on the objective, and I
 6   understand that.
 7          But can you clarify what it
 8   means to sort of assess the revenue or
 9   assess the royalties or manufacturing
10   costs or recording costs in light of the
11   objective before you?
12          MR. SLOTNICK:  Objection as to
13   form.
14          You can answer.
15      A.   Yes.  If they're trying to
16   determine whether or not to pick up a
17   contractual obligation, if you have a
18   major superstar, you don't need to
19   necessarily calculate all those other
20   costs.
21          You just need to know the
22   general revenue and the royalty expense
23   and one can make a qualified decision
24   based on that margin you've already seen,
25   whether or not you have to calculate
```

Page 35

```
 1              C. Frilot
 2   whether or not it's profitable.
 3      Q.   But with an artist less
 4   profitable, not like a major superstar who
 5   is just selling out stadiums, but with a
 6   lesser artist, all of these things become
 7   more important, all of these elements that
 8   you've listed, correct?
 9      A.   Correct.
10      Q.   So just to go over it briefly,
11   someone will come to you and ask for a
12   specific projection -- is it a projection
13   of profit or is it, just give me -- what
14   did we make the revenue, what did it cost
15   us through manufacturing, what were the
16   recording costs, will they give you that
17   or they will just come in and say I need
18   to know whether they made money from X and
19   you provide the rest?
20          MR. SLOTNICK:  Objection as to
21   form, but you can answer.
22      A.   Typically, questions that come
23   to my department, it's for actual costs.
24      Q.   And what are actual costs?
25      A.   Not a projection.
```

Page 36

```
 1              C. Frilot
 2      Q.   So they want to know what money
 3   they made?
 4      A.   Correct.
 5      Q.   Presuming they made the money?
 6      A.   Yes.
 7      Q.   How do you calculate profits and
 8   revenue -- I should separate that.  Strike
 9   that.
10          How do you calculate profits
11   from CDs that came out under different
12   labels that were later acquired by
13   Universal?
14          MR. SLOTNICK:  Objection as to
15   form.
16          Go ahead, answer.
17      A.   Typically we don't provide
18   historical data if it predates our
19   systems.
20      Q.   You said predates your systems.
21   When did your systems come into existence?
22      A.   It depends on what system we're
23   talking about, so they vary.
24      Q.   Can you give an example -- the
25   system that you just described where
```

Page 37

```
 1              C. Frilot
 2   you're in putting information and getting
 3   an output, when did that come about, when
 4   did that system come about?
 5      A.   Approximately 2002.
 6      Q.   So everything after 2002 would
 7   be tracked by this system?
 8      A.   It depends.
 9      Q.   And what does it depend on?
10      A.   We acquire companies post-2002,
11   that would not be in our systems.  Also,
12   the system I'm talking about was the
13   domestic system and we set a different
14   date for our foreign systems.
15      Q.   Can you elaborate on that?  You
16   said everything post-2002 would not be in
17   the system?
18      A.   No there are acquisitions that
19   are post-2002 that would not be in our
20   systems.
21      Q.   What would be the reason that a
22   post-2002 acquisition would not be in a
23   system?
24      A.   The example would be the
25   acquired EMI in approximately 2015.  So
```

10 (Pages 34 to 37)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 38

C. Frilot

1
2  their historical data would not be in our
3  systems.
4      Q.   But their historical data --
5  it's not historical, but after 2015, their
6  information would be in your system,
7  correct?
8      A.   Correct.  Approximately.  I
9  don't recall the actual date of the
10  acquisition.
11      Q.   And the 2002 date you've
12  mentioned, is that the domestic system or
13  the foreign system?
14      A.   Domestic.
15      Q.   When did the foreign system come
16  into being?
17      A.   I don't recall.
18      Q.   Do you know anything about the
19  foreign profits or revenue?  Do you work
20  with foreign profits or revenue?
21      A.   Yes.
22      Q.   So when you calculate all of
23  this, it's not just U.S. based, it's
24  worldwide, correct?
25      A.   It depends on the objective of

Page 39

C. Frilot

1
2  the analysis that we're doing.
3      Q.   Are there other systems that
4  came around at a different time besides
5  from 2002?
6      A.   Yes.
7      Q.   Can you elaborate on what's the
8  system and when it came into being?
9      A.   One system has a different date.
10  I just don't recall the date.
11      Q.   So whatever that date is it
12  would be all the foreign profits and
13  revenues and sales would be tracked, not
14  in the U.S. but worldwide, and that data
15  would be available from a different date,
16  not 2002?
17      A.   Correct.  The revenues would be
18  consolidated in a different system.
19      Q.   And what about labels acquired
20  before 2002, would profits be reported in
21  this particular system if the label was
22  acquired earlier?
23      A.   No.  The system doesn't have the
24  profits.  It has revenues.
25      Q.   If Universal acquired a label,

Page 40

C. Frilot

1
2  let's say, you know, in the '70s or so,
3  how would revenue be reported?  Would it
4  just be the same as other revenues
5  reported for Universal, is there no
6  difference, is there no different system
7  or different subsystem that it's under?
8      A.   No, that would be very difficult
9  to obtain.
10      Q.   And why is that?
11      A.   It would be impossible because a
12  lot of the systems have been retired and
13  are no longer able to query.
14      Q.   What kind of systems used to
15  exist that you're aware of that used to
16  track the profits of those labels that
17  were later taken over by Universal?
18      A.   There are many different system,
19  but we had different accounting systems
20  back then, different royalty systems.
21      Q.   In getting familiar with the
22  facts surrounding this case and your
23  preparations for today, did you have a
24  chance to review what other labels that
25  Universal later acquired were involved in

Page 41

C. Frilot

1
2  this particular case?
3      A.   I did have discussions with our
4  attorney.
5      Q.   Can you provide any information
6  about the specifics of Universal's
7  acquisition of, let's say, ABC Records?
8      MR. SLOTNICK:  I'm going to
9  caution the witness that you can
10  answer the question except to the
11  extent that any information you have
12  based on advice or communication with
13  counsel is privileged, and I'm going
14  to direct you not to answer with
15  respect to any communications with
16  your counsel.
17      But other than that, anything
18  else you know, you can answer.
19      A.   I only know that B.B. King was
20  part of the ABC catalogue.
21      Q.   So basically your specific
22  knowledge, the things that are relevant to
23  this case when it comes to the ABC being
24  bought over by Universal, is that that
25  B.B. King was part of the catalogue, you

11 (Pages 38 to 41)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 42

```
 1            C. Frilot
 2  don't know anything more about the terms
 3  of that transaction, as far as the
 4  acquisition about how to track how much
 5  money albums released by ABC records made?
 6     A.   That's correct.
 7     Q.   What about any of the other
 8  labels that are involved in this
 9  particular case, are you familiar with any
10  other labels that Universal later
11  acquired?
12          MR. SLOTNICK:  Objection as to
13  the characterization, but you can
14  answer.
15     A.   I only know that ABC was
16  acquired by, I believe, MCA.
17     Q.   Do you know when ABC records was
18  acquired by MCA?
19     A.   I do not know.
20     Q.   Is there a way to track earnings
21  from MCA in the current Universal system
22  after the transition happened?
23     A.   No, no, I don't think so.
24     Q.   When did Universal sort of
25  become Universal from MCA, are you aware?
```

Page 43

```
 1            C. Frilot
 2     A.   I don't recall the date of the
 3  name change.
 4          MS. TSYVKIN:  Mark this
 5  Plaintiff's Exhibit 1.
 6          (Plaintiff's Exhibit 1, Initial
 7  disclosures, marked for
 8  identification, as of this date.)
 9          MS. TSYVKIN:  This is the batch
10  with the initial disclosures.
11          MS. MILLER:  I think we will
12  have to take a break so --
13          MS. TSYVKIN:  We're going to
14  take a break and send you some
15  documents.
16          THE WITNESS:  Okay.
17          MR. SLOTNICK:  You should have
18  them.
19          MS. MILLER:  Did you see them?
20  Did they come through?  We will take a
21  break and you can print them.
22          MS. TSYVKIN:  Let's take a
23  little break.
24          (Thereupon, a recess was taken,
25  and then the proceedings continued as
```

Page 44

```
 1            C. Frilot
 2  follows:)
 3     Q.   So we're looking right now at
 4  Plaintiff's Exhibit 1, which is UMG's
 5  initial disclosures.  If you see that,
 6  I'll let you find -- they're initial
 7  disclosures.  They are the defendants'
 8  responses and objections to document
 9  requests and then defendants' responses
10  and objections to the interrogatories.
11     A.   Do you know roughly where it is
12  in this stack, in the middle or --
13          MR. SLOTNICK:  Caroline, I don't
14  know if you can see this well, but
15  it's going to look like this.
16  BY MS. TSYVKIN:
17     Q.   They look like legal papers with
18  a caption on them.
19     A.   Does it have a Bates stamp on
20  it?
21          MR. SLOTNICK:  No, it doesn't.
22     A.   I think I might have found it.
23  What does it look like?
24          (Indicating.)
25          MS. MILLER:  Why don't you read
```

Page 45

```
 1            C. Frilot
 2  off what you're looking at, the first
 3  line?
 4          THE WITNESS:  Is this where it
 5  says "General objections"?  Can you
 6  see mine?
 7          MS. MILLER:  And what does the
 8  heading in bold say about one-third of
 9  the down the page?
10          THE WITNESS:  Defendant UMG
11  Recording's Responses and Objections
12  to Plaintiff Glen Craig --
13          MS. MILLER:  That's correct.  Do
14  you see there are page numbers on the
15  bottom of that one document, and it
16  looks like it goes through page 9 and
17  then another document --
18          MR. SLOTNICK:  On this one, it's
19  page 10.  On the document, it's page
20  10.  On the interrogatories, it's page
21  9.
22  BY MS. TSYVKIN:
23     Q.   They should all be there, sort
24  of together.  If you're in the area where
25  it is, that's where we are.
```

12  (Pages 42 to 45)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 46

```
 1              C. Frilot
 2      A.   There's one that goes through
 3  11.
 4      Q.   Yes.
 5      A.   And the second one goes
 6  through --
 7      Q.   Yes.
 8      A.   Nine.
 9      Q.   Yes.  That's correct.
10          MS. MILLER:  That's it.
11          THE WITNESS:  Okay.
12  BY MS. TSYVKIN:
13      Q.   Do you have on top of that the
14  initial disclosures, something that says
15  initial disclosures, it would be right on
16  top of that?
17          MS. MILLER:  It's the document
18      that's 11 pages, Caroline.  The
19      beginning on the very first page, it
20      should say, "UMG Recordings Inc.'s
21      Initial Disclosures Pursuant to Fed.
22      R. CIV. P.26(1)(A)."
23      A.   Yes, I have that.
24      Q.   Thanks for finding that.  So
25  we're going to look at Plaintiff's Exhibit
```

Page 47

```
 1              C. Frilot
 2  1, which is in front of you.
 3          Have you seen this document
 4  before?
 5      A.   No.
 6      Q.   Now, just to sort of inform you,
 7  these are the initial disclosures of
 8  Universal Music -- of UMG rather, as far
 9  as what we can expect from their corporate
10  witness.
11          Can you turn to page 2 of the
12  document that says, "UMG Recordings
13  Initial Disclosures."
14          And on the second page, where it
15  says B, do you see that, where it says
16  "Corporate representative"?
17      A.   Yes.
18      Q.   So can you sort of briefly look
19  at where it says:
20          "(i) UMG's exploitation of
21  products bearing the King's photographs,"
22  and in parenthesis, "UMG exploitation."
23          Do you see that?
24      A.   Yes.
25      Q.   So can you tell me whether you
```

Page 48

```
 1              C. Frilot
 2  have knowledge or you have information
 3  regarding UMG's exploitation of these
 4  three photographs that are involved in
 5  this case?
 6      A.   I had initial discussions with
 7  my attorneys.
 8      Q.   Would you be able to tell me an
 9  exhaustive list of all those
10  exploitations?
11      A.   No.
12      Q.   Can you look at the small (iv)
13  where it says:
14          "The non-infringing nature of
15  the UMG exploitation."
16          Do you see that?
17      A.   Yes.
18      Q.   Is there anything you can tell
19  me about the non-infringing nature of
20  UMG's exploitation?
21      A.   No.
22      Q.   Okay.  Let's move on to the
23  document in that packet that's just a
24  little bit behind that that says,
25  "Defendant UMG Recordings responses and
```

Page 49

```
 1              C. Frilot
 2  objections to plaintiff Glen Craig's first
 3  set of interrogatories."
 4          It would be the document that
 5  would be nine pages, if that would help
 6  you.  So this is still Plaintiff's Exhibit
 7  1.
 8      A.   Okay.
 9      Q.   Can you go to Interrogatory No.
10  6, which starts on page 7, so if you go to
11  page 7, and we go to the paragraph that
12  under Interrogatory No. 6 that says:
13          "Subject to and without waiving
14  the foregoing general and specific
15  objections, UMG states that a corporate
16  representative of UMG likely has knowledge
17  or information concerning UMG's licensing
18  of photographs for the cover of the Riley
19  B. King albums."
20          Do you see where it says that on
21  page 7 under interrogatory 6?  Take your
22  time.
23      A.   Okay.  Found it.
24      Q.   So now that you found it, can
25  you tell me anything about UMG's licensing
```

13 (Pages 46 to 49)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 50

1          C. Frilot
2   of the photographs that appeared on the
3   album covers of Riley B. King?
4      A.   No.
5      Q.   Can we go to the last page, page
6   9 of the interrogatories, it's
7   Interrogatory No. 10, and you see the
8   chart there, where it says UMG in the
9   chart, if you go right under documents and
10  evidence, it says, "Licenses for
11  photographs appearing on Riley B. King
12  album covers."
13         Do you see that?
14     A.   Yes.
15     Q.   Are you aware of any licenses
16  for album covers for Mr. King?
17     A.   No, I am not.
18     Q.   If we go to page 5 of that same
19  document under Interrogatory No. 2, and
20  you go to part B, it says:
21         "Corporate representative of UMG
22  likely has knowledge or information
23  concerning how UMG came into possession of
24  photographs."
25         Do you see that?

Page 51

1          C. Frilot
2      A.   Yes.
3      Q.   Do you have any knowledge or
4   information concerning how UMG came into
5   the possession of the photographs?
6      A.   No.
7      Q.   Let's go back to our
8   conversation about how UMG reports and
9   keeps track of profits and revenue.
10         Can you tell me how UMG keeps
11  track of revenue that he comes from
12  abroad?
13     A.   We record expenses into our
14  general ledger, as well as loading
15  activity into our royalty systems to pay
16  participants.
17     Q.   What is that ledger?
18     A.   SAP.
19     Q.   What is that exactly, can you
20  elaborate?
21     A.   It's an accounting system
22  software that's used by Universal to
23  record revenues, expenses, profits.
24     Q.   Would this ledger be easily
25  available to you when -- when someone asks

Page 52

1          C. Frilot
2   you to report on revenue coming from
3   abroad, you would just go and look it up
4   in the SAP, as you say?
5          MR. SLOTNICK:  Objection as to
6   form.
7          You can answer.
8      A.   Yes.
9      Q.   And what kind of breakdowns
10  would SAP give you?  What kind of
11  categories?
12     A.   Currently, we record revenues
13  down to the product level.
14     Q.   So someone would have to come in
15  with the name of the product, would you
16  put it in and out would come how much
17  money it's made worldwide, correct?
18     A.   Not that simple.
19     Q.   Okay.  Can you tell me how it
20  actually works?
21     A.   Revenues and royalty expenses is
22  recorded at the product level.  Recording
23  cost are not necessarily recorded at a
24  product level.  It might be at a project
25  level.  Overhead is not calculated at a

Page 53

1          C. Frilot
2   product level.  Historical information is
3   not at a product level.
4      Q.   Is that different from the
5   system that we discussed earlier today
6   when you were --
7      A.   Yes, we were talking about the
8   revenue data warehouse.  SAP is a
9   different system.
10     Q.   Is the SAP system only for
11  foreign entities that are reporting
12  earnings back to UMG?
13     A.   No.  SAP is used by many
14  territories within the U.S. within
15  Universal SAP is an accounting software,
16  so it reports accounting information, not
17  just revenues.
18     Q.   So it's a more comprehensive
19  system, you would say?
20     A.   Correct.
21     Q.   If a product is sold abroad, say
22  in Germany or Australia, for UMG, how
23  would that -- would that be reflected only
24  in the SAP system or would that also be
25  reflected in the system that we discussed

14  (Pages 50 to 53)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 54

1          C. Frilot
2 earlier in the day?
3          MR. SLOTNICK: Objection to the
4     characterization, the hypothetical,
5     and assumes facts not in evidence.
6          If you can answer it, go ahead.
7 BY MS. TSYVKIN:
8     A.   Revenues would be available in
9 our foreign sales systems, and if the
10 revenue was related to a product that was
11 already in U.S. territory, it would be
12 reported into and recorded in our general
13 ledger system as well in the U.S.
14     Q.   So is the SAP the only system
15 that records foreign territory revenue?
16     A.   No, not all territories are on
17 SAP. There are some smaller territories
18 that are on different accounting software
19 packages because SAP is cost prohibitive
20 for that particular territory.
21     Q.   Do you know if any of those
22 other territories that are not under
23 SAP --
24     A.   Not that I can recall right now.
25     Q.   So you don't know which

Page 55

1          C. Frilot
2 territories use SAP and which do not?
3     A.   Not off the top of my head.
4     Q.   Can you explain a little bit
5 about how SAP calculates profits and
6 revenue from abroad?
7     A.   SAP is a repository that record
8 -- SAP is a repository where it collects
9 information for the U.S. financial
10 information, I should say. Revenues are
11 recorded in SAP and expenses are also
12 recorded in SAP.
13     Q.   When UMG acquires a label and
14 that label has certain amount of CDs out
15 or already, has already published a CD or
16 a record or an album, what have you, and
17 then UMG acquires that label, how does the
18 accounting for the profits from before the
19 acquisition, how is that reflected to
20 after the acquisition, how does the
21 transition happen if you know?
22          MR. SLOTNICK: Objection as to
23     the compound question.
24          But if you can answer, go ahead.
25     A.   Generally opening balances are

Page 56

1          C. Frilot
2 entered into our system from the company
3 we acquired.
4     Q.   So what kind of information do
5 you usually obtain from a company when you
6 acquire it as far as profits and revenues
7 are concerned?
8     A.   Well, typically we obtain
9 balance sheet information which is not
10 necessarily revenue and profit
11 information.
12     Q.   Where is that information kept?
13     A.   The opening balances or their
14 ending balances would be loaded as opening
15 balances into our system including SAP.
16     Q.   You said including SAP, where
17 else would they be uploaded?
18     A.   Artist's balances, their ending
19 balances would be loaded into our artist
20 system, our royalty system, copyright as
21 well.
22     Q.   And by "copyright" as well, you
23 mean sort of any existing agreements or
24 contracts?
25     A.   Balances. So if an artist had

Page 57

1          C. Frilot
2 an ending unrecouped balance, that ending
3 balance, that would be our opening
4 balance.
5     Q.   In a specific area of copyright,
6 can you give an example of that, like what
7 would that be?
8     A.   So for copyright, an advance
9 could have been given to a publisher and
10 that unrecouped balance would have to be
11 our opening balance for that particular
12 song or publisher.
13     Q.   How many other offices do you
14 have around the world?
15     A.   I don't know the total number of
16 offices around the world.
17     Q.   Approximately?
18     A.   I do not know.
19     Q.   Does UMG calculate profits
20 regardless of the territories when it
21 decides whether an album is profitable or
22 not, if you know?
23     A.   It depends.
24     Q.   It depends on what?
25     A.   If the U.S. sales and expenses

15 (Pages 54 to 57)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 58

```
 1           C. Frilot
 2  are enough to make a qualified decision
 3  they don't necessarily need the foreign
 4  sales.
 5      Q.   So similar to what with you
 6  explained before, that if an artist is so
 7  big they don't need to calculate foreign
 8  sales to make a decision, they will just
 9  go with like a big star, just based on
10  domestic numbers alone, right?
11      A.   That's correct.
12      Q.   But the other offices, the other
13  offices around the world, they don't --
14  how independent are they?
15           MR. SLOTNICK:  Objection.  Calls
16  for a legal conclusion.
17           If you know, you can answer.
18      A.   They're independent in terms of
19  they can sign their own artist locally.
20      Q.   Do they report back to UMG in
21  the U.S.?
22      A.   Not for local repertoire.
23      Q.   For profits?
24      A.   Not for local repertoire.
25      Q.   But for artists that are not
```

Page 59

```
 1           C. Frilot
 2  local, the profits does get reported back
 3  to UMG, correct?
 4      A.   If it's a U.S.-owned repertoire,
 5  is gets reported to the U.S.
 6      Q.   So an accounting of profits from
 7  an artist that's U.S. based, an artist
 8  that's not a local artist to one of your
 9  global offices, but a U.S.-based artist,
10  an accounting of profits that he or she
11  generates would be reported back to UMG in
12  the U.S.?
13           MR. SLOTNICK:  Objection to the
14  characterization.
15      A.   That's correct.
16           MS. TSYVKIN:  Let's mark
17  Plaintiff's Exhibit 2.
18           (Plaintiff's Exhibit 2,
19           Document, marked for identification,
20           as of this date.)
21  BY MS. TSYVKIN:
22      Q.   Do you see it?  I'm introducing
23  Plaintiff's Exhibit 2, and what are we
24  looking at?
25      A.   There's multiple pages with
```

Page 60

```
 1           C. Frilot
 2  graphics, so which page are we looking?
 3      Q.   The first page of that exhibit.
 4  It's UMG 1781.
 5      A.   Okay.  Okay.
 6      Q.   So I think you've had a moment
 7  to just take a look at Plaintiff's Exhibit
 8  2.  Can you tell me what we're looking at?
 9      A.   This was not prepared by my
10  group.
11      Q.   Okay.  Does this look familiar?
12      A.   I glanced at it.
13      Q.   Okay.  Can you tell me anything
14  about what this document says?
15      A.   Sure.  It says label, account,
16  cost element, UPC, exploitation, product
17  type, fiscal year, 2014, 2015, 2016.
18      Q.   Thank you.
19           I meant what is this a record
20  of, in other words?
21      A.   It looks like it contains
22  multiple items on here.  It has revenues.
23  It has company income.  Manufacture
24  charges.  Purchase price.  Distribution
25  charges.
```

Page 61

```
 1           C. Frilot
 2      Q.   Who would prepare such a
 3  document, if it's not your team?  Do you
 4  know who?
 5      A.   It would be central accounting
 6  services.
 7      Q.   What would be the purpose of
 8  such a document?
 9      A.   It must have been responding to
10  a request for information.
11      Q.   So someone inquired as to
12  something, and central accounting services
13  entered that information into some system,
14  if you know, and this is what came out,
15  correct?
16      A.   It appears so.
17      Q.   You have no knowledge about the
18  creation of this document, correct?
19      A.   What do you mean by "no
20  knowledge"?
21      Q.   You don't know whether this is
22  an exhaustive list of exploitations of any
23  particular album?
24      A.   That's correct, I do not know.
25      Q.   You don't know how it was
```

16 (Pages 58 to 61)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 62

```
 1              C. Frilot
 2   created, this list?
 3       A.   No.
 4       Q.   You don't know the parameters
 5   that were given to the people searching
 6   for this stuff?
 7       A.   No.
 8       Q.   If you go to the back it's the
 9   second-to-last page, UMG 1780, where it
10   says BB manufacturing costs, is that more
11   familiar to you, this sheet, or is it --
12       A.   No.
13       Q.   So when you were saying you
14   don't really know about this document,
15   were you saying -- in total -- this sheet
16   doesn't look like the other sheets that's
17   why I'm asking if there's any kind of a
18   difference?
19       A.   That would not have been
20   prepared by my group.
21       Q.   And you presume it was prepared
22   by central accounting services?
23       A.   That's correct.
24       Q.   Pursuant to whatever categories
25   were given to them?
```

Page 63

```
 1              C. Frilot
 2       A.   That's correct.
 3       MS. TSYVKIN:  I'm going to
 4   introduce Plaintiff's Exhibit 3.  It
 5   will be the Complaint.
 6       (Plaintiff's Exhibit 3,
 7   Complaint, marked for identification,
 8   as of this date.)
 9   BY MS. TSYVKIN:
10       Q.   So Plaintiff's Exhibit 3 is
11   called the Complaint.  Have you found that
12   document?  It looks like legal -- they all
13   look like legal documents, I suppose, but
14   just something with a caption that says
15   Complaint.
16       A.   Okay.
17       Q.   If we could turn to the
18   pagination on top there, if we could turn
19   to page 3 of 15, this is Plaintiff's
20   Exhibit 3, and go to number 13.
21       A.   Okay.
22       Q.   So number 13 discusses that
23   around 2012, Universal published a 10CD
24   box set entitled Ladies and Gentlemen
25   Mr. B.B. King and released it under their
```

Page 64

```
 1              C. Frilot
 2   UMG/Amazon.com label.
 3       Do you see that?
 4       A.   Okay.  Yes.
 5       Q.   Do you have any specific
 6   knowledge or knowledge about how much
 7   money this particular release made for
 8   Universal?
 9       MR. SLOTNICK: Objection to the
10   form.
11       THE WITNESS:  Do I answer?
12       MR. SLOTNICK:  You can, yes.
13       A.   No.
14       Q.   And number 14:
15       "In or around March 15, 2005,
16   Universal published a disc entitled 'The
17   Ultimate Collection' under the Geffen
18   Records label with that particular UPC."
19       Are you able to tell me how much
20   money that album made?
21       A.   No.
22       Q.   Number 15 now, number 15:
23       "In or around October 20, 1992,
24   Universal published a 10CD Retrospective
25   Box Set entitled Ladies and Gentlemen
```

Page 65

```
 1              C. Frilot
 2   Mr. B.B. King, under its HIPO/Universal
 3   label."
 4       Are you familiar with how much
 5   money that made for Universal?
 6       A.   No.
 7       Q.   On that same date, October 20,
 8   '92, Universal published a 4CD Box Set
 9   entitled B.B. King King of the Blues under
10   it's MCA records.
11       Are you familiar with how much
12   money that album made?
13       A.   No.
14       Q.   "In or around April 06, 1992,
15   Universal published a CD entitled 'Why I
16   Sing the Blues' under its MCA special
17   products label."
18       Are you familiar with how much
19   money that release made for Universal?
20       A.   No.
21       Q.   Number 18:
22       "Around June 5 of 2007,
23   Universal published a CD entitled 'Why I
24   Sing the Blues' under its MCA special
25   products label."
```

17 (Pages 62 to 65)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 66

1          C. Frilot
2          Are you familiar with how much
3     money that made Universal?
4          A.   No.
5          Q.   Number 19:
6          "In or around March 19, 1992,
7     Universal published a first release CD of
8     an original recording entitled 'Best of
9     B.B. King and Bobby Bland,' under its
10    Geffen USA label."
11         Are you familiar with how much
12    money that made Universal?
13         A.   No.
14         Q.   Turning the page, number 20:
15         "In or around May 19, '99,
16    Universal published a disc entitled 'Live
17    in Japan B.B. King' under its MCA records
18    USA label."
19         Are you familiar with how much
20    money that made Universal?
21         A.   No.
22         Q.   "On October 9, 1992, Universal
23    published a 4CD Box Set entitled 'Ladies
24    and Gentlemen, Mr. B.B. King,' under its
25    HIPO Universal USA label."

Page 68

1          C. Frilot
2          A.   No.
3          Q.   "Around August 19, 2014,
4     Universal published a 2CD Box Set entitled
5     'King of the Blues No Frills LP,' under
6     its Universal Records U.K."
7          Are you familiar with how much
8     money that made Universal?
9          A.   No.
10         Q.   "Around September 16, 2015
11    through September 25, 2015, Universal
12    published a CD entitled 'B.B. King Live in
13    Japan Limited Edition,' under its
14    Universal records Japan label."
15         Are you familiar with how much
16    money that made Universal?
17         A.   No.
18         Q.   "Around 1992, Universal
19    published a CD entitled 'B.B. King Live in
20    Japan,' under its Universal Records Japan
21    label."
22         Are you familiar with how much
23    money that made Universal?
24         A.   No.
25         Q.   "Around 1999, Universal

Page 67

1          C. Frilot
2          Are you familiar with how much
3     money that label made Universal?
4          A.   No.
5          Q.   "In or around November 6th of
6     2015, Universal published a 2LP set
7     entitled 'Ladies and Gentlemen, Mr. B.B.
8     King,' under its Universal Music label."
9          Are you familiar with how much
10    money that made Universal?
11         A.   No.
12         Q.   "Around September 16th of 2015,
13    Universal published a limited edition 4CD
14    Box Set entitled 'Ladies and Gentlemen,
15    Mr. B.B. King,' under its Universal Japan
16    label."
17         Are you familiar with how much
18    money that made Universal?
19         A.   No.
20         Q.   "Around November 11, 2015,
21    Universal published a 2LP set entitled
22    'Ladies and Gentlemen, Mr. B.B. King,'
23    under its Universal Japan label."
24         Are you familiar with how much
25    money that made Universal?

Page 69

1          C. Frilot
2     published a CD entitled 'B.B. King Live in
3     Japan,' under its Universal Records South
4     Africa label."
5          Are you familiar with how much
6     money that made Universal?
7          A.   No.
8          Q.   "Around June 18, 2013, Universal
9     published a 2CD set entitled, 'B.B. King
10    Live in Japan,' under its Geffen label."
11         Are you familiar with how much
12    money that made Universal?
13         A.   No.
14         Q.   Around 1971, Universal published
15    a 2LP set entitled 'B.B. King Live in
16    Japan,' under its ABC Records Japan
17    label."
18         Are you familiar with how much
19    money that made Universal?
20         A.   No.
21         Q.   "Around 1992, Universal
22    published a CD entitled 'B.B. King Live in
23    Japan,' under its Universal Victor label."
24         Are you familiar with how much
25    money that made Universal?

18 (Pages 66 to 69)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 70

```
 1              C. Frilot
 2      A.   No.
 3      Q.   "Around September 25, 2015,
 4   Universal published a CD entitled 'B.B.
 5   King Live in Japan,' under its Universal
 6   Records Japan label."
 7           Are you familiar with how much
 8   money that made Universal?
 9      A.   No.
10      Q.   "In September 16, 2015,
11   Universal published online a 4CD Box Set
12   entitled 'Ladies and Gentlemen, Mr. B.B.
13   King,' under its Universal Music Japan
14   label."
15           Are you familiar with how much
16   money that made Universal?
17      A.   No.
18      Q.   "In September 24, 2012,
19   Universal published a 10CD Box Set
20   entitled 'Ladies and Gentlemen, Mr. B.B.
21   King,' under its Universal Music France
22   label."
23           Are you familiar with how much
24   money that made Universal?
25      A.   No.
```

Page 71

```
 1              C. Frilot
 2      Q.   "On September 22, 2012,
 3   Universal published a 10CD Box Set
 4   entitled 'Ladies and Gentlemen, Mr. B.B.
 5   King,' under its Universal Music Germany
 6   label."
 7           Are you familiar with how much
 8   money that made Universal?
 9      A.   No.
10      Q.   "September 24, 2012, Universal
11   published a 4CD Box Set entitled 'Ladies
12   and Gentlemen, Mr. B.B. King,' under its
13   Universal Music France label."
14           Are you familiar with how much
15   money that made Universal?
16      A.   No.
17      Q.   "Around September 21, 2012,
18   Universal published a 4 CD Box Set
19   entitled 'Ladies and Gentlemen, Mr. B.B.
20   King,' under its Universal Music Australia
21   PTY LTD label."
22           Are you familiar with how much
23   money that made Universal?
24      A.   No.
25      Q.   "Around November 6th of 2015,
```

Page 72

```
 1              C. Frilot
 2   Universal published a 2LP set entitled
 3   'Ladies and Gentlemen, Mr. B.B. King,'
 4   under its Universal Music France label."
 5           Are you familiar with how much
 6   money that release made Universal?
 7      A.   No.
 8      Q.   "Around November 6, 2015,
 9   Universal published a 2LP set entitled
10   'Ladies and Gentlemen, Mr. B.B. King,'
11   under its Geffen USA label."
12           Are you familiar with how much
13   money that made Universal?
14      A.   No.
15      Q.   "Around October 2nd of 2000,
16   Universal published a 4CD Box Set entitled
17   'B.B. King of the Blues Box Set,' under
18   its MCA Distribution France import label."
19           Are you familiar with how much
20   money that made Universal?
21      A.   No.
22      Q.   "Around October 2nd of 2009,
23   Universal published a CD entitled 'B.B.
24   King Live in Japan Digital Reissue,' under
25   its Universal Music Australia PTY LTD
```

Page 73

```
 1              C. Frilot
 2   label."
 3           Are you familiar with how much
 4   money that made Universal?
 5      A.   No.
 6      Q.   "Around June 12, 2015, Universal
 7   published a CD entitled 'B.B. King Live in
 8   Japan,' under its Universal Music France
 9   label."
10           Are you familiar with how much
11   money that made Universal?
12      A.   No.
13      Q.   "Around June 12th of 2012,
14   Universal published a CD entitled 'B.B.
15   King Live in Japan' under its Geffen
16   Records USA label."
17           Are you familiar with how much
18   money that made Universal?
19      A.   No.
20      Q.   "Around December 18, 2012,
21   Universal published a CD entitled 'B.B.
22   King Live in Japan Digital Re-Mastered,'
23   under its Universal Records Japan label."
24           Are you familiar with how much
25   money that made Universal?
```

19 (Pages 70 to 73)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 74

```
 1           C. Frilot
 2    A.   No.
 3    Q.   "Around May 5, 2012, Universal
 4  published a CD entitled 'B.B. King Live in
 5  Japan Digital-Re-Mastered,' under its
 6  Universal Records Germany label as a
 7  digital download."
 8        Are you familiar with how much
 9  money that made Universal?
10    A.   No.
11    Q.   "Around 2008, Universal
12  published a CD entitled 'B.B. King Live in
13  Japan Digital Re-Mastered,' under its
14  Universal Music Japan label."
15        Are you familiar with how much
16  money that made Universal?
17    A.   No.
18    Q.   "Around September 16, 2015,
19  Universal published a CD entitled 'B.B.
20  King Live in Japan Digital Re-Mastered,'
21  under its Universal Records Japan label."
22        Are you familiar with how much
23  money that made Universal?
24    A.   No.
25    Q.   "Around May 19 1999, Universal
```

Page 75

```
 1           C. Frilot
 2  published a CD entitled 'Live in Japan
 3  B.B. King,' under its MCA Records USA
 4  label."
 5        Are you familiar with how much
 6  money that made Universal?
 7    A.   No.
 8    Q.   "Around January 2nd of 2000,
 9  Universal published a CD entitled 'B.B.
10  King Live in Japan Re-Mastered' under its
11  MCA Records Universal Germany label."
12        Are you familiar with how much
13  money that made Universal?
14    A.   No.
15    Q.   "Around 1980, Universal
16  published a 2LP set entitled 'B.B. King
17  Live in Japan LP,' under its MCA Records
18  Japan label."
19        Are you familiar with how much
20  money that made Universal?
21    A.   No.
22    Q.   "Around June 12, 2007, Universal
23  published a CD 'Why I Sing the Blues'
24  under its Universal Music Germany label."
25        Are you familiar with how much
```

Page 76

```
 1           C. Frilot
 2  money that made Universal?
 3    A.   No.
 4    Q.   "March 18, 2013, Universal
 5  published a CD entitled 'Best of B.B. King
 6  and Bobby Bland,' under its Geffen Music
 7  Australia PTY LTD label."
 8        Are you familiar with how much
 9  money that made Universal?
10    A.   No.
11    Q.   "Around March 19th of 2013,
12  Universal published a CD entitled 'Best of
13  B.B. King and Bobby Bland,' under its
14  Geffen Music Germany label."
15        Are you familiar with how much
16  money that made Universal?
17    A.   No.
18    Q.   "Around October 9, 2009,
19  Universal published a CD entitled
20  'Live/Fillmore East New York, New York,
21  June 18, 1971, B.B. King,' under its
22  Universal Music Australia PTY LTD label."
23        Are you familiar with how much
24  money that made Universal?
25    A.   No.
```

Page 77

```
 1           C. Frilot
 2    Q.   Last, but certainly not least:
 3        "Around October 13th of 2009,
 4  Universal published a CD 'Live/Fillmore
 5  East New York, New York, June 18, 1971
 6  B.B. King' under its Universal Music
 7  Germany label."
 8        Are you familiar with how much
 9  money that made Universal?
10    A.   No.
11        MR. SLOTNICK:  I'm going to
12  object to the entire line of
13  questioning and move that it be
14  stricken on the basis that it calls
15  for speculation.
16        MS. TSYVKIN:  Is this a speaking
17  objection, counsel?
18        MR. SLOTNICK:  No.  I'm making
19  an objection.  Would you like to hear
20  the reasons, or I can just object and
21  say I'm objecting, but I thought I
22  would give you the courtesy of telling
23  you that it calls for facts not in
24  evidence, makes certain assumptions,
25  certainly as to form, speculation, and
```

20  (Pages 74 to 77)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 78

1           C. Frilot
2    a characterization of Universal and
3    the witness' familiarity of things
4    without showing her documents that
5    might actually lead to an answer.  No
6    more speaking -- no more objections on
7    this.
8           MS. TSYVKIN:  I would remind
9    counsel during the plaintiff's
10   deposition they enjoyed great leeway
11   as far as both having the absence of
12   speaking objections and great leeway
13   to elicit information that is relevant
14   for the purposes of this deposition.
15   I'm just reminding.
16          MR. SLOTNICK:  Thank you.  I
17   don't need a reminder.  Trust me, I'm
18   showing abnormal restraint in my
19   objections.  You can ask your
20   questions and she can answer the
21   questions as best she can based on the
22   questions.
23   BY MS. TSYVKIN:
24       Q.   Do you need a break?
25       A.   No.  It's fine.

Page 79

1           C. Frilot
2        Q.   I'm sorry.  You were just on
3    your phone checking something.
4        A.   Yes.
5        Q.   So you are -- you can tell me
6    something about how much money the
7    exploitation of these photographs that are
8    involved in this lawsuit made, how much
9    money UMG made, right?  You have
10   information pertaining to that, correct?
11          MR. SLOTNICK:  Objection to the
12       characterization.
13          You can answer.
14       A.   I do know how much revenues
15   were, I guess, were collected for a
16   specific time period.
17       Q.   Okay.  What is that time period?
18       A.   2014 through 2016 for the U.S.
19   sales.  That was on one of the schedules.
20       Q.   So you would not be able to tell
21   me anything about revenue prior to 2014
22   and revenue that's United States of the
23   U.S., correct?
24          MR. SLOTNICK:  Objection.  Calls
25       for a characterization.

Page 80

1           C. Frilot
2        You can answer.
3        A.   Not for prior to 2014.  And
4    there were -- I don't know if it was in
5    one of the schedules.  There was some
6    foreign revenues that were collected in
7    the U.S. that I could talk about.
8        Q.   Which four?
9        A.   Foreign.
10       Q.   In your preparation for this
11   deposition, what were you told -- not what
12   were you told, but what can you tell me as
13   far as the profits made by the relevant
14   records, meaning from 2014 to 2016 that
15   only pertain to US territories, what can
16   you tell me about those profits?
17          MR. SLOTNICK:  Objection, calls
18       for a narrative.
19          You can answer.
20       A.   We did not prepare a profit
21   analysis.
22       Q.   Have you looked at numbers
23   pertaining to this case before?
24       A.   Yes, we prepared revenues.
25       Q.   But you didn't prepare anything

Page 81

1           C. Frilot
2    outside of the U.S., correct, that wasn't
3    part of your preparation?
4          MR. SLOTNICK:  I'm going to
5       object and direct the witness not to
6       answer any question that may be the
7       result of instructions from counsel.
8       If you can answer without dealing with
9       the communication with an attorney,
10      then you can answer.  If not, then you
11      can't answer.
12       A.   We did collect information about
13   revenues pertaining to the B.B. King
14   albums outside the U.S. that was collected
15   in the U.S., the foreign revenues for the
16   albums related to this case.
17          MS. TSYVKIN:  Can you read that
18       back?
19          (Record was read back by the
20       court reporter as follows:
21          "ANSWER:  We did collect
22       information about revenues pertaining
23       to the B.B. King albums outside the
24       U.S. that was collected in the U.S.,
25       the foreign revenues for the albums

21 (Pages 78 to 81)

CONTAINS HIGHLY CONFIDENTIAL PORTIONS

Page 82

C. Frilot

1           C. Frilot
2      related to this case.")
3   BY MS. TSYVKIN:
4      Q.   Can you elaborate on that?  I'm
5   not sure I understand.  So these are
6   foreign revenues?
7      A.   Yes.  So for the albums that
8   were sold outside the U.S.
9      Q.   So you did collect information
10  about foreign revenues that was collected
11  here?
12     A.   Yes.
13     Q.   Would there be foreign revenues
14  that are not collected here that would not
15  be reflected in your analysis?
16     A.   There could be.
17     Q.   Why would they not be part of
18  the analysis that you made?
19         MR. SLOTNICK:  Again, I'm going
20     to caution the witness regarding
21     attorney-client communications.
22     A.   I don't recall seeing any
23  licensing income.  I think just collected
24  physical and digital.
25     Q.   Can you explain that a little

Page 83

1           C. Frilot
2   bit?  What do you mean by you don't
3   remember seeing any licensing income?
4   Just unpack that statement for us just so
5   I understand for myself.
6      A.   It's possible there could have
7   been special markets income related to
8   these albums -- or masters included in the
9   album.
10     Q.   What are special markets, what
11  does that mean?
12     A.   If there was a track included in
13  the album that might have been licensed to
14  another label to include on another
15  compilation.
16     Q.   So the analysis that you
17  prepared for the relevant dates and
18  territories, meaning 2014 to 2016 U.S.,
19  would not have included what you referred
20  to as special markets or something else,
21  correct?
22     A.   Yes.  It could have been a
23  commercial or a TV or film where they
24  might have licensed one of the songs off
25  of the album.

Page 84

1           C. Frilot
2      Q.   What other examples of things
3   that are not accounted in your analysis
4   would be involved?
5      A.   That's what I could recall.
6   Licensing.
7      Q.   You mentioned other things aside
8   from licensing?
9      A.   Like TV and film.  Like if there
10  was a commercial that used one of the
11  tracks off the album, those are all
12  considered licensing income.
13     Q.   Anything aside from those
14  licensing revenues that would not be
15  accounted in this analysis?
16     A.   There could be others.  I just
17  don't recall, top of my head.
18     Q.   What are you looking at right
19  now in front of you?
20     A.   It was your document UMG0001779.
21     Q.   Okay.  Were you able to sort of
22  familiarize yourself with that particular
23  exhibit?
24     A.   Well, that document, that
25  exhibit was one that was prepared by my

Page 85

1           C. Frilot
2   group.
3      Q.   Is it the one we were looking at
4   earlier?
5      A.   No.  Were you looking at 1780.
6      Q.   So can you specifically tell me
7   what page in that testimony that you are
8   looking at?
9      A.   It's the last page.
10     Q.   The very last page?  Does it say
11  1779?  This is Plaintiff's Exhibit 2?
12     A.   Yes.
13     Q.   So 1779.  So this looks familiar
14  to you?
15     A.   Yes.
16     Q.   Because I believe earlier you
17  said your group didn't compile the
18  information in this exhibit.  Do you want
19  to correct that?
20     A.   You were asking about 1780 and
21  the document right in front of it, 1781.
22     Q.   But the one that's 1779 of
23  Plaintiff's Exhibit 2 that's familiar to
24  you?  Your group compiled this one page
25  here?

22 (Pages 82 to 85)