Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
GLEN CRAIG,

                Plaintiff,

v.                                   16 civ. 5439 (JPO)

UNIVERSAL MUSIC GROUP, INC.,
KINGSID VENTURES, LTD. and
ESTATE OF RILEY B. KING,

                Defendants.
------------------------------X
```

VIDEOCONFERENCE DEPOSITION OF

LOUISE LAVERNE TONEY

New York, New York

April 6, 2017

Reported by:

Sara Freund

Job No. 18494

Page 2

                        April 6, 2017
                        1:00 p.m.










              VIDEOCONFERENCE DEPOSITION OF
    LOUISE LAVERNE TONEY, held at the offices of Loeb
    & Loeb, LLP, 345 Park Avenue, New York, New York,
    before Sara Freund, a Shorthand Reporter and a
    Notary Public of the State of New York.

Page 3

         APPEARANCES:

         LIEBOWITZ LAW FIRM, PLLC
            Attorneys for Plaintiff
            11 Sunrise Plaza - Suite 305
            Valley Stream, New York 11580
         BY: KATE TSYVKIN, ESQ.
            kt@liebowitzlawfirm.com
            RICHARD LIEBOWITZ, ESQ.
         rl@liebowitzlawfirm.com

         LOEB & LOEB, LLP
            Attorneys for Defendants
            345 Park Avenue
            New York, New York 10154
         BY: BARRY L. SLOTNICK, ESQ.
         bslotnick@loeb.com

         ALSO PRESENT:
         Glen Craig - Plaintiff

Page 4

         IT IS HEREBY STIPULATED AND AGREED by and
between counsel for the respective parties hereto,
that the filing, sealing, and certification of the
within deposition shall be and the same are hereby
waived;
         IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the times of trial;
         IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed before any
Notary Public with the same force and effect as if
signed and sworn to before this court.

Page 5

              L. L. TONEY
         L O U I S E  L A V E R N E  T O N E Y, after
having first been duly sworn by a Notary Public of
the State of New York, was examined and testified
as follows:
EXAMINATION BY
MS. TSYVKIN:
         Q.  State your name and address for the
record.
         A.  My name is Louise LaVerne Toney, and my
address is 3763 Lone Mesa Drive, Las Vegas,
Nevada 89147.
         Q.  Good morning, Ms. Toney.  My name is
Kate Tsyvkin, and I am the plaintiff's attorney.
The plaintiff in this case is Glen Craig.  I'm
going to be asking you a few questions.
         A.  Okay.
         Q.  Thank you for being here, first of all,
and making time for this.  I'm going to go over
some ground rules before we get started just so
we're clear how this thing works.  I'll take into
account some lapse of time between when I finish
speaking and you finish speaking because of the
Skype or whatever video conferencing magic is at
work here.  I'll try to finish my question, and

Page 14

L. L. TONEY

come into Mr. King and to the estate, and there are three different accounts, and depending on who the check is to, to actually deposit that in the appropriate account.

Q. So, they come in for different names. What are the names?

A. One would be King Road Shows; one would be Kingsid Ventures; one would be the Estate of Riley B. King; and the last one is the trust account. So, there are four different accounts.

Q. And can you, for me, differentiate between those four accounts, like what kind of revenue would arrive in the first one you've mentioned, the Road Shows?

A. King Road Shows would be checks that are addressed to King Road Shows, and that could be -- oh, there are so many of them -- it could be checks for 45 cents up to, say, $100, all these various different entities that do royalties. Sometimes they'll come three or four a week ranging, like I said, from 45 cents up to $100.

Q. And could you elaborate on what they're for? Because, obviously, it has the words "Road

Page 15

L. L. TONEY

Shows" in the title, so I would presume it's from touring, but since, unfortunately, Mr. King is no longer --

A. Right. But some of them are from touring. They would be even from old television programs, royalties for that, and over time those royalties decreased; like I said, one was even for 45 cents. So, they just come in to King Road Shows. That's the name that it was put under since its very inception, so they still come to King Road Shows. So, those checks are deposited into King Road Shows. Like old TV shows, like Sanford and Son, everyone knows that happened a long time ago, but the checks still come in, but they get smaller and smaller.

Q. And you've mentioned Kingsid; also, there are checks under that name?

A. Exactly.

Q. What are those for?

A. Kingsid would be royalties from the various clubs bearing Mr. King's name, and they would also come from -- well, mainly the clubs, the club in New York, the various clubs that are owned by Tommy Peters, all of those, all

Page 16

L. L. TONEY

royalties by contract. And those checks come at various times, sometimes regularly, sometimes not.

Q. You mentioned "various clubs." Where are the other clubs, if you know?

A. One club is in Memphis; one is in Nashville; another one is in Orlando, Florida. There's one in one of the Indian casinos -- it begins with an M. And also, there are royalties that come from a cruise ship line, because there are clubs on eight cruise ships at the moment, from American -- I'm having a brain fade -- it's American something Cruise Lines, there are eight clubs on those cruise ships right now; so they pay royalties, as well. And that's Kingsid.

Q. What do they pay royalties for?

A. Being able to use Mr. King's name and likeness for the clubs, and that's as per contracts.

Q. You said that's through existing contracts set up with these clubs?

A. Yes.

Q. So, the amounts don't diminish because they continue to use the likeness.

Page 17

L. L. TONEY

A. No, they don't diminish. As the clubs make money, then the estate, Kingsid, makes more money.

Q. You mentioned Tommy Peters?

A. Tommy Peters.

Q. So, Tommy Peters is the owner of the club in New York?

A. No. That's the only one he doesn't own; that's owned by the Ben Susans.

Q. And Tommy Peters owns the rest of them.

A. Yes.

Q. Moving on to the estate of Riley B. King, the checks that come in that are addressed to Riley B. King, what are they for?

A. They can be for royalties from other entities, as well, and any check that comes in with just Mr. King's name on it, I've been instructed to deposit those into the estate account.

Q. Would the royalties from Universal come in under the Estate of Riley B. King?

A. No. They would just have Mr. King's name on it, and then they would be deposited into the estate account.

```
                                                   Page 18                                                     Page 20
 1                L. L. TONEY                                    1                L. L. TONEY
 2        Q.  Any revenue from Universal coming into             2        Q.  Can you briefly discuss the trust
 3   any of these other accounts that you've                     3   account, what kind of checks arrive addressed to
 4   mentioned:  Kingsid --                                      4   the trust account?
 5        A.  No, they would not go into Kingsid.                5        A.  Not many, but I'm trying to think of
 6        Q.  Anything would go into the Road Shows              6   which ones.  I can't really think of one at the
 7   account?                                                    7   time, but there are not many checks that go into
 8        A.  No.  Not from Universal, no.                       8   the trust account; it's rare.  And if I remember
 9        Q.  And the royalties that come into the               9   correctly, for this situation, whatever I have
10   Estate of Riley B. King, are they also pursuant            10   from memory, nothing that can be looked at or
11   to contracts that exist?                                   11   anything like that, correct?
12        A.  No.  Just different royalty situations.           12        Q.  What do you mean?  I'm not sure I
13        Q.  Can you elaborate on "royalty                     13   understand.
14   situations"?                                               14        A.  Well, I have nothing in front of me, so
15        A.  Okay.  You're speaking about what would           15   every answer to the question is strictly from
16   go into Kingsid?                                           16   memory, correct?
17        Q.  No.  We were speaking about the Estate            17        Q.  Yes, I'm asking what you remember.
18   of Riley B. King.  So, the kind of royalty checks          18        A.  At the moment, nothing comes to mind,
19   that go in there, can you just elaborate whether           19   but I know that there are and there are very few.
20   they were pursuant to existing contracts or                20        Q.  So, if you had royalties for any one of
21   something else?                                            21   Mr. King's albums, they would come into the
22        A.  No.  Like, it would be royalties, but             22   Estate of Riley B. King, correct, that's the
23   royalties from past -- like Sound Exchange, Sound          23   account?
24   Exchange is a company that collects royalties for          24        A.  They would be put into that account,
25   musicians in the United States and out, and when           25   yes.  Because they state which account.  They'll

                                                   Page 19                                                     Page 21
 1                L. L. TONEY                                    1                L. L. TONEY
 2   that check comes, that's put in the estate                  2   say "in trust account" or -- because there are a
 3   because it comes in Mr. King's name.                        3   number of accounts.  It's not just one with
 4        Q.  So, there are other kinds of                       4   Universal, if that's what you mean.
 5   arrangements aside from, say, a record company              5        Q.  Well, how many are there with
 6   and Mr. King, like with Sound Exchange?                     6   Universal?
 7        A.  Yes.                                               7        A.  Oh, God, I'd say maybe five.
 8        Q.  Any other kinds of arrangements that               8        Q.  And what are they?
 9   exist that aren't included in either existing               9        A.  I'm not sure what you mean, "what are
10   contracts or some sort of an arrangement with              10   they?"
11   Sound Exchange, can you think of other examples?           11        Q.  You said there are five different
12        A.  Other examples would be Gibson Guitar,            12   accounts --
13   and that's by contract, too; they have a contract          13        A.  Right, they have account numbers;
14   with Mr. King in regards to the Lucille guitar             14   they're numbered.
15   which Mr. King used.  So, they pay a certain               15        Q.  I guess I'm trying to ask about the
16   amount per quarter to Mr. King because they still          16   organizing principle of why have five accounts
17   produce that guitar.                                       17   instead of one account with Universal?
18        Q.  Other examples, if you recall?                    18        A.  I really can't speak to that, other
19        A.  What I'm thinking of, everything else             19   than there is one that Mr. King owes money to
20   is due to contracts.  Just royalties from                  20   Universal; it's from back advances that he got
21   television programs and a book that he did, a              21   when he was producing albums and which were very
22   children's book that he did; there continues to            22   big on giving these advances, so now after he's
23   be sales, so he still gets royalties.  As I said,          23   passed away there is an account saying he owes X
24   it diminishes over time, but he still gets                 24   amount of money, and whenever money comes to that
25   royalties from that kind of thing.                         25   account they deduct it from what's owed.  So,
```

```
                                         Page 66                                              Page 68
 1             L. L. TONEY                            1             L. L. TONEY
 2      Q.  Do you ever recall hearing from           2   himself in that kind of decision-making or
 3   Plaintiff before this case started; do you ever  3   choosing a photo or not choosing a photo; that
 4   recall having any interactions with the          4   was not Mr. King's way of doing things.  So, he
 5   plaintiff?                                       5   did not know who Mr. Craig was or anything about
 6      A.  Yes.                                      6   it.  Then there was another occasion where I
 7      Q.  What do you recall?                       7   heard from people out on the road, because Mr.
 8      A.  I remember him giving me a phone call.    8   Craig showed up trying to seek access to Mr.
 9      Q.  Do you remember the approximate date of   9   King on his bus and he was denied access.
10   that phone call?                                10      Q.  Do you remember what that show was?
11      A.  I'm thinking more of the year, but he    11      A.  No, no, not at all.
12   gave me several phone calls.  So, it was before 12      Q.  Do you remember where that show was?
13   Mr. King came off the road, so it had to have   13      A.  No.
14   been in 2012, 2013.                             14      Q.  So, the first you heard from the
15      Q.  And how do you know that these are the   15   plaintiff, you say was a phone call?
16   dates that the plaintiff contacted you?  I mean,16      A.  Yes.
17   you gave me a range of two years, 2012 and 2013.17      Q.  And you picked up the phone and spoke
18   How do you know that this was approximately the 18   to him directly?
19   time?                                           19      A.  Yes.
20      A.  Well, thinking in terms of the time      20      Q.  Does the name Robert Turrell ring a
21   when Mr. King came off the road, which was in   21   bell to you?
22   October of 2014.  So, Mr. King was on the road at 22    A.  Yes.
23   that time and everything was normal.  So, I'm   23      Q.  Who is Robert Turrell?
24   thinking it had to have been in 2013, I'm       24      A.  Robert Turrell is an employee of the
25   thinking probably the latter part of 2013, to my 25  museum in Mississippi.

                                         Page 67                                              Page 69
 1             L. L. TONEY                            1             L. L. TONEY
 2   best recollection.                               2      Q.  This is the B.B. King Museum?
 3      Q.  And what was the call about, if you       3      A.  Yes.
 4   recall?                                          4      Q.  How well do you know Mr. Turrell?
 5      A.  Well, he had called me on the first       5      A.  I know him quite well; I known him for
 6   occasion, as far as I can remember, explaining to 6  several years.  And I see him every year when we
 7   me in great detail how he had contact with Sid   7   go down to the festivities on the grounds of the
 8   Seidenberg years and years ago something in      8   museum, in June.
 9   regards to a photograph, which at that time I    9      Q.  Do you recall Mr. Turrell telling you
10   didn't have any information about that, and him 10   anything about the plaintiff and trying to
11   wanting to get in contact with Mr. King.  And so,11  contact you?
12   I gave his message to Mr. King and explained to 12      A.  He may well have.  I don't recall, but
13   Mr. King what Mr. Craig had told me, and Mr. King 13  he may well have.  It wouldn't have been unusual.
14   told me he had no idea who he was and what he was 14    Q.  Do you recall calling up the plaintiff
15   talking about.  So, as far as I was concerned,  15   yourself to return a phone message or a phone
16   that was the end of it.  Then there was another 16   call that the plaintiff had left for you?
17   call when he was trying to see Mr. King again and 17     A.  I may well have.
18   he was going through the same information that he 18    Q.  Do you recall getting any e-mails from
19   had previously given me, and I had asked him why 19   the plaintiff?
20   hadn't he gone back to Mr. Seidenberg, who he had 20     A.  Yes.
21   originally spoken to, why had he waited so long. 21      Q.  Do you remember sending e-mails to the
22   And I don't recall his answer to that.  Because I 22  plaintiff?
23   told him Mr. King did not know who he was or    23      A.  No.
24   anything about the situation, because that was  24      Q.  So, communications with plaintiff on
25   not how it all worked.  Mr. King did not involve 25   your behalf, were they handled -- how many
```

18 (Pages 66 to 69)

Page 90

L. L. TONEY
Q. So, you might have seen some, but you didn't really notice them because they were like the same old, same old thing.
   MR. SLOTNICK: Objection to form. Lack of foundation. You can answer it, if you can.
A. I wouldn't say necessarily that I didn't pay attention to it. I gave it its proper attention, and then passed on the information to the attorneys and moved on to what needs to be done.
Q. I definitely understand what you're saying in regards to the letter, that's what you did with the letter.
A. Yes.
Q. But I'm asking after you turned over the letter to your attorneys, later on, if you had come across newly released or re-released album art, so cover art for any albums following that, you didn't really notice it, as you said.
   MR. SLOTNICK: Objection. Lack of foundation, assuming facts not in evidence. You can answer if you can answer.
A. If the art was new or not new, no, I

Page 91

L. L. TONEY
really didn't. It was outside of my realm. Whatever universal did, I was assured, I was thinking they had proper permission to do whatever they were doing, and I didn't see it as being a part of what's going on now, no.
Q. Do you specifically recall seeing any CD covers or any kind of cover art or any of the three photographs that are at the center of this litigation on B.B. King's albums; do you recall seeing them after getting this letter?
A. Do I recall seeing this cover art after I got -- when you say "this letter," you're still talking about the letter on the front of the packet?
Q. Correct, the September 18th, 2014.
A. Okay. I can't say whether I did or I didn't. Like I said, it was just in the normal flow of doing business, just move on. But these pictures, I've only seen copies of these pictures. I never saw any original photographs, no.
Q. I'm going to ask you about a couple of albums, maybe it will jog your memory. If it does, let me know; if it doesn't, just say you

Page 92

L. L. TONEY
don't remember.
A. Okay.
Q. Around the same time, which is September 16, 2015, Universal published a limited edition four-CD set called "Ladies and Gentlemen, Mr. B.B. King." So, this would have been a four-CD set.
A. Okay.
Q. Do you recall seeing the cover of that?
   MR. SLOTNICK: Objection as to the characterization. You can answer.
A. I remember seeing that you're speaking of.
Q. Do you recall how you got it, how you came to see it?
A. How I got it would have been through Universal, through the mail.
Q. So, this is one of those packages that they would send to you, right?
A. Yes.
Q. And then a little bit later, November 11, 2015, Universal published a two-LP set entitled "Ladies and Gentlemen, Mr. B.B. King."
A. Mm-hmm.

Page 93

L. L. TONEY
Q. I'm not sure whether this is one of the times whether it's an LP or a CD, I have it in my records as an LP, but I don't know if you have a recollection that's different. Do you recall seeing the cover for that?
   MR. SLOTNICK: Objection as to form. Assumes facts not in evidence. You can answer if you can answer.
A. I did see it.
Q. Around the same time, again, September of 2015, Universal published a CD "Live in Japan, Limited Edition." Any recollection if you saw that particular CD?
A. No.
   MR. SLOTNICK: Objection. Assumes facts not in evidence.
Q. So, you never saw that particular CD; it didn't arrive to you by mail?
A. No.
Q. Do you remember any CD that was just a single CD called, "B.B. King Live in Japan," that was released around September 25th of 2015?
   MR. SLOTNICK: Objection. Assumes facts not in evidence.