K277CRAC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    GLEN CRAIG,

 4                    Plaintiff,

 5            v.                            16 Civ. 5439 (JPO)

 6    UNIVERSAL MUSIC GROUP, INC.,
      et al.,
 7
                      Defendants.
 8
      ------------------------------x
 9                                         New York, N.Y.
                                           February 7, 2020
10                                         3:00 p.m.

11    Before:

12                         HON. J. PAUL OETKEN

13                                         District Judge

14                              APPEARANCES

15    LIEBOWITZ LAW FIRM PLLC
           Attorneys for Plaintiff
16    BY:  RICHARD LIEBOWITZ

17    LOEB & LOEB
           Attorneys for Defendants
18    BY:  BARRY SLOTNICK (via telephone)
           CHENG CHEN
19
      ALSO PRESENT:  JAMES FREEMAN
20

21

22

23

24

25
```

K277CRAC

1          (In open court)

2          (Case called)

3          MR. LIEBOWITZ:  Richard Liebowitz, Liebowitz Law Firm,

4  counsel for plaintiff Glen Craig.  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          MR. FREEMAN:  Good afternoon, your Honor.  James

7  Freeman, Leibowitz Law Firm, appearing on behalf of Leibowitz

8  Law Firm and Richard Liebowitz, but I expressly am not

9  appearing on behalf of the plaintiff.

10          THE COURT:  Good afternoon.

11          And you are Mr. Craig, right?

12          MR. CRAIG:  Correct, yes.

13          MS. CHEN:  Good afternoon, Judge Oetken.  Linna Chen

14  on behalf of defendants.  And also on the phone is Barry

15  Slotnick on behalf the defendants.

16          THE COURT:  Good afternoon.

17          Mr. Slotnick, can you hear us?

18          MR. SLOTNICK:  Yes, I can.  Thank you very much.

19          THE COURT:  OK.  I had scheduled this conference in

20  response to the letter from defense counsel dated January 20.

21          Just to set the stage a little bit, this is a

22  copyright case.  It has been around, it was filed in 2016.

23  There have been a number of motions and background which I

24  won't go into.

25          On September 30 of last year I issued a 30-day order

K277CRAC

1    dismissing the case without prejudice to reopening, having been

2    notified that the parties had reached a settlement in

3    principle.   Then I granted an extension at the end of October,

4    another extension at the end of November, then another

5    extension on January 6, extending the deadline for restoring

6    the action to January 21, and then on January 20 I received the

7    letter from counsel for Universal Music Group and defendants

8    giving background on the -- I'm not going to go into the

9    detail -- but background on whether a settlement has been

10   reached, etcetera.

11          So, I guess I will start with Ms. Chen, any background

12   you went to give me.   If you will just speak into the

13   microphone.

14          MS. CHEN:   Sure.   I won't bore your Honor or everybody

15   else with the specifics, but just the general background is

16   there was a mediation that was scheduled to be held on the 26th

17   of September.   That was a Monday.   And the Friday before that

18   Mr. Slotnick and Mr. Liebowitz were communicating and reached

19   an agreement in principle to settle this case.   Mr. Slotnick

20   then wrote to the mediator.   The mediator then informed the

21   court and canceled the mediation on that Monday.

22          Since then the defendants have drafted a version of

23   the settlement agreement incorporating all of those points in

24   full that was agreed to by Mr. Liebowitz.   We sent that to

25   Mr. Liebowitz in early October, given the Court's then pending

K277CRAC

1    deadline, and we essentially received no comments, no comments

2    at all, and it wasn't until December 30 that we got a

3    substantive response from Mr. Liebowitz which was:  We have

4    agreed to everything that is written in the settlement

5    agreement, here is the signed settlement agreement by

6    Mr. Craig, by Mr. Liebowitz, and by Mr. Liebowitz on behalf of

7    the Liebowitz law firm.  So, at that point we agreed to the

8    three week extension that Mr. Liebowitz proposed because in a

9    since it was December 30 and we needed time for the defendants

10   to execute the settlement agreement.

11           THE COURT:  So the one you got on October 30 --

12           MS. CHEN:  December 30.

13           THE COURT:  Oh, that was December 30.  The December 30

14   version, this was after the first extensions.

15           MS. CHEN:  Yes.

16           THE COURT:  And the December 30 version you received

17   you said was signed.

18           MS. CHEN:  Correct, electronically.

19           THE COURT:  So tell me how you received it.  By

20   e-mail?

21           MS. CHEN:  We received is it by e-mail from

22   Mr. Liebowitz, no comments, just said here is the signed

23   agreement.  And when we looked on the signature page it was an

24   electronic signature by Mr. Craig, electronic signatures by

25   Mr. Liebowitz.

K277CRAC

1           THE COURT:  So tell me how you received it.  Was it an

2    e-mail?

3           MS. CHEN:  It was an attachment to an e-mail; it was a

4    PDF document attached to an e-mail.

5           THE COURT:  And then there were pages at the end that

6    appeared to have electronics signatures.

7           MS. CHEN:  Correct.

8           THE COURT:  OK.  And what was next?

9           MS. CHEN:  So we had no reason at that point to doubt

10   that Mr. Craig didn't sign it, so we agreed to the extension.

11          THE COURT:  There had been no changes from the version

12   you had sent in October.

13          MS. CHEN:  Correct.  So we forwarded it to our clients

14   and said please execute as soon as quickly as you can because

15   we're only asking for a three week extension and we know

16   everybody wants to wrap this up.

17          Then I think two hours later I received a missed call

18   from Mr. Craig.  Mr. Slotnick received a missed call from

19   Mr. Craig.  And I believe Mr. Craig left Mr. Slotnick a voice

20   mail, which we transcribed for your Honor in our letter of

21   January 20.  The voice mail called into question whether

22   Mr. Craig had actually signed the agreement.  It was obtuse, so

23   we weren't sure if he had even read the agreement, if he knew

24   what it said, if he had signed it, if he didn't agree with it

25   or even knew it existed.  So that was the point at which we

K277CRAC

1   reached out to both Mr. Craig and Mr. Liebowitz, informing

2   Mr. Leibowitz that Mr. Craig had called us and left a voice

3   mail, and then informing Mr. Craig to the fact that

4   Mr. Liebowitz has sent us this signed executed settlement

5   agreement on his behalf, and to ask Mr. Craig whether

6   Mr. Liebowitz still represented him in this matter, whether he

7   had new counsel, because his voice mail was just not clear, and

8   also to reply back to us, to let us know whether he had

9   actually signed and read this settlement agreement that his

10  electronic signature appeared on.

11          So, we did not hear from Mr. Craig at all.  I think

12  one or two days later Mr. Liebowitz replied, saying that, yes,

13  I had spoken to -- in fact he had spoken to Mr. Craig, that

14  Mr. Craig did sign this agreement and let's move forward.  We

15  still hadn't heard from Mr. Craig, so at that point the

16  defendants decided that they needed assurance that Mr. Craig

17  had actually executed this settlement.

18          THE COURT:  And then on January 14 you receive an

19  e-mail from Mr. Craig --

20          MS. CHEN:  Yes.

21          THE COURT:  -- saying I would like to discuss the

22  settlement by phone; there are certain matters the settlement

23  did not address.

24          MS. CHEN:  And that don't seem to have been

25  communicated to you.  I would also like some clarity on some of

K277CRAC

1    the terms.  So, we said, sure, we would like to discuss that

2    with you to the extent you have any questions, but you are

3    represented by counsel.  So he e-mailed that to us -- I'm

4    sorry, he did copy Mr. Liebowitz, so we wrote back and said,

5    well, yes, we can have a call but Mr. Liebowitz needs to be

6    included, and we all agreed to speak at 4 p.m. on that day.

7              THE COURT:  Then you had a 40 minute call on January

8    14.

9              MS. CHEN:  Yes.

10             THE COURT:  At 4 p.m.

11             MS. CHEN:  Yes.  And on that call Mr. Craig

12   essentially gave us the background of what had happened in

13   between September 30 and that day, which was he did not have an

14   idea -- he had not seen the settlement agreement until I

15   believe he said mid-November, that he was around, that his

16   associate Ryan had only recently went to Pacer and so Mr.

17   Slotnick's letter stating that the reasons for these extension

18   requests were because Mr. Craig had been traveling, and that

19   that wasn't true, he had been around, that he had no idea why

20   he hadn't received a copy of the settlement agreement, and that

21   he had given comments to Mr. Liebowitz, that he had questions

22   that he addressed to Mr. Liebowitz that don't seem to have been

23   communicated or incorporated into the settlement agreement.

24   And we asked him if he signed the agreement, and he said no.

25   Then we said, well, what else, what do you not agree with?

K277CRAC

1    Then he said he had some questions; he had questions about a

2    couple of the terms of the settlement agreement.  He wanted to

3    make sure that the way he understood it to be written was what

4    he also intended and agreed.  And then he said he had

5    additional comments that he wanted us to address, so he said he

6    would send them to us, because they were the same comments he

7    had sent to Mr. Liebowitz and that he would just forward them

8    to us.

9          So I mean all throughout this call Mr. Liebowitz was

10   on the call, and he didn't say anything, he didn't object to

11   any of this line of discussion, he didn't object to Mr. Craig

12   offering to send us these comments and questions.  And it was

13   Mr. Slotnick who pointed out that he could and would be waiving

14   attorney client privilege if he were to send us these

15   documents, but that if he wanted to do that, we would agree

16   that that was waived as to only those documents and not the

17   subject matter as a whole.

18         Mr. Liebowitz did not say anything, did not object,

19   and Mr. Craig agreed that that was OK with him and he would do

20   so.

21         So, our next communications with him were via e-mail

22   where he -- he called again after that phone call.  He made a

23   phone call to me, and he made a phone call to Mr. Slotnick.  We

24   did not answer.  So then he e-mailed us saying he wanted to

25   speak again.  We e-mailed him back, copying Mr. Liebowitz,

K277CRAC

saying you can't communicate with us without a lawyer present,

unless he is no longer is his lawyer, or unless he gives us

permission to talk to us without his presence.

     After that he sent us these e-mails and text messages

that he had sent to Mr. Liebowitz with his comments to the

settlement agreement, and we then also received a communication

from Mr. Liebowitz later that night, asking us to refrain from

communicating with Mr. Craig even in Mr. Liebowitz's presence,

so we wouldn't be copying him on e-mails.

     So, we agreed but said, you know, Mr. Craig has

represented to us that he has additional comments, he has

questions, and he wants to incorporate additional terms, so

since you're not telling us to no longer communicate with

Mr. Craig, then you have to communicate with us as to

Mr. Craig's comments.

     We didn't hear from Mr. Liebowitz.  The next time that

we heard from Mr. Liebowitz was when Mr. Freeman sent us an

e-mail on the 17th of January purportedly on behalf of the

Liebowitz law firm and no longer on behalf of Mr. Craig,

stating essentially that the law firm's position as a party to

the settlement agreement is that this settlement has been

finalized, that Mr. Craig had actually placed his signature on

the settlement agreement, and now it is up to the defendants to

execute the settlement agreement without any further changes.

And it attached this TeleSigned document, and it also asserts

1    that Mr. Craig had placed his electronic signature on the

2    settlement agreement using this HelloSign program, and that it

3    was Mr. Craig's signature and so it is considered executed from

4    the law firm's point of view with respect to Mr. Craig.

5             Given all of the communications from the Liebowitz law

6    firm and Mr. Liebowitz, and the fact that they we cannot

7    communicate with Mr. Craig, we then wrote to the Court because

8    based on all of the information we had before us, we have no

9    way of ascertaining whether Mr. Craig had actually agreed to

10   all of the settlement agreement, the terms of the settlement

11   agreement.

12            THE COURT:  Well, I have Mr. Craig here right now.

13            MS. CHEN:  Yes.

14            THE COURT:  OK.  Well, before we decide whether we're

15   going to need an evidentiary hearing, let me hear from

16   Mr. Liebowitz or Mr. Freeman.

17            MR. FREEMAN:  Thank you, your Honor.  For the

18   Leibowitz law firm I just think there is a threshold issue here

19   regarding whether or not there is a conflict of interest in

20   terms of Mr. Liebowitz's ability to represent Mr. Craig in the

21   context of this hearing, because according to Rule 1.7 of the

22   New York Rules of Professional Conduct, a conflict of interest

23   between an attorney and his current client exists where, one,

24   the representation will involve the lawyer in representing

25   differing interests and, two, there is a significant risk that

K277CRAC

1    the lawyer's professional judgment on behalf of a client will

2    be adversely affected by a lawyer's own financial, business,

3    property or other personal interests.

4            So, with respect to the first prong, it's the

5    Liebowitz's law firm's position that Mr. Craig signed the

6    agreement and is bound -- legally bound by that agreement.

7            THE COURT:  Right.  And to assess that I have to get

8    into whether that's true or not.

9            MR. FREEMAN:  OK.  So we're saying that the conflict

10   of interest analysis will come after?

11           THE COURT:  Well, I think to assess the conflict of

12   interest, I have to assess to some extent whether there really

13   is a dispute here.

14           MR. FREEMAN:  That's true.  Because we don't really

15   know what Mr. Craig -- I mean we get the e-mails and stuff, but

16   we haven't heard him on the record say what his position is

17   about, A, signing it and, B, if he's bound by it.  So, I

18   suppose you're right, we can wait to get into the facts of if

19   there is actually a conflict.

20           THE COURT:  Correct.  But let me start by saying that

21   the position of the Liebowitz law firm and Mr. Liebowitz at

22   this point is that he signed on December 30.  You're not

23   changing that position.

24           MR. LIEBOWITZ:  Absolutely.  I mean HelloSign is a

25   program we've used for four years.  We have probably over 1,000

K277CRAC

engagement letters, declarations, verifications, settlement

agreements, all executed through HelloSign.  Mr. Craig himself

have signed seven previous settlement agreements in other

matters with the exact same procedural mechanism, HelloSign.

So I think if we're going to have a trial about whether or not

HelloSign is an appropriate vehicle to which you can affix

one's signature, I don't know that is necessary, but we would

actually be prepared to litigate that because it's essential to

our ordinary normal course of business that HelloSign be

treated as a valid signature.

        THE COURT:  Before I get into evidence, I want you to

just give me a representation about how the process worked in

terms of what was provided to him in the nature of what we

regard as the final version of the settlement agreement that

you think you signed on December 30.  How was it provided?

When?

        MR. FREEMAN:  So the actual draft of the agreement was

first sent to Mr. Liebowitz by UMG's lawyers on October 4.

That version of the agreement was not transmitted to Mr. Craig

until November 19, so roughly about six weeks later.

        So, Mr. Liebowitz e-mailed Mr. Craig the agreement --

and he hadn't made any changes, comments or red lines -- as is.

        THE COURT:  On November 19.

        MR. FREEMAN:  19th.  It was then thereafter uploaded

to the HelloSign system for the purpose of Mr. Craig signing it

K277CRAC

| | |
|---|---|
| 1 | on December 17.  And then on December 30 at 9:21 a.m. Eastern |
| 2 | Standard Time Mr. Craig executed the agreement from his unique |
| 3 | IP address, and that IP address is actually listed.  You can |
| 4 | see, your Honor. |
| 5 | THE COURT:  I see it.  Exhibit 7. |
| 6 | MR. FREEMAN:  That stuff -- if we had to get into the |
| 7 | evidence of whether he actually is in possession of that IP |
| 8 | address and whether he signed it, whether this is his e-mail |
| 9 | address, you know, we can get into that. |
| 10 | I have heard testimony from Ms. Chen that Mr. Craig |
| 11 | has claimed that he didn't sign it.  I think the question |
| 12 | whether he signed it is more of a factual issue, and the |
| 13 | question of whether or not he is bound by it is a question of |
| 14 | fact and law, which could bring up the traditional defenses |
| 15 | that one might have to the formation of a contract, like |
| 16 | duress, undue influence, coercion, mutual mistake, whatever |
| 17 | those defenses are.  It seems to me that Mr. Craig is sort of |
| 18 | limited to making those legal arguments if he does state to the |
| 19 | court that he actually signed it.  We will get into that. |
| 20 | THE COURT:  Mr. Craig, are you comfortable talking |
| 21 | about the issues that have been raised here today? |
| 22 | MR. CRAIG:  Sure. |
| 23 | THE COURT:  Would you do me a favor and pull the mic |
| 24 | over?  Is there I mic there?  At this point I'm not at the |
| 25 | point where I've decided to have an evidentiary hearing where I |

K277CRAC

1    put parties under oath and make findings of fact, because I

2    want to do an initial assessment of whether there is a

3    conflict, what is the nature of the issues I need to decide.

4    So I think what I need now is your version of what happened.

5    Did you understand that you were signing an agreement on

6    December 30?

7              MR. CRAIG:  So, let's roll the tape back if we can.

8    On or before September 14 I requested a sit-down in terms of

9    the mediator conference of the 23rd.  OK?  In that meeting I

10   brought evidence, e-mails, so forth and so on to

11   Mr. Liebowitz's office, sat down with him that afternoon,

12   outlined everything -- web, social media usage, two additional

13   T-shirts and a figure of 225 for this.

14             On Friday, September 20 -- which we found out later --

15   Mr. Liebowitz initiated a phone call to Mr. Slotnick and

16   so-called a temporary agreement was reached.

17             OK.  On Sunday night at 8:30 p.m. I received a text

18   from Mr. Liebowitz saying that the Monday meeting of the 23rd

19   was called off.  Now, I had a signed contract from a client to

20   go to Italy, it had to be cancel.

21             THE COURT:  So that was going to be the mediation with

22   the mediator that was canceled.

23             MR. CRAIG:  Exactly.

24             THE COURT:  Did he tell you why it was canceled?

25             MR. CRAIG:  No.  All I received -- and I have copies

K277CRAC

1   right here if you would like to see that -- is that the

2   settlement conference was called off, one line on the text.

3   That was it.

4           OK.  Then I'm sending e-mails back and forth to

5   Mr. Liebowitz.  I was in the country, contrary to Mr. Liebowitz

6   claiming that I was not in communication with him for close to

7   two months.  A crock of bullshit, to put it bluntly.  OK, I was

8   there.  OK?  On November 19 I received an e-mail after

9   pressuring him for weeks where is the settlement agreement from

10  UMG.  No answer.

11          THE COURT:  But at this point you understood that

12  there was an agreement in principle or not?

13          MR. CRAIG:  No.  No.

14          THE COURT:  Then why are you asking him about a

15  settlement agreement?

16          MR. CRAIG:  I'm asking him afterwards.  I said --

17  because I'm wondering what the hell is going on, you know,

18  meeting is canceled, etcetera, etcetera, what's going on with

19  UMG.  OK?  He sends me an e-mail saying I have a rough draft

20  for a settlement agreement; I'm sending it to you over -- I

21  think it was a Sunday night.

22          THE COURT:  Is this around November 19?

23          MR. CRAIG:  Yes.

24          OK.  I immediately saw it and went ballistic, because

25  nothing that we had talked about was addressed within this

K277CRAC

1    settlement.  Nothing whatsoever.  I responded to him --

2              THE COURT:  Let me just stop you there for one second.

3    Was there a monetary amount that you did agree to?  Are there

4    other things?

5              MR. CRAIG:  Yes.

6              THE COURT:  So the monetary amount was agreed at that

7    point?

8              MR. CRAIG:  No, the monetary amount was not what we

9    talked about on September 14 at his office.  No way.  Nor was

10   the other facts regarding two additional T-shirts, web use,

11   social media usage and so forth, past and present and future

12   rights to the copyrights, or left out and not addressed within

13   the agreement.  And these were things that were brought up to

14   him on various e-mails and texts back and forth.  OK?  Now, at

15   that point, as my rep Ryan got into Pacer and saw these letters

16   back and forth, one, about the out and out lie that I was

17   missing for two months out of the country or whatever -- which

18   is not true -- and he was using me as a Ponzi to blame, you

19   know, the actions and so forth of no response, etcetera,

20   etcetera.  OK?  That was the first issue.

21             THE COURT:  Hold on.  You said Ryan.  What's Ryan's

22   last name?

23             MR. CRAIG:  Ryan Septh, S-e-p-t-h.

24             THE COURT:  S-e-p-t-h?

25             MR. CRAIG:  Right.

K277CRAC

1          THE COURT:  And that's your --

2          MR. CRAIG:  That's my rep.  He contacted a firm that

3   he uses for my negotiations for contracts and that's when the

4   Christmas present started that he found in Pacer, these

5   letters, etcetera, etcetera, contrary, and that I voiced

6   otherwise now to you and on the phone call with Mr. Slotnick.

7          THE COURT:  So to be clear, when Mr. Liebowitz said in

8   September to the mediator we have a settlement in principle,

9   you're saying that's not true.

10         MR. CRAIG:  Right.

11         THE COURT:  You never essentially agreed on the basic

12  term in September?

13         MR. CRAIG:  No, no.  I never saw anything.  OK?  I

14  never knew until afterwards that there was a phone call.  It

15  was hidden from me this phone call.

16         THE COURT:  Was there an agreed-upon amount?

17         MR. CRAIG:  Yes, 225 is what I proposed to him on that

18  day September 14 at his office, with all the materials ready

19  for that Monday conference.

20         THE COURT:  So that's the number you had in mind.

21         MR. CRAIG:  Yes.

22         THE COURT:  And was the agreement later in December

23  that amount?

24         MR. CRAIG:  No, it was not.

25         THE COURT:  So go ahead to where you were.

K277CRAC

1          MR. CRAIG:  So the only travel that existed was on

2     October 13, a quick trip to a shoot for a client and I was back

3     on the 21st Sunday night.  Prior to PPE -- which is called

4     Photo Expo East -- I was in communication with him via text and

5     phone calls.  PPE ran from October 22 to 31.  We had a booth

6     one aisle away from Mr. Liebowitz's, and I saw his face every

7     day at that conference.

8          THE COURT:  And where was that?

9          MR. CRAIG:  In the Javits Center.

10          THE COURT:  Wait.  What was the October 13 to 21?

11          MR. CRAIG:  OK.  October 13 through the 21st was a

12     shoot for Peru Travel.

13          THE COURT:  Where was that?

14          MR. CRAIG:  In Peru.

15          THE COURT:  But the conference you mentioned at Javits

16     Center was when?

17          MR. CRAIG:  It started the 22nd of October through the

18     31st.

19          THE COURT:  And that was in New York.

20          MR. CRAIG:  Yes, at the Javits Center.  During this

21     time there were e-mails back and forth regarding UMG and the

22     points, etcetera, etcetera.  There are copies of these e-mails

23     here.

24          THE COURT:  And the points?

25          MR. CRAIG:  And the points missed within the

 1    agreement.  OK?

 2              THE COURT:  During that time October 22 through --

 3              MR. CRAIG:  Right, right.  Once we knew about the

 4    phone call, that's when the party started.

 5              THE COURT:  Once you knew about the phone call.  Can

 6    you explain that?

 7              MR. CRAIG:  OK.  He made a phone call on September 20

 8    secretly to Barry Slotnick, which was not discussed with me.

 9    OK?  On Sunday night the 22nd I received a text canceling the

10    settlement conference on the 23rd.  That was it.  No details,

11    nothing brought up to me regarding this Friday the 20th

12    conference or phone conference with Loeb & Loeb, etcetera,

13    etcetera.  Nothing.

14              We found out ourselves by Ryan having his firm -- or

15    the firm he uses -- go into Pacer and see the letter that

16    Mr. Liebowitz executed to the court saying a settlement had

17    been reached.  That's our notice.  In other words, we found out

18    on our own.

19              THE COURT:  And when did you find that out?

20              MR. CRAIG:  Sometime like around the conference, a

21    little bit before the conference, before my trip, you know,

22    Ryan calls me and says, hey, and he sends me a copy of it, of

23    the letter, and I said, what?

24              THE COURT:  What conflict?

25              MR. CRAIG:  Before the PPE conference in Javits

K277CRAC

center.

        THE COURT:  So that was in October.

        MR. CRAIG:  Yes.

        THE COURT:  So in October you're saying you learned about --

        MR. CRAIG:  Right.

        THE COURT:  Mr. Leibowitz had to notify the Court that there was a settlement.

        MR. CRAIG:  Exactly.

        THE COURT:  All right.  Then jumping back you also said during October that there were these e-mails about the points missed in the agreement.

        MR. CRAIG:  Correct.

        THE COURT:  What happens half that?

        MR. CRAIG:  I kept talking on it and harping on it, harping on it, and deaf ear.  When are you going to call Barry?  When are you going to bring up the T-shirts?  When are you going to do this?  When are you doing to do that?

        Deaf ear.  Obviously the phone calls or the communication was never made to UMG and to Loeb & Loeb.

        THE COURT:  All right.  And then did you get later into November or December, did you got a revised version of the draft settlement agreement?

        MR. CRAIG:  Yes, I did.

        THE COURT:  Do you remember when that was?

K277CRAC

1          MR. CRAIG:  Well, the first one I received on November

2     19.

3          THE COURT:  OK.  So then you received a draft from

4     Mr. Liebowitz?

5          MR. CRAIG:  Right.

6          THE COURT:  And did that reflect the points missed?

7          MR. CRAIG:  No.

8          THE COURT:  Did it have any changes from the --

9          MR. CRAIG:  No, no, not to include those points that

10    were --

11         THE COURT:  Well, I guess that's the first time you

12    saw a draft of the agreement?

13         MR. CRAIG:  Yes.

14         THE COURT:  And then did you talk with Mr. Liebowitz

15    or have any communication about changes you wanted in that

16    draft?

17         MR. CRAIG:  Your Honor, for the past two years there

18    has been back and forth, ask for this, ask for that, never

19    communicating, up through this year, September, on that phone

20    call with Mr. Slotnick.  None of these things were addressed;

21    they were just brushed off.

22         THE COURT:  OK.  So November 19 to December 30, can

23    you tell me what happened during that period?

24         MR. CRAIG:  OK.  During that time period back and

25    forth there were e-mails exchanged of things that were missing,

K277CRAC

1    etcetera, etcetera, and at that point we were frustrated

2    because none of these things were being addressed.  As we found

3    another document that Ryan got from the firm -- the letter that

4    was written by Mr. Slotnick to your Honor outlining certain

5    points in there of my absence -- which I went livid, berserk,

6    that I was used as a pawn.  As indicated, many, many other

7    times other people have been used as pawns by Mr. Liebowitz in

8    different other cases.

9            And we saw this letter, and we saw things that were in

10   there not to my liking, not to anybody's liking whatsoever, and

11   the point here was the out-and-out as a paid client that has

12   rights with the attorney, OK, and we felt at this point that

13   the rights of the client were violated; there was no

14   transparency as to actions.  Incidents going back many, many

15   months in other cases of sneak attacks and other situations of

16   his way of doing business, and then advising you afterwards,

17   saying after he had made in one case an agreement with a firm,

18   then came to me and sent me an e-mail and said we should have a

19   great offer here, you should take this offer, it's a great

20   deal.

21            THE COURT:  He said that to you?

22            MR. CRAIG:  Yes, in the form of an e-mail, and it's

23   right here.  And once again Ryan asked the firm, and they

24   uncovered a letter to the court that the agreement had been

25   made.

K277CRAC

1          THE COURT:  Let's get into December now.

2          MR. CRAIG:  Right.

3          THE COURT:  When did you next see after November 19 a

4   new version of the agreement?

5          MR. CRAIG:  That's basically the one that we saw.

6          THE COURT:  It's the only one you saw.

7          MR. CRAIG:  Yes.

8          THE COURT:  You never saw a different one.

9          MR. CRAIG:  Right.

10          THE COURT:  OK.  Did you ultimately decide to sign the

11   agreement in late December?

12          MR. CRAIG:  I questioned.  I questioned.  I wanted a

13   phone call.  And there is an e-mail written to Mr. Liebowitz in

14   this vein.

15          THE COURT:  My question is did you actually ultimately

16   decide to sign it?

17          MR. CRAIG:  At that point, no.

18          THE COURT:  Did you ever?

19          MR. CRAIG:  No, I did not, and I will explain to you

20   why.

21          THE COURT:  OK.

22          MR. CRAIG:  At this point I requested -- this was

23   prior to December 30.  There is an e-mail saying I want a phone

24   call with Barry, a three-way.  If you do not execute this phone

25   call for me, I will call myself to their firm.  And that's when

1    I initiated the phone call.

2            And at that point, from December 30 through probably

3    the first or second week of January, we had that contract

4    reviewed by a Fortune 500 company that specializes in

5    entertainment contracts and so forth, and they advised me of

6    certain things within that contract.

7            I addressed to Mr. Liebowitz, and Mr. Liebowitz came

8    back to me on the phone and said it's a good deal; you should

9    take it.  And he started bombarding me with e-mails and texts,

10   barraging me, pushing me, distressing me, say that I'm going to

11   withdraw as your attorney; you know, if you go, the judge is

12   going to open up the case again, and then you're going to have

13   to pay millions and millions of dollars to UMG and to

14   Mr. Liebowitz's firm for court costs, etcetera.  And there is

15   an e-mail from Mr. Liebowitz saying these things as well.

16           THE COURT:  And when was that?

17           MR. CRAIG:  This was -- the whole series, towards the

18   end of December up to Christmas and New Years and stuff, with

19   e-mails back and forth and so forth.

20           THE COURT:  Did there come a point when you said, OK,

21   I'll sign?

22           MR. CRAIG:  What happened was the night of the 30th --

23   I mean he had the balls enough on Christmas Eve to be calling

24   people, pushing, pushing, pushing, sign it, sign it, sign it,

25   don't worry, we can turn around, we can sue them afterwards for

K277CRAC

1    the T-shirts and things like that.  And there are e-mails that

2    reflect my answers back to him which said, no, you can't

3    legally.  And this was from an expert who reviewed the

4    contract.

5          Furthermore, in the way that Mr. Slotnick's firm

6    executed the agreement from the client, from UMG, it's stated

7    in there that in terms of the monetary payments and so forth he

8    had an outstanding judgment of $98,000 to the court.  OK?  And

9    the way that that contract was written and reviewed it was

10   stated that if monies in two forms were sent over, that UMG and

11   Loeb & Loeb would consider it a wash of the $98,000 if funds

12   went directly to me.

13         THE COURT:  I'm not sure I understand that part,

14   but...

15         MR. CRAIG:  Your Honor, you would have to see the

16   agreement.  You would have to interpret the agreement the

17   way --

18         THE COURT:  Anyway, I have to be clear about this.  On

19   December 30 did you sign the agreement?

20         MR. CRAIG:  At that point he forced me to sign.

21         THE COURT:  How do you mean forced you?

22         MR. CRAIG:  Threatening me with these phone calls,

23   with these texts and so forth, telling me that if I don't, the

24   case is going to be opened, I'm going to withdraw from being

25   your attorney.  He sent me an e-mail saying that the firm will

K277CRAC

1  then put a lien on any money coming in from this settlement, if

2  there was a new attorney in place, etcetera, etcetera.  These

3  were pressure tactics on his part that were used.

4         THE COURT:  So tell me the circumstances of your

5  ultimately giving in and signing.  Was it on December 30?

6         MR. CRAIG:  Yes.

7         THE COURT:  And was it the same version of that

8  November 19 agreement?

9         MR. CRAIG:  Yes.

10         THE COURT:  No different?

11         MR. CRAIG:  And we sent an e-mail -- which you have a

12  copy, or I think Barry forwarded it to you -- if not, we have

13  it here -- that we were in no accordance with that agreement

14  whatsoever and the points contained in the agreement.

15         THE COURT:  But you signed it.

16         MR. CRAIG:  Yes.

17         THE COURT:  On December 30.

18         MR. CRAIG:   Yes.

19         THE COURT:  And then you continued to try to talk to

20  the Loeb & Loeb firm.

21         MR. CRAIG:  Yes.

22         THE COURT:  Because you weren't happy with them.

23         MR. CRAIG:  Yes.

24         THE COURT:  When you signed it, didn't you understand

25  that you were signing or were executing the agreement?

1          MR. CRAIG:  Not in particular, because I was misguided

2    by Mr. Liebowitz in terms of using his pressure tactics, in

3    terms of if you don't sign it you're going to lose the money,

4    they are going to withdraw the money, they're going to take and

5    reopen the case, I'm withdrawing and you are going to have to

6    go to court.  There is an e-mail.  You are going to have to owe

7    millions to UMG and to Loeb & Loeb in terms of court costs,

8    you're going to lose, it's a good offer, take it, we can go

9    back afterwards and sue them regarding these other points,

10   T-shirts, etcetera, etcetera.

11         THE COURT:  OK.  So you did sign using the electronic

12   signature on December 30.

13         MR. CRAIG:  Yes.

14         THE COURT:  But you then communicated with Loeb & Loeb

15   that you wanted a difference.

16         MR. CRAIG:  Case in point, the final blow, on or about

17   that time I received an electronic document from the Supreme

18   Court of Oregon in a court case that Mr. Liebowitz had filed.

19   About a day later -- I have the copy here of the court --

20   paperwise they mailed it to me, wanting my presence on that

21   particular hearing's phone call, and in there he had applied

22   for representation in Oregon, and he had checked off that he

23   had no infractions, no jurisdictions, whatever you want to call

24   it, against him or his firm.  OK?  They denied him in that, in

25   what they sent me back, and they listed ten plus situations

K277CRAC

1    around the country, infractions, penalties, court things from

2    judges, etcetera, including your court here for the $98,000.

3    When we saw that, Ryan immediately called the firm and said,

4    OK, if he's not going to get on the phone with Loeb & Loeb,

5    we're going to initiate the phone call.

6            THE COURT:  You're taking when?  January or December?

7            MR. CRAIG:  Right after I would say New Year's.

8            THE COURT:  So after you signed.

9            MR. CRAIG:  Yes.

10           THE COURT:  OK.  And as of today, the agreement you

11   have now admitted that you signed, you want out of it.

12           MR. CRAIG:  Yes.  And I will explain to you why.

13           Based on the facts that we know now, and that the

14   Court is privy to seeing these e-mails and so forth, the lack

15   of transparency, the lack of trust from lawyer to client, the

16   way the settlement was executed, he answered back in an

17   e-mail -- which is here, and I think Loeb & Loeb saw it as

18   well -- and on his part he looked like he was not going to

19   honor what was composed by Loeb & Loeb in regards to the way it

20   was written regarding the $98,000 penalty against him.  That's

21   when we wrote back a letter to him via e-mail demanding that if

22   something was going to happen, that we wanted certified checks,

23   number one, from him to me, or to our firm, and more so that

24   either the court -- and I mentioned it to Barry on the phone

25   call that day -- that I was not comfortable on receiving any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    kind of financial compensation through the Liebowitz firm

2    because of the transparency and trust that was violated and so

3    forth, and we asked if we could appoint a trustee of the court

4    into an escrow account and take it from there.  And it was also

5    based on the fact that after two years, any kind of expenses

6    that were made by the firm and not authorized by me have never

7    been given receipts for me to have analyzed by anybody.

8            THE COURT:  OK, I think I am going to probably have to

9    get into the terms of the settlement, because I'm not sure what

10   this $98,000, how it fits into things.  If you all need to ask

11   for parts of the transcript be placed under seal, that's fine,

12   but maybe -- I guess maybe Ms. Chen, you can --

13           MR. CRAIG:  Can I finish something here that's

14   incredibly important?

15           THE COURT:  Yeah.

16           MR. CRAIG:  OK.  Based on this particular agreement

17   and the e-mails that we got back -- if you need copies of these

18   e-mails, we have them -- of Mr. Liebowitz's correspondence back

19   and forth to me, etcetera, etcetera, me to him, that reflect

20   some of these things going on, the main thing here was contrary

21   e-mails.  I received an e-mail from him saying Mr. Liebowitz

22   received an e-mail from the Slotnick firm.  Well, if we never

23   had received any kind of communications in regards to during

24   all this time, any kind of points that were missed and so

25   forth, why don't you address them now and put together a red

K277CRAC

1  line.  He, Mr. Liebowitz, sent me an e-mail stating those

2  things at the same time he had his assistant James send that

3  document of he signed it and you have to enforce it and so

4  forth and so on.

5       So there are two conflicting e-mails here in terms of

6  one says put together the modifications and then his assistant

7  sending an e-mail trying to enforce that contract as is.

8       And there was a deadline, I believe, of the 20th or

9  21st, Martin Luther King Day.  I sat down with my team and

10  lawyers that Ryan brought in.  We executed a red line

11  ourselves, sent a copy to Mr. Liebowitz, sent a copy to Barry

12  Slotnick.  So that's in place probably for a month if not six

13  weeks since the Sunday night of the 19th.

14       THE COURT:  So you signed a different version of the

15  agreement.

16       MR. CRAIG:  Something that I put together, including

17  these points that were missed.

18       THE COURT:  OK, got you.

19       MR. CRAIG:  And then cc'd to Mr. Liebowitz, sent over

20  to Mr. Slotnick.

21       THE COURT:  OK.

22       MR. CRAIG:  That addressed everything.  Because in the

23  letter that Mr. Slotnick put, they've asked to Mr. Liebowitz --

24  which I was cc'd on -- please put together a red line of things

25  that you would like to address, etcetera, etcetera.

K277CRAC

1          THE COURT:  And when was that that they asked that?

2          MR. CRAIG:  You could ask.

3          THE COURT:  Ms. Chen, do you know?

4          MS. CHEN:  It was in January.  It was after the

5     January 14th letter.

6          THE COURT:  OK.  So let me hear from Mr. Slotnick or

7     Ms. Chen, if there is anything you want to say in terms of the

8     relief you're seeking, about where we are with possible

9     settlement.

10          First of all, I'm curious about whether the difference

11     between the mid-January one sent by Mr. Craig and the December

12     30 one which he signed, if they are substantially different.

13          MS. CHEN:  I have not actually looked at the e-mail

14     that Mr. Craig sent because Mr. Liebowitz informed us that we

15     should not be communicating with Mr. Craig at all, or reviewing

16     anything that he sends us.

17          THE COURT:  Mr. Slotnick, were you going to say

18     something?

19          MR. SLOTNICK:  Yes, your Honor.  I hear an echo.  We

20     were not aware of the fact that there was any dispute over the

21     amount of the settlement, but our communication has always been

22     with Mr. Liebowitz and his office.  Beyond that, just as a

23     matter of clarification, if it's not already clear, part of

24     this settlement concept that was going to go to Mr. Craig was

25     going to be the 98,000 and change that Mr. Liebowitz owed to

K277CRAC

1    the defendant as part of your Honor's order a number of months

2    ago, and --

3            (Inaudible)

4            Beyond that --

5            (Inaudible)

6            I have never incurred a situation like this, and I

7    hope that I never have to again.  But we wanted to make sure

8    for the defendant's case was settled, that the parties agreed.

9    And obviously that was a concern that we had when we saw the

10   electronic signature, and then Mr. Craig's comment led us to

11   where we are now.  I have nothing else to say, your Honor.

12           MS. CHEN:  If I could just clarify what Mr. Slotnick

13   was saying.

14           THE COURT:  Sure.

15           MS. CHEN:  Just to sort of clarify.  There was a

16   $98,000 sanctions award against Mr. Liebowitz and his law firm.

17   Part of the settlement agreement was that of the settlement

18   amount it would be funded in part by Mr. Liebowitz and his law

19   firm in satisfaction of that judgment and order.  And so that

20   was in the settlement agreement in terms of the source of

21   funds, where it was going, and where it was coming from, and

22   that is the amount that Mr. Craig is referring to.

23           THE COURT:  So that was just part of this settlement

24   by all parties.

25           MS. CHEN:  Correct, correct.  And that is how and why

K277CRAC

```
 1  I think Mr. Freeman is here on behalf of the Liebowitz law
 2  firm, because they are a party to the settlement agreement as
 3  drafted.
 4          THE COURT:  Understood.
 5          Well, given what we've heard today, we have a request
 6  by the party -- not his counsel -- to not deem the December 30
 7  signed agreement enforceable.  I guess, defendants, do you have
 8  a position?  You can either move to enforce the December
 9  agreement or not.
10          The other thing I'm curious about -- which I still
11  don't understand -- I guess I know from Mr. Craig -- is this
12  mid-January version, is that a different total amount involved?
13          MR. CRAIG:  Yes.
14          THE COURT:  So it's a different agreement.
15          MR. CRAIG:  Yes.
16          THE COURT:  And so you don't know if defendants are
17  going to agree to that.
18          MS. CHEN:  Correct.
19          THE COURT:  Do you want me to enforce the December
20  30th agreement?
21          MS. CHEN:  Yes.
22          THE COURT:  Do you want me to do something else?
23          MS. CHEN:  Based on Mr. Craig's testimony this
24  afternoon, it seems clear to us that he read this agreement, he
25  understood the terms of the agreement and he placed his
```

K277CRAC

signature on it, even though he may not like the terms of the

agreement, and that it is enforceable.  That is all we wanted

out of this hearing, to determine whether he understood the

terms and placed his signature on it, and it seems that he did.

THE COURT:  OK.  Mr. Liebowitz?

MR. LIEBOWITZ:  Yes, your Honor.  Your Honor, all

along Mr. Craig knew about this settlement.  You know, even

today he said that in October he knew about the agreement.  I

called Mr. Craig in September.  The issue of going away, he did

say that he had plans to go away during the mediation and that

he wanted to get it settled.  I spoke to Mr. Craig before that;

we agreed upon a number, he agreed, and that's that.  And we

even have an e-mail on December 30 before he signed:  "Richard,

I will sign the agreement for my own peace of mind."  Which

shows that he signed it.  "I do accept your interpretation of

the settlement agreement split and all based on what this

agreement says."

And, you know, clearly Mr. Craig knew about the

agreement, he signed it.  We have a HelloSign thing showing

with his IP address, with his e-mail address and his e-mail.

And the agreement was signed by Mr. Craig, me and my law firm.

And the defendants are saying it's enforceable and that

Mr. Craig should be bound by the agreement.

THE COURT:  Well, you know, I haven't put people under

oath, and I don't know that it's necessary.  I mean given what

K277CRAC

1    Mr. Craig has represented, it sounds like he has represented

2    frustration -- perhaps understandable, who knows what the truth

3    is about the nature of your back-and-forth and your

4    communication was Mr. Liebowitz.  You have contended that he

5    pressured you, that he said this is a good deal.  You now don't

6    think it's a good deal, but at the end of the day you did sign

7    the agreement.  You had the agreement, you knew what the terms

8    were.  I don't really know that there is a basis not to enforce

9    the agreement.

10             MR. CRAIG:  OK.  Your Honor, may I say something?

11             THE COURT:  Sure.

12             MR. CRAIG:  If you intend to enforce the agreement,

13   then by this court, in that agreement the way it was executed

14   by Barry Slotnick, that it be uphold in terms of the

15   disbursement of funds and so forth.  That's an issue.  If

16   that's going to be enforced, that's an issue right there of how

17   the funds will be disbursed, to whom.

18             THE COURT:  Is it not clear in the agreement?

19             MR. LIEBOWITZ:  Yes, it is clear in the agreement.

20             MS. CHEN:  I believe the agreement provides that the

21   funds are put into the client trust account for Mr. Liebowitz.

22             THE COURT:  OK.

23             MR. CRAIG:  OK.

24             THE COURT:  When I say the agreement, I mean the one

25   that the plaintiff signed on December 30.  And you can

K277CRAC

1   represent, Ms. Chen, that the defendants are prepared to sign

2   that.

3          MS. CHEN:  Yes, yes.

4          THE COURT:  OK.

5          MR. CRAIG:  OK.  Now, the big question here is the

6   $98,000.  The way this was written, OK, and executed by Mr.

7   Slotnick, and reviewed by an independent firm and so forth,

8   everybody is on the same page as the way this was written.

9          Now, the problem here is the transparency of this firm

10  and the way they operate.  OK?  There is outstanding expenses

11  that were never shown to us, and I am not going to be surprised

12  afterwards when somebody has my money and all of a sudden they

13  start producing receipts that are two years old in this case,

14  and the most part not talked about, not authorized expenditures

15  and so forth and so on.  I'm not prepared for that type of

16  situation.

17         THE COURT:  Well, let me get a representation from

18  plaintiff's counsel -- or defense counsel -- about what the

19  agreement provides about costs and expenses.

20         MR. LIEBOWITZ:  Well, it just the total amount, and

21  then just the retainer agreement that I have with Mr. Craig is

22  between both of us, and there are expenses that happened during

23  the case.

24         THE COURT:  Do you get a third?

25         MR. LIEBOWITZ:  It's going back a while, but we had a

K277CRAC

1  retainer agreement, and the expenses come out of the settlement

2  and, You know, that's now an issue between --

3          THE COURT:  So that's a separate agreement.  That's

4  your agreement with counsel.  And, you know, whether you're

5  happy with it or not is not really my jurisdiction.

6          The jurisdiction I have is over the settlement

7  agreement as between the defendants and you.  So, I don't have

8  any control over your agreement with counsel.  That's a state

9  court matter I assume.

10          MR. CRAIG:  Well, then we intend to proceed with that

11  between the bar association and the district attorney and other

12  people.

13          THE COURT:  OK, that's up to you.

14          MR. CRAIG:  Um-hum.

15          THE COURT:  So I'm going to enforce the settlement

16  agreement signed by plaintiff on December 30, 2019.  That's the

17  agreement in the case.  Can you get defendants to sign it

18  within a couple weeks?

19          MS. CHEN:  Three weeks.

20          THE COURT:  Three weeks, all right, sounds good.

21          If there is any other relief in terms of cost or

22  anything like that, you can submit a follow-up letter.

23          But based on what I am hearing, look, I do think, you

24  know, we have something where, you know, there is suggestion of

25  untoward behavior, possible misrepresentations of opposing

K277CRAC

```
 1   counsel about the busy-ness of the plaintiff himself.  It's not
 2   exactly clear whether there was a misrepresentation to the
 3   court about whether a settlement in principle had been reached
 4   in advance of the mediation.  But I don't think it's necessary
 5   to make a finding on that right now, because we're at a point
 6   where I believe there was a settlement reached at the end of
 7   December, and I intend to enforce that settlement, and that
 8   resolves the case.
 9              MR. LIEBOWITZ:  Thank you, your Honor.
10              MS. CHEN:  Thank you.
11              THE COURT:  Anything else by anybody?
12              MR. LIEBOWITZ:  Nothing from plaintiff.
13              THE COURT:  Mr. Slotnick, anything else?
14              MR. SLOTNICK:  Thanks very much.
15              THE COURT:  I hope you're doing OK.
16              MR. SLOTNICK:  I'm doing fine.  Thanks.
17              THE COURT:  OK.  Thanks everybody.
18                            - - -
19
20
21
22
23
24
25
```